

**DEPARTMENT OF DEFENSE**
**MILITARY COMMISSIONS DEFENSE ORGANIZATION**
1620 DEFENSE PENTAGON
WASHINGTON, DC 20301-1620

May 20, 2025

Mr. Mark Langer, Clerk
United States Court of Appeals for the District of Columbia Circuit
E. Barrett Prettyman United States Courthouse
333 Constitution Avenue, NW
Washington, DC 20001

      Re: *Al Baluchi v. Austin, 23-5251*
      Letter Filed Under Fed. R. App. P. 28(j)

Dear Mr. Langer:

      Counsel for Ammar al Baluchi submits the AE 942SSSS Ruling by Military Judge Matthew McCall in *United States v. Khalid Sheikh Mohammad, et al*, as supplemental authority containing findings of fact regarding the torture of Ammar al Baluchi and its impact on his mental state.

      Following 47 pages of factual findings regarding Mr. al Baluchi's treatment at the CIA black sites (AE 942SSSS, pp. 12-60), Judge McCall found that "[t]he RDI Program psychological assessments reflect that Mr. [al Baluchi] experienced fear and anxiety throughout his time in the RDI program," and that "at one point, his weight had dropped to 117 lbs." (AE 942SSSS at 59).

      Judge McCall noted that "the record is not sufficiently developed to make a finding of fact whether Mr. [al Baluchi] suffered from PTSD or other mental impairment . . ." (AE 942SSSS at n. 276). Nevertheless, Judge McCall found that "during the time Mr. [al Baluchi] was in the RDI program, he was subjected to physical coercion and abuse amounting to torture, and to conditions which constituted cruel, inhuman, and degrading treatment." (AE 942SSSS at 60).

Judge McCall finally found that the psychological effect of Mr. al Baluchi's torture negated the voluntariness of Mr. al Baluchi's statements to the FBI at Guantanamo Bay in 2007, and accordingly suppressed the statements.

Counsel submits this ruling in further support of oral argument that Mr. al Baluchi was undeniably "wounded" by the U.S. government to the point where his mental state was severely affected. Pursuant to AR 190-8 and the authorities contained in Mr. al Baluchi's previous Letter Filed Under Fed. R. App. P. 28(j) mandating application of AR 190-8 to Guantanamo Bay detainees, Mr. al Baluchi is entitled a Mixed Medical Commission to formally evaluate the enduring effects of his state-sponsored torture, especially in light of Judge McCall's finding that the record is insufficiently developed with regard to whether Mr. al Baluchi suffers from PTSD or other mental impairment.

Sincerely,

//s// Alka Pradhan
Alka Pradhan
James G. Connell, III

Counsel for Mr. al Baluchi

CUI

**MILITARY COMMISSIONS TRIAL JUDICIARY**
**GUANTANAMO BAY, CUBA**

| | |
|---|---|
| **UNITED STATES OF AMERICA** | **AE 942SSSS** |
| **v.** | **(U) RULING** |
| **KHALID SHAIKH MOHAMMAD, WALID MUHAMMAD SALIH MUBARAK BIN 'ATTASH, ALI ABDUL AZIZ ALI, MUSTAFA AHMED ADAM AL HAWSAWI** | **(U) Mr. al Baluchi's Motion to Suppress Alleged Statements as Involuntary and Obtained by Torture** |
| | **11 April 2025** |

## I. (U) Introduction

1. (U) This Ruling is limited to Mr. Ali's (a.k.a. al Baluchi)[1] motion to suppress certain oral statements allegedly made by Mr. Ali between 17 January 2007 and 30 January 2007, which were documented on 30 January 2007 by the Federal Bureau of Investigation (FBI) in a Letterhead Memorandum (LHM).[2] Mr. Ali's alleged statements were made, and the LHM was drafted, at Naval Station Guantanamo Bay (NSGB), Cuba.[3] Facially, the motion and request for relief seem to address a fairly straightforward legal issue. However, the procedural history of the litigation of this motion is extremely complex and inextricably entwined with issues raised in

Controlled by: OMC-TJ
CUI Category: OPSEC, LEI
Limited Dissemination Control: FEDCON
POC: Mr. Jeffrey Lavender, 703-545-3359

---

[1] (U) Counsel for Mr. Ali Abdul Aziz Ali refer to him in their pleadings as Mr. Ammar al Baluchi.

[2] (U) *See* LHM *at* AE 628C (GOV), Government Response to Mr. Ali's Motion to Suppress Alleged Statements as Involuntary and Obtained by Torture, filed 29 May 2019, Attach. F, pp. 89-356. This Ruling specifically covers Mr. Ali's statements to Special Agents Fitzgerald, Perkins, and McClain on 17, 18, 19, and 30 January 2007. Those statements were recorded by the Government on 30 January 2007 in a single document referred to as a "Letterhead Memorandum." For ease of reading, this Ruling variously refers to Mr. Ali's four verbal statements and the single LHM document as "the LHM" or Mr. Ali's "LHM statements." Unless otherwise obviously referring only to the written LHM, this Ruling's use of either "LHM statement" or "statements" applies collectively to the four oral statements and the one written LHM statement.

[3] (U) *See* AE 628 (AAA), Mr. al Baluchi's Motion to Suppress Alleged Statements as Involuntary and Obtained by Torture, filed 15 May 2019 (cited information is unclassified and is contained in a document classified Top Secret).

1

both the AE 524 Series[4] and the related LHM suppression motions submitted by Mr. Ali's

Co-Accused in this joint capital commission.

2. (U) The litigation of the issues pertaining to Mr. Ali's suppression motion has taken more than

seven years and spanned the tenure of seven different military judges.[5] The record of trial

during that time amassed more than 31,000 pages of transcript and now contains 385 separate

documents consisting of 53,799 pages in AE 628 and AE 942.[6]

3. (U) Mr. Ali was detained by the Central Intelligence Agency (CIA) for more than three and a

half years prior to the recording of the statements that are the subject of this suppression motion.

As such, the litigation of the suppression motion has involved a massive amount of classified

information. For example, 129 of the 385 documents filed in the AE 628 / AE 942 series contain

information classified at either the Secret or Top Secret level. Additionally, the Prosecution has

withheld a substantial amount of classified information from the Defense (and from some of the

Prosecution's own witnesses) through the use of the summary and substitution process

authorized under the Military Commissions Act of 2009 (M.C.A.), 10 U.S.C. §§ 949p-3 and

949p-4, Rule for Military Commission (R.M.C.) 701(f), and Military Commission Rules of

Evidence (M.C.R.E.) 505(e) and (f).[7]

---

[4] (U) *See* AE 524AAAA / AE 628FFFFFFF / AE 630QQQQ / AE 631Z / AE 632YY / AE 791A Corrected Copy, Trial Conduct Order, Defense Motions to Suppress Letterhead Memoranda Statements, dated 10 October 2023; AE 524LLL Ruling, Government Motion to Reconsider and Clarify AE 524LL, Ruling, dated 3 April 2019; and AE 524LL Ruling, Mr. al Baluchi's Motion to Dismiss, or in the Alternative, to Compel the Government to Produce Witnesses for Interview; Government Notice of Proposed Protective Order, dated 17 August 2018.

[5] (U) Colonels Pohl, Parrella, Watkins, Cohen, Keane, Acosta, and the undersigned.

[6] (U) Due to the voluminous filings in the AE 628 series, on 12 April 2024, the Commission directed that all future filings in the AE 628 series be filed in the AE 942 series. *See* AE 628OOOOOOOOO / AE 942, Trial Conduct Order, Re-designation of Future Filings AE 628 Series to AE 942 Series, dated 12 April 2024.

[7] (U) Before the Prosecution may request to "delete, withhold, or otherwise obtain other relief with respect to the discovery of, or access to any classified information," the Prosecution must provide the Commission a declaration

2

4. (U) Consequently, there are numerous classified pleadings, rulings, and transcribed oral arguments which are part of the record of trial, but which cannot be discussed in detail in an unclassified ruling. Accordingly, these portions of the record will be addressed only generally in this unclassified Ruling and only to the extent necessary to provide context for this Ruling.

## II. (U) Procedural History

1. (U) **Mr. Ali's Motion to Suppress**.

a. (U) On 15 May 2019, Mr. Ali moved the Commission to suppress all statements allegedly made by Mr. Ali to government agents on or after his transfer out of the CIA Rendition, Detention and Interrogation (RDI) Program.[8] This ruling, however, addresses only the admissibility of Mr. Ali's Statements made to the Federal Bureau of Investigation (FBI) on 17, 18, 19, and 30 January 2007 (LHM statements). Mr. Ali's motion asserts that his statements should be suppressed because each of these statements:

(1) (U) was obtained by torture and cruel, inhuman, or degrading treatment in violation of 10 U.S.C. § 948r(a), M.C.R.E. 304(a)(1); and the United States Convention Against Torture and Other Cruel, Inhuman, or Degrading Treatment, Art.15.[9]

---

invoking the United States' classified information privilege and setting forth the damage to national security the discovery of, or access to, such classified information reasonably could be expected to cause. This declaration must be signed by a "knowledgeable United States official possessing authority to classify information." 10 U.S.C. § 949p-4(a)(1). The M.C.A. authorizes the Military Judge to authorize the Prosecution to: (1) "delete or withhold specified items of classified information;" (2) "substitute a summary for classified information;" or (3) "substitute a statement admitting relevant facts that the classified information or material would tend to prove." 10 U.S.C. § 949p-4(b)(1)(A-C). The M.C.A. requires the Military Judge to grant a Prosecution request to substitute a summary or a statement admitting relevant facts "if the military judge finds that the summary, statement, or other relief would provide the accused with substantially the same ability to make a defense as would discovery of or access to the specific classified information." 10 U.S.C. § 949p-4(b)(3).

[8] (U) *See* AE 628 (AAA), Mr. al Baluchi's Motion to Suppress Alleged Statements as Involuntary and Obtained by Torture, filed 15 May 2019 (cited information is unclassified and is contained in a document classified Top Secret).

[9] (U) Convention against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment, art. 15, 18 April 1988, T.I.A.S. No. 94-1120.1 (entered into force 20 November 1994).

CUI

(2) (U) was not voluntary in violation of 10 U.S.C. § 948r(c)(2)(B), M.C.R.E. 304(a)(2)(B(ii)), and the Due Process Clause; and

(3) (U) was not reliable or probative in violation of 10 U.S.C. § 948r(c)(1), M.C.R.E. 304(a)(2)(A), and the Due Process Clause.[10]

b. (U) On 29 May 2019, the Prosecution responded.[11] On 19 August 2019, Mr. Ali replied.[12]

c. (U) On 1 February 2024, Mr. Ali filed a supplement to the base motion.[13] In his supplemental pleading, Mr. Ali asserts one additional basis for suppression: that the statements should be suppressed as a sanction for alleged Government interference with defense investigation, denial of the rights to access witnesses, denial of the right to present a complete defense, interference with the right to effective assistance of counsel, unlawful influence, and under 10 U.S.C. § 949p-6(f).[14] Additionally, for these alleged violations, the supplemental pleading contains two additional requests for relief:

(1) (U) that the charges be dismissed for various reasons related to allegations of Government interference with the Defense function; and

(2) (U) that the death penalty be removed as an authorized punishment for various

---

[10] (U) U.S. CONST. amend. V.

[11] (U) *See* AE 628C (GOV), Government Response to Mr. Ali's Motion to Suppress Alleged Statements as Involuntary and Obtained by Torture, filed 29 May 2019, Attach. B and Attach. P–W (cited information is unclassified and is contained in a document classified Top Secret).

[12] (U) *See* AE 628N (AAA), Mr. al Baluchi's Reply to Government's Response to Motion to Suppress Alleged Statements as Involuntary and Obtained by Torture, dated filed 19 August 2019.

[13] (U) *See* AE 628 (AAA Sup), Supplement to Mr. al Baluchi's Motion to Suppress Alleged Statements as Involuntary and Obtained by Torture, filed 1 February 2024 (cited information is unclassified and is contained in a document classified Top Secret).

[14] (U) *See id.* at 5. (cited information is unclassified and is contained in a document classified Top Secret).

4

CUI

reasons related to allegations of Government interference with the Defense function and the alleged denial of a reliable capital sentencing procedure.

During oral argument, Counsel for Mr. Ali removed each of the three additional requests for relief pursuant to this motion.[15]

    d. (U) On 23 May 2019, Mr. Ali moved the Commission to compel 100 witnesses in support of his motion.[16] On 6 June 2019, the Prosecution responded,[17] advising the Commission that the Prosecution had agreed to produce 12 witnesses requested by Mr. Ali and proposed that the Commission defer ruling on the remaining witnesses until after the Prosecution introduced its evidence on voluntariness of Mr. Ali's LHM statements and Mr. Ali presented his case with the 12 witnesses the Prosecution agreed to produce. The Prosecution also produced a proposed stipulation of fact regarding Mr. Ali's time in the RDI program.[18] On 13 June 2019, Mr. Ali

---

[15] (U) The Defense requests for these additional remedies in AE 628 (AAA Sup) is tied to its related motions in the AE 524, AE 548, and AE 549 series of motions. However, during oral argument before the Commission, while leaving open the possibility of these additional requests for relief in AE 628 (AAA Sup) via other still outstanding motions, counsel for Mr. Ali asserted that only the following grounds were at issue for suppression of the LHM statements:

    (1) the statements were obtained by torture or cruel, inhumane, or degrading treatment in violation of 10 U.S.C. 948r(a), M.C.R.E. 304(a)(1), and Article 15 of the Convention Against Torture;

    (2) the statements were not voluntarily obtained in violation of the Fifth Amendment, 10 U.S.C. 948r(c)(2)(B), and M.C.R.E. 304(a)(2)(B)(ii); and

    (3) the statements are not reliable and lack sufficient probative value to be admitted under the Fifth Amendment, 10 U.S.C. 948r(c)(1), and M.C.R.E. 304(a)(2)(A).

(*See* Unofficial/Unauthenticated Transcript of the *United States v. Khalid Shaikh Mohammad et al.* (hereinafter "Tr."), dated 22 January 2025, at pp. 51986, 51983-94).

[16] (U) *See* AE 628B (AAA), Mr. al Baluchi's Motion to Compel Witnesses In Support of Mr. al Baluchi's Motion to Suppress, filed 23 May 2019, Attach. B (cited information is unclassified and is contained in a document classified Top Secret).

[17] (U) *See* AE 628F (GOV), Government Response to Mr. Ali's Witness List in Support of Mr. Ali's Motion to Suppress, filed 6 June 2019.

[18] (U) *See id.* at Attach. B.

CUI

CUI

replied,[19] agreeing to the Prosecution's proposed way ahead.

e. (U) On 19 July 2019, the Prosecution filed AE 628L / AE 629B / AE 630H / AE 631C / AE 632D (GOV),[20] a consolidated notice of witnesses it intended to call to establish voluntariness and reliability of each of the Accused's LHM statements made to the FBI.

f. (U) On 20 September 2019, the Prosecution filed AE 628WW / AE 629F / AE 630J / AE 631H / AE 632N (GOV), a consolidated notice of Prosecution exhibits.[21]

---

[19] (U) *See* AE 628G (AAA), Mr. al Baluchi's Reply to Government Response to Motion Compel Witnesses In Support of Mr. al Baluchi's Motion to Suppress, filed 13 June 2019.

[20] (U) *See* AE 628L / AE 629B / AE 630H / AE 631C / AE 632D, Government Consolidated Notice of Witnesses It Intends to Call Demonstrating Voluntariness and Reliability of the Accused's 2007 and 2008 Statements to Law Enforcement, filed 19 July 2019.

[21] (U) AE 628WW / AE 629F / AE 630J / AE 631H / AE 632N (GOV), Government Consolidated Notice of Exhibits, filed 20 September 2019.

CUI

CUI

g. (U) To date, the following witnesses have testified regarding the voluntariness of the

Accused's LHM statements:

(U)

| Witness | Date(s) |
|---|---|
| 1. SA James Fitzgerald, FBI | 5 and 7 December 2017; 16 – 20 September 2019; and 16 November 2023 |
| 2. Abigail Perkins, FBI (SA, FBI, Retired) | 6 – 8 December 2017; 20 September 2019; and 8 – 9 November 2023 |
| 3. SA Stephen McClain, Transnational Criminal Investigative Unit | 23 September 2019 |
| 4. Honorable Bernard E. DeLury, Jr., Judge, New Jersey Superior Court | 24 September 2019 |
| 5. D.J. Fife, Latent Print Examiner, FBI | 25 September 2019 |
| 6. Adam Drucker, FBI (SA, FBI, Retired) | 29 – 31 October 2019 |
| 7. First Camp VII Commander (hereafter "Camp VII Commander") | 1 and 4 November 2019; and 29 – 31 July 2024 |
| 8. Charles Parker, Criminal Investigative Task Force | 5 November 2019 |
| 9. Timothy Adams, Criminal Investigative Task Force | 5 November 2019 |
| 10. SA Michael S. Butsch, FBI | 6 – 8 November 2019; and 13 November 2023 |
| 11. Dr. James Mitchell | 21 – 24, 27 – 31 January 2020; and 20 – 21, 26 – 28 February 2024 |
| 12. Dr. Bruce Jessen | 31 January 2020; and 15 – 19 July 2024 |
| 13. SA Francis Pellegrino, FBI | 25 – 28 September 2023 |
| 14. Brian Antol (IA, FBI, Retired) | 2 – 5 October 2023 |
| 15. Assistant Director Jacqueline Maguire, FBI | 9 – 10 November 2023 |
| 16. Robert Antoon, Linguist, FBI | 14 – 15 November 2023 |
| 17. SA James Fitzsimmons, FBI | 14 – 16 February 2024 |
| 18. SA James Hodgson, Special Investigative Field Office | 29 February – 1 March 2024 |
| 19. Supervisory Intelligence Analyst ("IA") Kimberly Waltz, FBI | 5 – 8 March 2024; and 16 – 18, 22 – 24 April 2024 |
| 20. Evan F. Kohlmann | 29 – 30 April 2024; and 1 May 2024 |
| 21. SA Aaron Zebley, FBI | 2 – 3 May 2024 |
| 22. Dr. Charles Alexander Morgan, III | 6 – 9 May 2024 |
| 23. SA Robert McFadden, Criminal Investigative Task Force | 15 – 16 May 2024; and 7 Aug 2024 |
| 24. Dr. WK5I | 13 May 2024; 8 – 9 August 2024; and 16 – 18 September 2024 |
| 25. SA Maria Jocys, FBI | 1 – 2 Aug 2024 |
| 26. Dr. David Hanrahan | 19 – 20 September 2024 |
| 27. Dr. Thomas J. Guilmette | 23 – 24 September 2024 |
| 28. Dr. Michael Welner | 7 – 8 and 10 – 12 November 2024 |

7

2. (U) **AE 524 Series and Protective Order #4 (PO #4)**.

    a. (U) As previously noted, Mr. Ali's suppression motion regarding the voluntariness of his LHM statement is inextricably intertwined with ongoing litigation in the AE 524 series. On 10 October 2023, the Commission issued AE 524AAAA / AE 628FFFFFFF / AE 630QQQQ / AE 631Z / AE 632YY / AE 791A,[22] a Trial Conduct Order (TCO) setting forth a brief synopsis of the procedural history of the litigation in the AE 524 series regarding PO #4. The most relevant procedural history from this TCO regarding the ongoing litigation in the AE 524 series as it pertains to Mr. Ali's motion to suppress is set forth below.

    (1) (U) On 17 August 2018, this Commission issued AE 524LL,[23] wherein the then presiding Military Judge (Pohl) suppressed[24] each Accused's LHM Statements made to the FBI in 2007 and 2008, finding that:

> The extensive discovery provided by the Government regarding the RDI [Rendition, Detention, and Interrogation] program, the extensive information available about the RDI program in open sources, the Government offer to stipulate to 'verifiable facts regarding the Accused's involvement and treatment within the CIA's [Central Intelligence Agency] former RDI program'[25] and witness interviews of CIA persons who consent to a Defense interview pursuant to Protective Order #4 **will not** provide the Defense with substantially the same ability to investigate, prepare, and litigate motions to suppress the FBI Clean Team Statements.[26] Specifically, Protective Order #4 will not allow the Defense to develop the particularity and nuance necessary to present a rich and

---

[22] (U) *See* AE 524AAAA / AE 628FFFFFFF / AE 630QQQQ / AE 631Z / AE 632YY / AE 791A Corrected Copy, Trial Conduct Order, Defense Motions to Suppress Letterhead Memoranda Statements, dated 10 October 2023.

[23] (U) *See* AE 524LL Ruling, Mr. al Baluchi's Motion to Dismiss, or in the Alternative, to Compel the Government to Produce Witnesses for Interview; Government Notice of Proposed Protective Order, dated 17 August 2018.

[24] (U) *Id.* at p. 36. Other requested relief was also addressed in the ruling.

[25] (U) *Id.* at p. 35.

[26] (U) The LHM statements have also been referred to as "FBI Clean Team Statements." *See* Tr. dated 20 June 2019, at p. 23484.

vivid account of the 3-4 year period in CIA custody the Defense alleges constituted coercion.[27]

(2) (U) On 3 April 2019, in AE 524LLL,[28] the then presiding Military Judge (Parrella) granted the Prosecution's motion to reconsider and clarify AE 524LL,[29] finding Judge Pohl's ruling to be premature. Judge Parella suspended the suppression of the Accused's LHM statements as a sanction for the discovery matters raised by the Defense in the AE 524 series, and deferred ruling on other requested relief, pending further development of the record in evidentiary hearings regarding the motions to suppress the LHM statements.[30]

3. (U) **Current Posture of the Motion**.

a. (U) On 10 October 2023, the Commission issued a Trial Conduct Order, AE 524AAAA / AE 628FFFFFFF / AE 630QQQQ / AE 631Z / AE 632YY / AE 791A.[31] In addition to providing a brief history of AE 524 and PO#4, the Trial Conduct Order directed the

---

[27] (U) *See* AE 524LL Ruling, Mr. al Baluchi's Motion to Dismiss, or in the Alternative, to Compel the Government to Produce Witnesses for Interview; Government Notice of Proposed Protective Order, dated 17 August 2018 at pp. 34-35. Protective Order #4 can be found at AE 524MM, Protective Order #4, Defense Access to Current and Former CIA Employees and Contractors, dated 17 August 2018, as amended by AE 524MM *Amended* Protective Order #4, Defense Access to Current and Former CIA Employees and Contractors, dated 30 May 2019. The Commission notes that the Military Judge made a separate, contrary finding regarding mitigation evidence after considering that the LHM would be suppressed.

[28] (U) *See* AE 524LLL Ruling, Government Motion to Reconsider and Clarify AE 524LL, Ruling, dated 3 April 2019.

[29] (U) *See* AE 524NN (GOV), Government Motion to Reconsider and Clarify AE 524LL, Ruling, filed 22 August 2018.

[30] (U) AE 524AAAA / AE 628FFFFFFF / AE 630QQQQ / AE 631Z / AE 632YY / AE 791A Corrected Copy, Trial Conduct Order Defense Motions to Suppress Letterhead Memoranda Statements, dated 10 October 2023, at pp. 1-2 (citing AE 524LLL Ruling, Government Motion to Reconsider and Clarify AE 524LL, Ruling, dated 3 April 2019, at pp. 9-12).

[31] (U) *See* AE 524AAAA / AE 628FFFFFFF / AE 630QQQQ / AE 631Z / AE 632YY / AE 791A Corrected Copy, Trial Conduct Order, Defense Motions to Suppress Letterhead Memoranda Statements, dated 10 October 2023. Mr. bin al Shibh's motion to suppress his LHM statement is in the AE 629 (RBS) series. He was severed from this case on 21 September 2023. *See also* AE 906O / AE 914EE, Ruling and Order, Rule for Military Commission 909 Competency Determination and Severance, dated 21 September 2023.

9

Accused to file supplements to their LHM suppression motions addressing both voluntariness and the issues raised in AE 524LL and AE 524LLL, set forth deadlines for the Defense supplements, (to include responses and replies), and for the Prosecution to supplement its proposed stipulations of fact regarding each of the Accused's time in the RDI program and proposed findings of fact in the AE 791 series.[32]

b. (U) On 31 July 2024, Messrs. Mohammad, bin 'Attash, and Hawsawi entered into pretrial agreements (PTA) with the Convening Authority, Ms. Susan Escallier.[33] A term of each PTA requires the Accused to withdraw their suppression motions. On 7 August 2024, the Commission advised the parties that it would proceed with litigation of Mr. Ali's LHM

---

[32] (U) The deadlines set forth have been extended in subsequent orders and are not relevant to the outcome of this motion. *See* AE 524FFFF / AE 630JJJJJ / AE 631UUU / AE 632AAAA / AE 791E / AE 942VVV, Fourth Trial Conduct Order, Defense Motions to Suppress Letterhead Memoranda (LHM) Statements, dated 8 October 2024; AE 524EEEE / AE 630HHHHH / AE 631RRR / AE 632ZZZ / AE 791D / AE 942II, Third Trial Conduct Order, Defense Motions to Suppress Letterhead Memoranda (LHM) Statements, dated 23 May 2024; AE 524DDDD / AE 628HHHHHHHHH / AE 630YYYY / AE 631VV / AE 632LLL / AE 791C, Second Trial Conduct Order, Defense Motions to Suppress Letterhead Memoranda (LHM) Statements, dated 26 March 2024; AE 524-47 (RUL)(GOV) / AE 628-16 (RUL)(GOV) / AE 630-14 (RUL)(GOV) / AE 631-2 (RUL)(GOV) / AE 632-10 (RUL)(GOV) / AE 791-2 (RUL)(GOV), Ruling, Government Motion for Extension of Time to Comply with Trial Conduct Order, Defense Motions to Suppress Letterhead Memoranda (LHM) Statements, Paragraphs 3.a.-b., dated 15 November 2023; AE 524AAAA / AE 628FFFFFFF / AE 630QQQQ / AE 631Z / AE 632YY / AE 791A, Corrected Copy Trial Conduct Order, Defense Motions to Suppress Letterhead Memoranda (LHM) Statements, dated 10 October 2023.

[33] (U) On 2 August 2024, the Secretary of Defense (SECDEF) attempted to withhold Ms. Escallier's authority to enter into PTAs with the four accused in this case and Mr. bin al Shibh and to withdraw from the three PTAs entered into on 31 July 2024. The Commission ruled the SECDEF exceeded his authority, the three PTAs remained valid, and the Commission would schedule the entry of pleas. *See* AE 955J/ AE 956J/ AE 957I, Ruling, Defense Motions to Schedule Entry of Pleas, dated 6 November 2024. The Prosecution appealed this ruling. *See* AE 955N (GOV) / AE 956N (GOV) / AE 957M (GOV), Government Notice of Filing of Petition for a Writ of Mandamus and Prohibition with the U.S. Court of Military Commission Review, filed 26 November 2024; *see also* AE 955V (GOV) / AE 956T (GOV) / AE 957R (GOV), Government Notice Regarding *In re United States*, No. 25-1009 (D.C. Cir.), filed 7 January 2025. On 9 January 2025 and on 7 February 2025, the D.C. Circuit stayed litigation on the three PTAs. *See* AE 955Z (GOV) / AE 956W (GOV) / AE 957V (GOV), Government Notice Regarding *In re United States*, No. 25-1009 (D.C. Cir.), filed 9 January 2025; *and* AE 955KK (GOV) / AE 956GG (GOV) / AE 957EE (GOV), Government Notice Regarding *In re United States*, No. 25-1009 (D.C. Cir.), filed 10 February 2025. The stay does not impact Mr. Ali's case or litigation of this motion to suppress.

10

suppression motion pending resolution of the litigation regarding the validity of the PTAs.[34] At

the time of this Ruling, the litigation over the validity of those PTAs remains ongoing in our

superior courts.

c. (U) On 4 October 2024, Mr. Ali filed AE 942TTT (AAA),[35] his second supplement to

the original base motion to suppress his LHM statements. This motion reaffirmed the collective

requests for relief which were previously included in AE 628 (AAA) and AE 628 (AAA Sup).

d. (U) On 2 December 2024, the Prosecution filed AE 942YYY (GOV)[36] in response.

e. (U) On 19 December 2024, Mr. Ali filed AE 942ZZZ (AAA)[37] in reply.

f. (U) The Commission heard oral argument on Mr. Ali's motion to suppress his LHM

statements on 21-23 January 2025.[38]

g. (U) On 21 February 2025, the Prosecution filed AE 942YYY (GOV Sup).[39] Mr. Ali

did not file a response to the Government's Supplement.

---

[34] (U) *See also* AE 524FFFF / AE 630JJJJJ / AE 631UUU / AE 632AAAA / AE 791E / AE 942VVV, Fourth Trial Conduct Order, Defense Motions to Suppress Letterhead Memoranda (LHM) Statements, dated 8 October 2024, at para 3.a (suspending deadlines for Messrs. Mohammad, bin 'Attash, and Hawsawi).

[35] (U) *See* AE 942TTT (AAA), Unclassified Notice, Mr. al Baluchi's Second Supplement to AE 628 (AAA) Mr. al Baluchi's Motion to Suppress Alleged Statements as Involuntary and Obtained by Torture, filed 4 October 2024.

[36] (U) *See* AE 942YYY (GOV), Government Response to AE 628 (AAA Sup) and AE 942TTT (AAA), Mr. Ali's Supplements to AE 628 (AAA), Motion to Suppress Alleged Statements as Involuntary and Obtained by Torture, filed 2 December 2024.

[37] (U) *See* AE 942ZZZ (AAA), Unclassified Notice, Mr. al Baluchi's Reply to Government Response to AE 628 (AAA Sup) and AE 942TTT (AAA), Supplements to AE 628 (AAA), filed 19 December 2024.

[38] (U) Tr. dated 21-23 January 2025, at pp. 51703-52166.

[39] (U) *See* AE 942YYY (GOV Sup), Government Supplement to AE 942YYY (GOV), Government Response to AE 628 (AAA Sup) and AE 942TTT (AAA), Mr. Ali's Supplements to AE 628 (AAA), Motion to Suppress Alleged Statements as Involuntary and Obtained by Torture *And* Government Notice In Response to Questions from the Military Judge, filed 21 February 2025.

11

4. (U) **Burden of Proof on the Motion**. When an appropriate motion or objection has been made by the defense under M.C.R.E. 304, the prosecution has the burden of establishing the admissibility of the evidence by a preponderance of the evidence.[40]

### III. (U) Findings of Fact

1. (U) **Establishment of the RDI Program**.

a. (U) On 17 September 2001, in the wake of the 11 September 2001 terrorist attacks on the United States, President George W. Bush signed a covert action Memorandum of Notification (MON) to authorize the Director of Central Intelligence to "undertake operations designed to capture and detain persons who pose a continuing, serious threat of violence or death to U.S. persons and interests or who are planning terrorist activities."[41] When the MON was signed, the CIA had in place long-standing formal standards for conducting interrogations.[42] In response to the new environment, the CIA began to develop its own detention and interrogation capabilities, resulting in the CIA building and/or operating a number of overseas detention facilities.[43] This operation eventually became what is known as the Rendition, Detention, and Interrogation (RDI) program.[44]

b. (U) As part of the RDI program, the CIA developed a list of "Enhanced Interrogation

---

[40] (U) M.C.R.E. 304(d).

[41] (U) *See* S. Rep. No. 113-288, dated 9 December 2014, *Report of the Senate Select Committee on Intelligence Committee Study of the Central Intelligence Agency's Detention and Interrogation Program*, Executive Summary ("SSCI Executive Summary"), at p. 11 [quoting the Presidential *Memorandum of Notification, for Members for the National Security Council, re. DTS #2002-0371*, dated 17 September 2001 ("MON")]. The SSCI Executive Summary is also in the record of this proceeding at AE 286 (AAA 2nd Sup) Corrected Copy, Defense Supplement to Motion to Compel Discovery of Senate Select Committee on Intelligence Study of RDI Program and Related Documents, filed 3 February 2015, Attach. D at pp. 42-540.

[42] (U) SSCI Executive Summary at p. 17.

[43] (U) AE 628GGGGG (AAA), Defense Notice of Exhibits, filed 13 December 2019, Attach. B at p. 217.

[44] (U) *Id.* at Attach. B at p. 215.

12

CUI

Techniques" (EITs) to be used in addition to the Standard Interrogation Techniques (SITs).[45] Dr. James Mitchell, a contract psychologist who worked for the CIA, proposed that the EITs be based on techniques used in U.S. military SERE[46] training.[47] SERE training was designed to help prepare U.S. military personnel for the types of coercive interrogation techniques that have been employed in the past by U.S. adversaries to exploit captured U.S. military members.[48] The EITs proposed by Dr. Mitchell were more coercive than the techniques that had been previously used by the CIA,[49] and were designed to overcome resistance techniques that were believed to be known by RDI program detainees.[50]

c. (U) Dr. Mitchell proposed to the CIA a list of twelve SERE techniques: (1) the attention grasp, (2) walling, (3) facial hold, (4) facial slap, (5) cramped confinement, (6) wall standing, (7) stress positions, (8) sleep deprivation, (9) waterboard, (10) use of diapers, (11) use of insects, and (12) mock burial.[51] The CIA considered the proposal and eventually approved use of certain EITs.[52] The CIA hired Dr. Mitchell and another contract psychologist, Dr. Bruce

---

[45] (U) SITs included, but were not limited to, the use of isolation, sleep deprivation for limited periods, reduced caloric intake, deprivation of reading material, use of loud music or white noise, and the use of diapers for limited periods. *See* AE 628FFFFFFFF (AAA), Defense Notice of Exhibits, filed 21 February 2024, Attach. F at pp. 232-236, citing to MEA-13E-00000546-549.

[46] (U) Tr. dated 31 January 2020, at p. 32307 ("[T]he acronym SERE stands for survive, evade, resist, and escape[.]")

[47] (U) AE 628GGGGG (AAA), Defense Notice of Exhibits, filed 13 December 2019, Attach. B at p. 599; *see also* Tr. dated 27 January 2020, at pp. 31163; and Tr. dated 7 May 2024, at p. 46726.

[48] (U) Tr. dated 31 Jan 2020, at pp. 32312-32316 and 32326.

[49] (U) AE 628GGGGG (AAA), Defense Notice of Exhibits, filed13 December 2019, Attach. B at p. 600.

[50] (U) Tr. dated 7 May 2024, at p. 46721.

[51] (U) SSCI Executive Summary at p. 32.

[52] (U) Tr. dated 21 February 2024, at pp. 41798-41799. For a description of how each EIT was supposed to be conducted, *see* AE 628FFFFFFFF (AAA), Defense Notice of Exhibits, filed 21 February 2024, Attach. F at 75-80.

13

Jessen,[53] to help develop an interrogation program for use on high-value detainees (HVDs) in CIA custody. Drs. Mitchell and Jessen had both worked with the Air Force SERE school and were well-versed in SERE techniques, although neither were experienced as real-world interrogators.[54]

    d. (U) The RDI program was designed to obtain threat and actionable intelligence from detainees.[55] This objective was accomplished by creating in the detainees an "exploitable mental state"[56] which made them willing to answer questions. The program employed a "conditioning strategy" over the course of two primary phases: Interrogation and Debriefing.[57]

    e. (U) During the "interrogation" phase, coercive pressure in the form of SITs and EITs would be used to undermine the detainee's sense of personal efficacy to continue to resist and to induce a temporary state of helplessness.[58] The interrogation phase used classical conditioning[59] to induce the detainee to associate "a signal in their environment with the occurrence of an

---

[53] (U) Tr. dated 27 January 2020, at p. 31188 (Dr. Mitchell describes himself and "Bruce" Jessen as being employed by the CIA as interrogators); *also* Dr. Mitchell is referred to as Interrogator 1 or Grayson Swigert, and Dr. Jessen is referred to as Interrogator 2 or Hammond Dunbar, in some documents, *see* Tr. at 31162 (Dr. Mitchell is "Grayson Swigert," and Dr. Jessen is "Hammond Dunbar").

[54] (U) Tr. dated 31 January 2020, at pp. 32381-32385. *See also* SSCI Executive Summary at p. 32.

[55] (U) AE 628GGGGG (AAA), Defense Notice of Exhibits, filed 13 December 2019, Attach. B at p. 217.

[56] (U) Tr. dated 20 February 2024, at pp. 41475-41476.

[57] (U) Tr. dated 22 January 2020, at p. 30410; and AE 942YYY (GOV), Government Response to AE 628 (AAA Sup) and AE 942TTT (AAA), Mr. Ali's Supplements to AE 628 (AAA), Motion to Suppress Alleged Statements and Involuntary and Obtained by Torture, filed 2 December 2024, at p. 29.

[58] (U) AE 632W (MAH), Defense Notice of Exhibits, filed 23 January 2020, Attach. O at pp. 2244-2254, citing MEA-2C-00001046, *Using Coercive Pressure of (sic) in Interrogation of High Value Targets*.

[59] (U) Dr. Mitchell defined classical conditioning in his book, Enhanced Interrogation: Inside the Minds and Motives of Islamic Terrorists Trying to Destroy America (2016), *see* AE 632W (MAH), Defense Notice of Exhibits, filed 23 January 2020, Attach. H. at p. 2008.

14

adverse event."[60] The EITs were the unconditioned stimulus, and the fear the EITs created in the detainee was the unconditioned response.[61] By pairing the EITs with specific cues, the detainee would start to associate the EITs with the cues.[62] The cues could then cause distress to the detainee similar to the distress from the EITs.[63] The program used classical conditioning to raise the detainee's distress and then used operant conditioning,[64] when the detainee answered questions, to reduce and relieve that distress.[65] In this way, the detainee would experience a sense of relief and a sense of safety by answering questions.[66]

 f. (U) The eventual goal was detainee cooperation, elaboration, and spontaneity.[67] Dr. Mitchell considered detainees to be somewhere on a continuum of resistance.[68] This continuum went from outright refusal to answer a question, to a defensive response to a question, to minimally answering a question, to adding some additional details, to spontaneously answering a question.[69] Spontaneity meant that when asked a question, the detainee would

---

[60] (U) AE 942YYY (GOV), Government Response to AE 628 (AAA Sup) and AE 942TTT (AAA), Mr. Ali's Supplements to AE 628 (AAA) Motion to Suppress Alleged Statements as Involuntary and Obtained by Torture, filed 2 December 2024, at p. 29; *see also* Tr. dated 23 January 2020, at pp. 30747-30749.

[61] (U) *Id.* at p. 30; *see also* Tr. dated 21 February 2024, at p. 41899.

[62] (U) *Id.* at p. 30; *see also* Tr. dated 21 February 2024, at p. 41898.

[63] (U) Tr. dated 21 February 2024, at p. 41900.

[64] (U) Dr. Mitchell described operant conditioning as a kind of learning that is driven by rewards and punishments in the environment. *See* Tr. dated 20 February 2024, at p. 41477; *see also* Tr. dated 26 February 2024, at pp. 41990-41992.

[65] (U) Tr. dated 23 January 2020, at pp. 30749, 30865-30866.

[66] (U) Tr. dated 23 January 2020, at p. 30749.

[67] (U) Tr. dated 23 January 2020, at pp. 30704-30705. In *Principles of Influence: Applications for Interrogation*, Drs. Mitchell and Jessen wrote that, "[t]he desired end state for interrogation is a subject with a consistently exploitable state of mind manifest by active to *complete compliance* in answering intelligence questions." AE 628FFFFFFFFF (AAA), Defense Notice of Exhibits, filed 21 February 2024, Attach. D at p. 37, citing to MEA-2C-00001198 (emphasis added).

[68] (U) Tr. dated 23 January 2020, at p. 30705.

[69] (U) Tr. dated 23 January 2020, at p. 30706.

answer the question as fully and completely as possible, even spontaneously volunteering additional information.[70] Questioners would sometimes give a detainee a "bridging question" that would inform the detainee of future areas of questioning so they could think about the topic in their cell and be ready to expound on the topic at the next questioning.[71]

g. (U) Once a detainee was providing enough useful information to be considered compliant and cooperative, he would be transitioned into the "debriefing" phase.[72] This phase would involve more operant conditioning by improving the detainees' environment, for example, giving them better clothes, better food, and opportunities to sleep, to read, and to sit down, to ensure the detainee continued to cooperate.[73] Detainees were trained that the more freely and completely they complied with questioning, the better their situation would become. They were also regularly reminded that a lack of compliance could lead to a worse environment.[74]

h. (U) Once in a debriefing status, the interviewers would make accommodations with detainees such as trying to avoid prayer time and sometimes even allowing detainees to temporarily decline a debriefing if they were sick or in some kind of distress.[75] Despite these accommodations, detainees were still expected to fully comply with any and all questioning.

i. (U) A concept that is mentioned continually in reporting from the RDI program is

---

[70] (U) Tr. dated 23 January 2020, at p. 30713.

[71] (U) Tr. dated 23 January 2020, at p. 30742.

[72] (U) AE 628FFFFFFFF (AAA), Defense Notice of Exhibits, filed 21 February 2024, Attach. F at p. 134, citing to MEA-STA-00007237.

[73] (U) Tr. dated 23 January 2020, at pp. 30750-30751.

[74] (U) Tr. dated 23 January 2020, at p. 30716; Tr. dated 20 Feb 2024, at p. 41681 (Dr. Mitchell was asked whether, when in debriefing mode, "the detainee's calculation is one of, for instance, keeping his Quran and the other amenities?" Dr. Mitchell responded: "Yeah. Well, that could be it. I mean, it's operant conditioning. [. . .] [W]e do know that people will work harder to keep what they've got than they will to gain new stuff[.] [. . .] And so that's – that's what it was.")

[75] (U) Tr. dated 23 January 2020, at p. 30789.

"learned helplessness." Learned helplessness is a concept developed originally by Dr. Martin Seligman in an experiment where he placed a dog in a cage and electrified the floor.[76] The dog would initially attempt to escape, but if there were no way to escape, the dog would just lay down and accept the shocks. Both Dr. Mitchell and Dr. Jessen explained that they did not want to develop Dr. Seligman's version of "learned helplessness" in the detainees because it would mean that they stopped responding.[77] Drs. Mitchell and Jessen wanted the detainees to have a means of escape—cooperation with questioning. In this way, the detainees would not become non-responsive, rather, they would continue to use the techniques they had been taught—that cooperation meant the end of the torture and improvement of their conditions. Unfortunately, many of the CIA officials involved in the RDI did not seem to understand this concept.[78] Thus, when reports mention that a detainee has developed "learned helplessness," Dr. Mitchell believed the CIA interrogators meant that the detainee realized they could not resist and were dependent on the interrogators to improve their circumstances.[79] Dr. Jessen thought it meant that the person was feeling generally helpless.[80] The Commission accepts Dr. Mitchell's explanation and finds that when RDI personnel reported that Mr. Ali was developing "learned helplessness," they meant that he was learning that he could not resist and was completely dependent on his captors.

j. (U) Another term that first arose during testimony is "fear extinction." A few nights

---

[76] (U) Tr. dated 21 January 2020, at pp. 30328-30329, and Tr. dated 22 January 2020, at pp 30483-30484.

[77] (U) Tr. dated 23 January 2020, at pp. 30864-30865.

[78] (U) Tr. dated 21 January 2020, at pp. 30327-30331; Tr. dated 23 January 2020, at p. 30715; and Tr. dated 31 January 2020, at pp. 32441-32443.

[79] (U) Tr. dated 21 January 2020, at pp. at 30332-30333, and Tr. dated 22 January 2020, at p. 30482.

[80] (U) Tr. dated 31 January 2020, at p. 32443.

17

before he testified in 2024, Dr. Mitchell drew a diagram on a hotel napkin explaining a concept called "fear extinction."[81] He explained that "fear extinction" takes place when the unconditioned stimulus is no longer paired with the conditioned stimulus.[82] Accordingly, he believed that during the debriefing phase any classical conditioning response, in this case fear, would quickly dissipate.[83] Dr. Mitchell acknowledged that the severity of the fear would correlate to the time it would take for any fear to dissipate.[84] Dr. Charles Morgan, a forensic psychiatrist with extensive experience with SERE,[85] expounded on that concept, testifying that there is a lot of data that fear extinction can occur with nontraumatic events, but that there typically isn't significant fear reduction with traumatic events.[86] He explained that this is why trauma, such as torture, is extraordinarily difficult to treat when a person has psychological consequences, whether it is Post Traumatic Stress Disorder (PTSD), anxiety, or depression.[87] Dr. Mitchell acknowledged that a response that has been extinguished can nevertheless recover under a variety of circumstances, including just the passage of time, which can lead to the

---

[81] (U) *See* AE 628MMMMMMMM (GOV), In-Court Submission, Drawings and Notes on Stationary from the Ritz-Carlton Tysons Corner, submitted 21 February 2024, MEA-PRG-00001171 and 1172. Dr. Mitchell testified about conditioning extinguishing quickly during the nine days he testified in 2020, but he did not focus on the concept. He explained during his 2024 testimony that based on the 2020 questioning and after hearing about the LHM suppression litigation in the media, he believed there was a misunderstanding of the RDI conditioning. *See* Tr. dated 20 February 2024, at pp. 41631-41636.

[82] (U) Tr. dated 20 February 2024, at p. 41628.

[83] (U) Tr. dated 20 February 2024, at pp. 41628-41630, 41643. Dr. Mitchell cited to two articles in support of his theory on "fear extinction." However, he acknowledged there were no studies on programs such as the RDI program as, "[i]t would be a war crime to study it. If we had kept data on the effectiveness of it, human experimentation is illegal."

[84] (U) Tr. dated 20 February 2024, at p. 41640.

[85] (U) Tr. dated 6 May 2024, at pp. 46328-46329.

[86] (U) Tr. dated 6 May 2024, at pp. 46485-46509.

[87] (U) Tr. dated 6 May 2024, at p. 46505.

18

spontaneous recovery of the previous conditioning.[88] The Commission accepts that classically conditioned fear may reduce over time once the fear inducing conditions are removed, but only marginally in the short term. The Commission does not find that any fear that Mr. Ali suffered based on the classical conditioning imposed upon him in the RDI program was completely eliminated by the time of the LHM questioning.

k. (U) Regardless of the possible extinction of the classical conditioning, Dr. Mitchell explained that operant conditioning would continue throughout the debriefing stage as long as the reinforcement contingencies are perceived by the detainee.[89] The Commission finds that the operant conditioning continued throughout Mr. Ali's RDI detention and for some period at NSGB.

## 2. (U) **Post 9/11 Coordination between the FBI and CIA**.

a. (U) After the attacks on 11 September 2001, the FBI established a core investigative group known as "PENTTBOM[90] Team" to investigate those responsible for the attacks. Key members of the PENTTBOM team included FBI Special Agents ("SA") James Fitzgerald, SA Abigail Perkins, SA Adam Drucker, and Supervisory Intelligence Analyst Kimberly Waltz. Before the 11 September 2001 attacks, the FBI and the CIA operated independently with little overlap. After the attacks, the two organizations substantially increased their cooperation and

---

[88] (U) Tr. dated 26 February 2024, at p. 42023.

[89] (U) Tr. dated 26 February 2024, at pp. 41998-41999.

[90] (U) Tr. dated 16 September 2019, at p. 25367 (SA Fitzgerald testified: "PENTTBOM stood for – the P-E-N for the crash in Pennsylvania, and then P-E-N-T for the attack on the Pentagon. And it's spelled P-E-N-T-T-B-O-M. So the TT was for twin towers, so it represented each of the three crash sites, and BOM for a terrorist attack or bombing.")

19

CUI

coordination, to include sharing information and personnel.[91] This cooperation included

PENTTBOM team members sending questions to the CIA to be asked of detainees. The CIA

would then disseminate the detainees' answers to the intelligence community, including the

FBI.[92]

b. (U) The PENTTBOM team submitted at least 37 different cables with questions,

including one with at least 73 different questions,[93] for the CIA to ask Mr. Ali while he was in

the RDI program.[94] SA Fitzgerald submitted questions for Mr. Ali[95] and a request for Mr. Ali's

fingerprints.[96] These agents also had access to any disseminated RDI reporting by the CIA.

c. (U) The Prosecution concedes, for purposes of this motion, that the CIA provided the

results of all of Mr. Ali's interrogations and debriefings to the FBI.[97] The Prosecution also

concedes that the FBI agents who questioned Mr. Ali for the LHM statements, as well as the

agents who assisted in planning and coordinating the LHM questioning, were capable of

accessing the CIA RDI reporting.[98]

---

[91] (U) AE 942YYY (GOV), Government Response to AE 628 (AAA Sup) and AE 942TTT (AAA), Mr. Ali's Supplements to AE 628 (AAA), Motion to Suppress Alleged Statements as Involuntary and Obtained by Torture, filed 2 December 2024, at p. 23.

[92] (U) Tr. dated 16 September 2019, at pp. 25445-25448 and 25461-25463; Tr. dated 18 September 2019, at pp. 26046-26047.

[93] (U) Tr. dated 18 September 2019, at p. 26059.

[94] (U) AE 942YYY (GOV), Government Response to AE 628 (AAA Sup) and AE 942TTT (AAA), Mr. Ali's Supplements to AE 628 (AAA), Motion to Suppress Alleged Statements as Involuntary and Obtained by Torture filed 2 December 2024, at p. 25.

[95] (U) Tr. dated 19 September 2019, at pp. 26190-26212.

[96] (U) Tr. dated 18 September 2019, at pp. 26063-26064.

[97] (U) AE 942YYY (GOV), Government Response to AE 628 (AAA Sup) and AE 942TTT (AAA), Mr. Ali's Supplements to AE 628 (AAA), Motion to Suppress Alleged Statements as Involuntary and Obtained by Torture, filed 2 December 2024, at p. 24 n.74.

[98] (U) *Id* at p. 24 n.74.

20

CUI

3. (U) **Mr. Ali's Capture and Time in Custody of a Foreign Government**.

a. (U) Mr. Ali was captured by Pakistani authorities in Pakistan in April 2003.[99] He was 25 years old at the time of capture. During this time in Pakistani custody, Mr. Ali was interrogated by U.S. officials and potentially Pakistani officials.[100] The record of these interrogations of Mr. Ali is substantially incomplete. SA James Fitzsimmons, FBI, testified that he was present for some of the interrogations, but he did not arrive until Mr. Ali had already been questioned for a couple of days.[101] Additionally, SA Fitzsimmons was required to destroy any notes at the end of each day, and he did not personally draft any reports of these interrogations.[102]

b. (U) The Prosecution did not present any witness testimony concerning Mr. Ali's treatment while in Pakistani custody, prior to SA Fitzsimmons arriving at the location. The record indicates, however, that Mr. Ali was subjected to sleep interruptions.[103] The CIA reporting states that Mr. Ali engaged in conversations and gave partial answers. SA Fitzsimmons testified that Mr. Ali admitted to being a facilitator for Al Qaeda and to being involved in the 9/11 attacks.[104]

---

[99] (U) *Id.* at p. 33.

[100] (U) Tr. dated 14 February 2024, at p. 40879; Tr. dated 15 February 2024, at p. 41006.

[101] (U) Tr. dated 14 February 2024, at p. 40879.

[102] (U) Tr. dated 15 February 2024, at p. 41005.

[103] (U) Tr. dated 14 February 2024, at pp. 40910-40911 and 40918; AE 628FFFFFFFF (AAA), Defense Notice of Exhibits, filed 21 February 2024, Attach. F at p. 88, citing MEA-STA-000001547.

[104] (U) Tr. dated 15 February 2024, at pp. 41070 and 41125-41126.

21

c. (CUI) During the questioning, because the CIA believed Mr. Ali was being deceptive[105] and non-cooperative,[106] he was warned that this "easy approach and current venue" would change if he did not cooperate.[107]

4. (U) **Mr. Ali's Time in the RDI Program at Location 2**.

a. (U) Arrival and Initial Interrogation.

(1) (CUI) In May 2003, Mr. Ali was rendered to U.S. custody at DETENTION SITE COBALT (Location 2.)[108] Location 2 was like "a dungeon,"[109] looked "like an old Nazi concentration camp,"[110] and "something out of a horror show."[111] Detainees at Location 2 were kept shackled in cells resembling "horse stalls."[112] The cellblock windows were covered with two coats of black paint and heavy curtains making the cellblock completely dark.[113] Location 2 smelled unpleasant[114] and the detainees had "a stench that was like no other, enhanced by their

---

[105] (U) AE 628FFFFFFFF (AAA), Defense Notice of Exhibits, filed 21 February 2024, Attach. F, at p. 87, citing to MEA-STA-00001732; and Tr. dated 14 February 2024, at pp. 40913-40915.

[106] (U) *Id.* at Attach. F, p. 92, citing to MEA-10018-00007252.

[107] (U) *Id.* at Attach. F, p. 88, citing to MEA-STA-00001732.

[108] (U) AE 942YYY (GOV), Government Response to AE 628 (AAA Sup) and AE 942TTT (AAA), Mr. Ali's Supplements to AE 628 (AAA), Motion to Suppress Alleged Statements as Involuntary and Obtained by Torture, filed 2 December 2024, at p. 34.

[109] (U) Description by the chief of interrogations. *See* SSCI Executive Summary at 50.

[110] (U) AE 628RRRRR (AAA) Corrected Copy, Defense Notice of Exhibits, filed 29 January 2020, Attach. E, at p. 94, citing to MEA-JDM-00000075.

[111] (U) AE 628FFFFFFFF (AAA), Defense Notice of Exhibits, filed 21 February 2024, Attach. F, at p. 91, citing to MEA-JDM-00000050-52.

[112] (U) Tr. dated 22 January 2020, at pp. 30502-30503.

[113] (U) AE 628GGGGG (AAA), Defense Notice of Exhibits, filed 13 December 2019, at p. 179.

[114] (U) Tr. dated 31 January 2020, at p. 32495.

22

fear."[115] Stereo speakers would barrage the detainee with non-stop loud music.[116] When guards moved a detainee from their cell to the interrogation room, they would usually enter the cell with a flashlight and place a hood over the detainee's head.[117] The guards, masked and dressed in black, would not speak with detainees and would only communicate with each other nonverbally with hand signals.[118] The only object detainees had in their stall was a bucket for human waste. One senior CIA officer stated Location 2 was itself an enhanced interrogation technique.[119] Location 2 was set up with "isolation of the detainee being the primary goal. Each detainee's interaction with the outside world [was] intended to be limited to brief contact with the guards and more extensive contact with his CIA interrogators. This [allowed] CIA personnel to control almost all aspects of the detainees' existence."[120]

(2) (U) The conditions at Location 2 were so harsh that one detainee, Gul Rahman, died in 2002 of hypothermia, after being left overnight in cold temperatures wearing only a sweatshirt and after having been doused in cold water.[121]

---

[115] (U) AE 628FFFFFFFF (AAA), Defense Notice of Exhibits, filed 21 February 2024, Attach. F, at p. 90, citing to MEA-JDM-00000024-00000030.

[116] (CUI) AE 628RRRRR (AAA) Corrected Copy, Defense Notice of Exhibits, filed 29 January 2020, Attach. E, at p. 93, citing to MEA-JDM-00000074 (Interrogator QY7 recalled Eminem playing in the cell block area and that it was loud, but not ear-deafening. Interrogator NX2 stated that he would play Eminem at up 79 decibels to keep detainees awake during sleep deprivation.) AE 628RRRRR (AAA) Corrected Copy, Defense Notice of Exhibits, filed 29 January 2020, Attach. C, at p. 41, citing to MEA-2C-00000448.

[117] (U) AE 628GGGGG (AAA), Defense Notice of Exhibits, filed 13 December 2019, at p. 192.

[118] (U) *Id.* at pp. 192, 1100, 1878, 2375, and 2753.

[119] (U) *See* S. Rep. No. 113-288, dated 9 December 2014, *Report of the Senate Select Committee on Intelligence Committee Study of the Central Intelligence Agency's Detention and Interrogation Program*, Findings and Conclusions at p. 4.

[120] (U) AE 628GGGGG (AAA), Defense Notice of Exhibits, filed 13 December 2019, at p. 178.

[121] (U) SSCI Executive Summary at pp. 54-55; Tr. dated 31 January 2020, at pp. 32522-32533, and Tr. dated 17 July 2024, at p. 48355.

CUI

(3) (CUI) Upon Mr. Ali's arrival at Location 2, JP2,[122] a CIA psychologist, performed a psychological assessment of him. JP2 noted that Mr. Ali "answered all questions with brief, minimal responses and, as such, was only minimally cooperative with the interview."[123] JP2 further noted that of all the detainees he had observed, "Ammar's[124] presentation has elicited the strongest reactions from interrogators and others who have interacted with him. His dismissive, condescending, and arrogant style coupled with his obvious stonewalling, minimizing, and denying, serve to frustrate…"[125] JP2 concluded that EITs would cause no permanent psychological harm to Mr. Ali because he did not see "any of these guys as weak" and he described Mr. Ali as "too robust" to require his intervention.[126]

(4) (CUI) Mr. Ali was then interrogated with non-enhanced methods for approximately four hours and 45 minutes.[127] Mr. Ali was "confident, arrogant and outwardly hostile toward interrogators" and he only provided tidbits, not full details in answers to questions.[128] After the initial session, Mr. Ali was photographed, stripped, bathed[129] and then

---

[122] (U) Except for Drs. Mitchell and Jessen, all RDI witnesses are identified by a Unique Functional Identifier (UFI).

[123] (U) AE 628RRRRR (AAA) Corrected Copy, Defense Notice of Exhibits, filed 29 January 2020, Attach. C, at p. 25, citing to MEA-2C-00000432.

[124] (U) Mr. Ali is typically referred to as Ammar while in the RDI program. *See* Tr. dated 16 September 2019, at p. 25585 (SA Fitzgerald testified: "[Mr. Ali] advised he used the name Ammar and Mo'een and possibly one or two other names. [. . .] He did not describe them as kunyas, and I did not interpret them as that.")

[125] (U) AE 628RRRRR (AAA) Corrected Copy, Defense Notice of Exhibits, filed 29 January 2020, Attach. C, at p. 57, citing to MEA-2C-00000464.

[126] (U) *Id.* at Attach. C, p. 26, citing to MEA-2C-00000433.

[127] (U) AE 628FFFFFFFF (AAA), Defense Notice of Exhibits, filed 21 February 2024, Attach. F, at p. 95, citing to MEA-2IJ-00000028-00000029.

[128] (U) *Id.* at Attach. F, p. 95, citing to MEA-2IJ-00000028-00000029.

[129] (U) It is not clear what is meant by the term "bathed" as RDI personnel at Location 2 sometimes referred to water dousing as baths. *See e.g.* Tr. dated 20 February 2024, at p. 41583 (Dr. Mitchell also described Interrogator NX2 having two other RDI personnel hold a detainee while NX2 would "scrub [the detainee's] mouth with a brush and then scrub [the detainee's] balls and ass with a brush and then scrub [the detainee's] mouth with a brush." NX2 then said he was just giving the detainee a bath.)

24

CUI

placed in the standing sleep deprivation position for 12 hours to lower his resistance.[130] The

interrogation team determined that Mr. Ali's responses were false and that he was "hard cor[e],"

"defiant," and exhibited a hatred of Americans.[131]

(5) (CUI) The next day, Location 2 personnel requested and received approval for

the use of EITs on Mr. Ali.[132] That same day, Mr. Ali was again interrogated, but still without

the application of any reported EITs.[133] Mr. Ali, who had been kept overnight nude, without

food, or being allowed to sleep, was interrogated for two hours.[134] During the interrogation, he

was kept nude, hooded, and standing. Mr. Ali had become "somewhat more compliant," but he

continued to lie and make outright denials of known facts.[135]

b. Interrogations using EITs.

(1) (CUI) The following day, Mr. Ali was interrogated using EITs. The

documented use of EITs lasted over three-and-a-half days. During this period, Mr. Ali was kept

shackled and naked, not fed any food, forced to stand, and not permitted to sleep for

approximately 82 hours.[136] Mr. Ali's EIT-involved interrogations were supervised by NX2,[137]

---

[130] (U) AE 628FFFFFFFF (AAA), Defense Notice of Exhibits, filed 21 February 2024, Attach. F, at p. 95, citing to MEA-2IJ-00000028-29.

[131] (U) AE 628RRRRR (AAA) Corrected Copy, Defense Notice of Exhibits, filed 29 January 2020, Attach. C, at p. 26, citing to MEA-2C-00000433.

[132] (U) AE 628FFFFFFFF (AAA), Defense Notice of Exhibits, filed 21 February 2024, Attach. F, at p. 96-97, citing to MEA-2IJ-00000027-29.

[133] (U) AE 628FFFFFFFF (AAA), Defense Notice of Exhibits, filed 21 February 2024 at Attach. F, pp. 97-98, citing to MEA-10018-00007250.

[134] (U) *Id.* at Attach. F, p. 98, citing to MEA-10018-00007250.

[135] (U) *Id.* at Attach. F, p. 98, citing to MEA-10018-00007250.

[136] (U) AE 942YYY (GOV), Government Response to AE 628 (AAA Sup) and AE 942TTT (AAA), Mr. Ali's Supplements to AE 628 (AAA), Motion to Suppress Alleged Statements as Involuntary and Obtained by Torture, filed 2 December 2024, at p. 34, and p. 34 n.131.

[137] (U) Tr. dated 22 January 2020, at p. 30607, citing to AE 628 (AAA), Mr. al Baluchi's Motion to Suppress Alleged Statements as Involuntary and Obtained By Torture, filed 15 May 2019, Attach. D, MEA-10018-00007258.

25

CUI

who was also known as the "New Sheriff."[138] NX2 was the chief interrogator. He was known for being willing to go well beyond what was authorized with EITs.[139] NX2 believed the reason for doing EITs was to "break" the detainees so they responded.[140] NX2 wanted to condition compliance by focusing on obtaining absolute obedience by the detainees to even small demands of interrogators.[141] NX2 also attempted to intimidate other RDI personnel such as Dr. Mitchell if they tried to stop him from going too far in interrogations.[142] NX2 had populated Location 2 with many like-minded RDI personnel. Dr Mitchell referred to these personnel as NX2's acolytes[143] and Dr. Jessen referred to them as NX2's cadre.[144] Because of the way interrogations were done at Location 2, Drs. Mitchell and Jessen actually considered it a different program from their version of the RDI program.[145] The Prosecution did not call any Location 2 witnesses other than Drs. Mitchell and Jessen, neither of whom were at Location 2 at the same time as Mr. Ali.

(2) (CUI) On day one of using EITs on Mr. Ali, the interrogators used at least three instances of the facial grab, 20 facial insult slaps, 10 belly slaps, one round of walling, one application of water dousing, 30 minutes of stress position-forehead against the wall, and 25

---

[138] (U) Tr. dated 22 January 2020, at p. 30562. (Dr. Mitchell testified that the first time he met NX2 at Location 4, NX2 walked up to him and said, "There's a new sheriff in town." NX2 also told Dr. Mitchell that he was the Chief Interrogator and that Dr. Mitchell's services would no longer be needed.)

[139] (U) Tr. dated 22 January 2020, at pp. 30551-30554, 30581-30582, and 30587-30588.

[140] (U) Tr. dated 22 January 2020, at p. 30553.

[141] (U) Dr. Mitchell explained this approach in his book, *Enhanced Interrogation: Inside the Minds and Motives of Islamic Terrorists Trying to Destroy America* (2016), attached to AE 632W (MAH), Defense Notice of Exhibits, filed 23 January 2020, Attach. H. at p. 2041.

[142] (U) Tr. dated 22 January 2020, at pp. 30576-30583.

[143] (U) Tr. dated 20 February 2024, at p. 41583.

[144] (U) Tr. dated 15 July 2024, at p. 48069.

[145] (U) Tr. dated 26 February 2024, at p. 41972; Tr. dated 15 July 2024, at p. 48051, Tr. dated 16 July 2024, at p. 48092.

26

minutes of stress position-kneeling inclined to the rear.[146] Mr. Ali was "defiant as ever," "never soft," and, "you could see the hatred" with him.[147]

(3) (CUI) It is difficult to determine the full extent of what was done to Mr. Ali during the EITs. The Prosecution did not call any witnesses who were present during these interrogations. The record also demonstrates that the EITs, as explained below, were not performed in strict accordance with the approved procedures for EITs. Additionally, the evidence that does exist demonstrates the haphazard way that EITs were documented. As an example of this haphazardness, Interrogator X7Q said that during an interrogation, he tried to make a mental note of the number of times each measure was applied so he could provide the number in a cable to CIA headquarters. However, he generally had to estimate the numbers he used in the cables.[148]

(4) (CUI) An example of the problematic, and perhaps inaccurate, EIT reporting are the 20 facial insult slaps that were done to Mr. Ali. Dr. Mitchell testified that 20 facial insult slaps in one interrogation seems excessive.[149] Dr. Mitchell opined that the large number of facial slaps and 10 reported belly slaps made it seem like the interrogators were practicing on Mr. Ali.[150] Dr. Mitchell's concern was confirmed in a CIA Office of the Inspector General (OIG) report[151] in which it was reported that "each of the interrogators NX2 was training used each of

---

[146] (U) AE 942YYY (GOV), Government Response to AE 628 (AAA Sup) and AE 942TTT (AAA), Mr. Ali's Supplements to AE 628 (AAA), Motion to Suppress Alleged Statements as Involuntary and Obtained by Torture filed 2 December 2024, at p. 34 n.131.

[147] (U) AE 628RRRRR (AAA) Corrected Copy, Defense Notice of Exhibits, filed 29 January 2020, Attach. C at p. 27.

[148] (U) AE 628RRRRR (AAA) Corrected Copy, Defense Notice of Exhibits, filed 29 January 2020 at Attach. C, p. 32.

[149] (U) Tr. dated 23 January 2020, at p. 30697.

[150] (U) Tr. dated 23 January 2020, at p. 30698.

[151] (U) The CIA OIG report is located at AE 628RRRRR (AAA) Corrected Copy, Defense Notice of Exhibits, filed 29 January 2020, Attach. C at pp. 20-84, citing to MEA-2C-00000428-0491.

CUI

the measures on Ammar in order to gain their certification."[152] In this "training setting," there are examples of trainees conducting EITs improperly, such as QY7 reporting that PU2 had trouble doing the facial slap correctly and was "too much into it," with his arm too far extended.[153] PU2 said that a facial slap to someone who is shackled and cannot do anything is "beating the crap out of him."[154] There are also examples of trainees such as X7Q who said he was "one of many" who were trying to learn how to apply the "approved level of coercion" and that he felt "behind the curve," in part because he needed to practice interrogation tactics.[155]

(5) (CUI) The Prosecution acknowledges that Mr. Ali was subjected to "one round of walling," however, this one round was apparently a process where, again, the lead interrogator had four trainee interrogators line up and use Mr. Ali as a training prop so they could get certified.[156] As described, Mr. Ali was walled again and again by a trainee until the trainee became fatigued and then the next trainee would step up to wall Mr. Ali.[157] Mr. Ali's weight at capture intake was listed as 141 lbs and at least one of the interrogator trainees was 6'1" and weighed 225 lbs.[158] MA2 described the walling procedure as, "imagine asking a question, pausing for a response, if the response is not good, then 'boom, boom, boom, boom, boom'

---

[152] (U) AE 628RRRRR (AAA) Corrected Copy, Defense Notice of Exhibits, filed 29 January 2020, Attach. C at p. 33.

[153] (U) *Id.* at Attach. C, p. 34.

[154] (U) *Id.* at Attach. C, p. 34.

[155] (U) AE 628RRRRR (AAA) Corrected Copy, Defense Notice of Exhibits, filed 29 January 2020, Attach. C at p. 33.

[156] (U) AE 942YYY (GOV), Government Response to AE 628 (AAA Sup) and AE 942TTT (AAA), Mr. Ali's Supplements to AE 628 (AAA), Motion to Suppress Alleged Statements as Involuntary and Obtained by Torture filed 2 December 2024, at p. 34 n.131.

[157] (U) AE 628RRRRR (AAA) Corrected Copy, Defense Notice of Exhibits, filed 29 January 2020, Attach. C at pp. 36-37.

[158] (U) *Id.* at Attach. C, p. 37 n. 22.

28

against the wall. The interrogator would then pause and repeat the process until the detainee responds or the interrogator gives up on the technique."[159] MA2 acknowledged that "students seeking their certification probably would not bang the detainee against the wall once and then stop; such a practice would neither demonstrate the students' proficiency nor extract information from the detainee."[160] A typical walling session did not last more than two hours.[161] However, SG1 also explained that "there was no established number of times a detainee could be walled in one session, nor was there a time limit for each walling session. Ideally, walling would continue until a detainee started talking and providing information."[162] In this case, it is not clear how long the walling lasted, how many times Mr. Ali was hit against the wall, and whether the trainees were using the proper technique.[163]

(6) (U) Day one also included the 25 minutes of stress position-kneeling inclined to the rear. Although this stress position was approved, the interrogator placed a broomstick behind Mr. Ali's knees during this stress position. Placing a stick behind the knees is extremely

---

[159] (U) AE 628RRRRR (AAA) Corrected Copy, Defense Notice of Exhibits, filed 29 January 2020, Attach. C, at p. 37 n.23.

[160] (U) *Id.* at Attach. C, p. 37, n.23.

[161] (U) *Id.* at Attach. C, p. 37. In comparison, Dr. Jessen stated that walling should typically last only seconds as there should only be, at most, five hits into a wall. *See* Tr. dated 15 July 2024, at pp. 48084-48089.

[162] (U) AE 628FFFFFFFFF(AAA), Defense Notice of Exhibits, filed 21 February 2024, Attach. F at p. 143, citing to MEA-STA-00005506-10.

[163] (U) Dr. Jessen testified that the way walling was described with Mr. Ali was, "not consistent with the way it was ever applied at SERE school or in a program I was in." Transcript dated 15 July 2024, at pp. 48084-48088. Dr. Mitchell explained that if walling is done incorrectly, you could inadvertently hit the person's head against the wall instead of controlling it. Tr. dated 21 January 2020, at p. 30387.

painful for a detainee[164] and could result in dislocating the detainee's knees.[165] NX2 was eventually removed from his position for doing this.[166]

(7) (CUI) After the day one interrogation, Mr. Ali was returned to his cell naked and placed in the standing sleep deprivation position with his hands chained to the ceiling so that they were kept at eye level.[167] He was still denied food.[168] The purpose of having a detainee standing and naked while undergoing sleep deprivation was to humiliate him and make him uncomfortable in the cold.[169]

(8) (CUI) On day two of using EITs on Mr. Ali, the interrogators used at least eight facial insult slaps, two belly slaps, and one application of water dousing.[170] Water dousing was done on day one and day two to Mr. Ali. Again, the record is not clear how the water dousing was conducted. Later, CIA investigators "could not determine precisely what happened

---

[164] (U) Dr. Mitchell described Al Nashiri as screaming when it was done to him. NX2 was also pushing Al Nashiri backwards. Tr. dated 22 January 2020, at pp. 30546-30547. X7Q also witnessed NX2 use a broomstick in this way and put weight on it. *See* AE 628RRRRR (AAA) Corrected Copy, Defense Notice of Exhibits, filed 29 January 2020, Attach. C at p. 35, citing to MEA-2C-00000442. It is not clear whether such pushing was also done to Mr. Ali.

[165] (U) Tr. dated 22 January 2020, at pp. 30546-30547.

[166] (U) Tr. dated 22 January 2020, at p. 30552. *See also* AE 628RRRRR (AAA) Corrected Copy, Defense Notice of Exhibits, filed 29 January 2020, Attach. C at p. 82, citing to MEA-2C-00000489; and SSCI Executive Summary at p. 117.

[167] (U) AE 628FFFFFFFF (AAA), Defense Notice of Exhibits, filed 21 February 2024, Attach. D at pp. 103-104, citing to MEA-10018-00007247-7249. The shackling of Mr. Ali's hands appears to be contrary to guidelines as Dr. Mitchell testified that in the guidelines, he was familiar with, hands should only be raised above the heart for around 45 minutes because of health concerns. Tr. dated 22 January 2020, at pp. 30626-30628.

[168] (U) AE 628FFFFFFFF (AAA), Defense Notice of Exhibits, filed 21 February 2024, Attach. D at p. 104, citing to MEA-10018-00007247-7249. This is another part of the interrogation techniques where there is no documented guidance on procedures. Dr. Mitchell testified that he was not aware of any guidelines for withholding food from a detainee. When shown the documentation that food was withheld from Mr. Ali for four days, Dr. Mitchell said it was the first time he had seen that. *See* Tr. dated 20 February 2024, at pp. 41584-41585.

[169] (U) Description of purpose provided by NX2, *see* AE 628RRRRR (AAA) Corrected Copy, Defense Notice of Exhibits, filed 29 January 2020, Attach. C at p. 41, citing to MEA-2C-00000448.

[170] (U) AE 942YYY (GOV), Government Response to AE 628 (AAA Sup) and AE 942TTT (AAA), Mr. Ali's Supplements to AE 628 (AAA), Motion to Suppress Alleged Statements as Involuntary and Obtained by Torture, filed 2 December 2024, at p. 34 n.131.

30

to Ammar, but, at a minimum, the water the interrogators used was excessively cold and some of it had ice in it."[171] Water dousing has been described in multiple different ways by different witnesses. X3L stated that the water was "definitely cold."[172] QW9 and X7Q stated the water was iced or refrigerated.[173] X7Q also stated that the interrogation team kept the water cold by placing frozen water bottles in the buckets and that sometimes there was ice in the water.[174] Reportedly, 12 or 13 people were reportedly in the room when Mr. Ali was water doused;[175] however, again the Prosecution did not call any of these witnesses to testify for this motion. The Prosecution concedes that the Commission can conclude that the most onerous water dousing method was used on Mr. Ali.[176] The Commission adopts this concession and finds the water dousing of Mr. Ali involved the use of ice cold water poured on Mr. Ali while he was naked in a tarp on the concrete floor.[177] Further, there are conflicting accounts of how cold the rooms were kept at this point. NX2 stated that the interrogator would keep the room at 65 degrees Fahrenheit during the water dousing;[178] however, the reporting during Mr. Ali's EIT interrogations states

---

[171] (U) AE 628RRRRR (AAA) Corrected Copy, Defense Notice of Exhibits, filed 29 January 2020, Attach. C at p. 82, citing to MEA-2C-00000489. When reviewing this description of Mr. Ali's water dousing, Dr. Mitchell seemed genuinely shocked and stated, "So while dousing may have been approved, the use of ice water wasn't addressed. But my instinct is to say it would be disapproved. Jesus Christ." Tr. dated 20 February 2024, at p. 41596.

[172] (U) AE 628RRRRR (AAA) Corrected Copy, Defense Notice of Exhibits, filed 29 January 2020, Attach. C at p. 38, citing to MEA-2C-00000445.

[173] (U) *Id.* at Attach. C, p. 38, citing to MEA-2C-00000445.

[174] (U) AE 628RRRRR (AAA) Corrected Copy, Defense Notice of Exhibits, filed 29 January 2020, Attach. C at p. 38, citing to MEA-2C-00000445.

[175] (U) *Id.* at Attach. C, p. 38, citing to MEA-2C-00000445.

[176] (U) Tr. dated 21 January 2025, at p. 51759.

[177] (U) AE 628RRRRR (AAA) Corrected Copy, Defense Notice of Exhibits, filed 29 January 2020, Attach. C at p. 38, citing to MEA-2C-00000445.

[178] (U) *Id.* at Attach. C, p. 38, citing to MEA-2C-00000445.

31

the ambient temperature was above 70 degrees Fahrenheit.[179] The Commission finds the room

was at the cooler temperature. QY7 reported throwing up after watching a detainee being water

doused.[180] Because he was uncomfortable with the water dousing, he went to another room to

avoid watching Mr. Ali being water doused.[181] X7Q admitted that the water dousing was

probably outside the bounds of what was authorized.[182] Although only two instances of the water

dousing of Mr. Ali are documented, X3L recalled it was done to Mr. Ali more than once, but he

couldn't recall how many times.[183]

      (9) (CUI) During this second day of EITs, Mr. Ali continued to exhibit signs of

resistance.[184] It was noted that, "[d]espite repeated attempts to elicit more cooperation,

elaboration, and spontaneity in responding, [Mr. Ali] held to his resistance behavior."[185]

However, near the end of the approximately three-hour session, Mr. Ali's resistance "began to

wane." In particular, after he was subjected to a cold water bath, he became more cooperative.[186]

As a reward for his limited cooperation, he was allowed to sit at the end of the interrogation.[187]

Nevertheless, because he was still not fully compliant, he was then returned to his cell naked and

---

[179] (U) AE 628FFFFFFFF (AAA), Defense Notice of Exhibits, filed 21 February 2024, Attach. D. at p. 101, citing to MEA-10018-00007258.

[180] (U) AE 628RRRRR (AAA) Corrected Copy, Defense Notice of Exhibits, filed 29 January 2020, Attach. E at p. 98, citing to MEA-JDM-00000079.

[181] (U) *Id.* at Attach. C, p. 39, citing to MEA-2C-00000446.

[182] (U) *Id.* at Attach. C, p. 39, citing to MEA-2C-00000446.

[183] (U) AE 628RRRRR (AAA) Corrected Copy, Defense Notice of Exhibits, filed 29 January 2020, Attach. C at p. 38, citing to MEA-2C-00000447.

[184] (U) AE 628FFFFFFFF (AAA), Defense Notice of Exhibits, filed 21 February 2024, Attach. F at p. 105, citing to MEA-10018-00007247-7249.

[185] (U) *Id.* at Attach. F, p. 105, citing to MEA-10018-00007247-7249.

[186] (U) *Id.* at Attach. F, p. 105, citing to MEA-10018-00007247-7249.

[187] (U) *Id.* at Attach. F, p. 105, citing to MEA-10018-000072477249.

placed in the standing sleep deprivation position.[188] After withholding food from Mr. Ali for at least four days, the interrogators provided him two cans of the liquid food supplement, Ensure.[189]

(10) (CUI) Day three of using EITs on Mr. Ali appears to be the continuation of forced standing, sleep deprivation, and forced nakedness. At the start of the session, Mr. Ali had been sleep deprived for around 82 hours.[190] Mr. Ali was "clearly fatigued, and much of his arrogance had disappeared."[191] Mr. Ali was drowsy and "nodded off for a few seconds frequently" during the interrogation.[192] Psychologist JP2 noted that while Mr. Ali may have been experiencing some sensory distortion in his cell, it was more likely that he was dreaming during the brief moments he dozed off.[193] He opined that "Ammar will continue to cooperate. If not, even the threat of a return to a sleep deprived state will probably have a salutary effect."[194] At the end of the interrogation, due to Mr. Ali's "apparent compliance," he was returned to his cell with clothing and a mat upon which he would be allowed to sleep.[195] He was still not allowed solid food, but he was given Ensure. He also remained in isolation, in total darkness in his cell, and with a bucket to use as a toilet.

---

[188] (U) *Id.* at Attach. F, p. 105, citing to MEA-10018-00007247-7249.

[189] (U) AE 628RRRRR (AAA) Corrected Copy, Defense Notice of Exhibits, filed 29 January 2020, Attach. C at p. 29, citing to MEA-2C-435-00000436; AE 628FFFFFFFF (AAA), Defense Notice of Exhibits, filed 21 February 2024, Attach. F at p. 105, citing to MEA-10018-00007247-7249.

[190] (U) AE 628FFFFFFFF (AAA), Defense Notice of Exhibits, dated 21 February 2024, Attach. F at p. 106, citing to MEA-10018-00007255-7256.

[191] (U) AE 628FFFFFFFF (AAA), Defense Notice of Exhibits, dated 21 February 2024, Attach. F at p. 106, citing to MEA-10018-00007255-7256.

[192] (U) *Id.* at Attach. F, p. 108, citing to MEA-10018-00007255-7256. As observed by Psychologist JP2.

[193] (U) *Id.* at Attach. F, p. 108, citing to MEA-10018-00007255-7256.

[194] (U) AE 628RRRRR (AAA) Corrected Copy, Defense Notice of Exhibits, filed 29 January 2020, Attach. C at p. 29, citing to MEA-2C-00000436.

[195] (U) AE 628FFFFFFFF (AAA), Defense Notice of Exhibits, filed 21 February 2024, Attach. F at p. 106, citing to MEA-10018-00007255-7256.

33

(11) (CUI) In a May psychological assessment, Mr. Ali reported experiencing symptoms of a possible psychotic episode.[196] Specifically, he reported that while he was undergoing standing sleep deprivation, he overheard the interview, torture and murder of Aafia Siddique.[197] He also heard what sounded like interviewers murdering her infant child.[198] He also reported that he heard Khalid Shaikh Mohammad and Walid Bin 'Attash being interviewed and then executed.[199] He stated that an interviewer tried shooting at him, but he was saved by an FBI officer. He also reported that after being walled he was not able to recall complete memories because he tended to daydream.[200] The interviewer believed that Mr. Ali was probably fabricating the story.[201]

c. (U) Assessment Period.

(1) (CUI) After NX2 stopped the use of EITs, Mr. Ali went through an "assessment period."[202] During the assessment period, in multiple interrogations, Mr. Ali continued to demonstrate a cooperative attitude. As a reward, he was allowed solid food.[203] Interrogators noted that, "[Mr. Ali] is developing a sense of learned helplessness[204] which is

---

[196] (U) AE 628FFFFFFFF (AAA), Defense Notice of Exhibits, filed 21 February 2024, Attach. F at p. 121, citing to MEA-10018-00005984-5986.

[197] (U) *Id.* at Attach. F at p. 121, citing to MEA-10018-00005984-5986.

[198] (U) *Id.* at Attach. F at p. 121, citing to MEA-10018-00005984-5986.

[199] (U) AE 628FFFFFFFF (AAA), Defense Notice of Exhibits, filed 21 February 2024, Attach. F at p. 121, citing to MEA-10018-00005984-5986

[200] (U) *Id.* at Attach. F, p. 119, citing to MEA-STA-00001663-1665.

[201] (U) *Id.* at Attach. F, p. 122, citing to MEA-10018-00005984-5986.

[202] (U) AE 628RRRRR (AAA) Corrected Copy, Defense Notice of Exhibits, filed 21 February 2024, Attach. C at p. 29, citing to MEA-2C-00000436.

[203] (U) AE 628FFFFFFFF (AAA), Defense Notice of Exhibits, filed 21 February 2024, Attach. F at pp. 109-110, citing to MEA-10018-00007254.

[204] (U) *See* discussion of "learned helplessness" supra at Section III, paragraph 1, subparagraph i.

34

CUI

contributing to his compliance, and team will continue to lessen the intensity of the interrogation sessions relative to [Mr. Ali]'s cooperation."[205] It was also noted that he "not only fully answered questions asked but also elaborated in detail and provided other information of interest without being prompted."[206] Such cooperation was "completely different from the first three days of interrogation when information had to be pried from him in bits and pieces."[207] Mr. Ali would answer the question posed to him and then continue to discuss peripheral issues that were related.[208] Mr. Ali was "sternly informed he should continue to answer questions in this manner, expand on his answers, and let the team tell him when he no longer needs to continue on a particular topic."[209] The RDI personnel further noted that should Mr. Ali "regress into a defiant posture during future sessions, his clothing, sleeping and solid food privileges will immediately be removed and enhanced measures will be applied in order to instill a compliant posture."[210]

(2) (CUI) During an interrogation a few days after his last EIT session, interrogators again reported to headquarters that, "[Mr. Ali] is developing a sense of learned helplessness which is contributing to his compliance."[211] Mr. Ali continued to demonstrate an "apparently compliant resistance posture," but he did occasionally lapse into lying by

---

[205] (U) AE 628FFFFFFFF (AAA), Defense Notice of Exhibits, filed 21 February 2024, Attach. F at p. 110, citing to MEA-10018-00007254.

[206] (U) *Id.* at Attach. F, pp. 112-113, citing to MEA-10018-00007257.

[207] (U) *Id.* at Attach. F, pp. 112-113, citing to MEA-10018-00007257.

[208] (U) AE 628FFFFFFFF (AAA), Defense Notice of Exhibits, filed 21 February 2024, Attach. F at p. 113, citing to MEA-10018-00007257.

[209] (U) *Id.* at Attach. F, p. 113, citing to MEA-10018-00007257.

[210] (U) *Id.* at Attach. F, p. 113, citing to MEA-10018-00007257.

[211] (U) AE 628FFFFFFFF (AAA), Defense Notice of Exhibits, filed 21 February 2024, Attach. F at p. 115, citing to MEA-10018-00007240. This terminology about Mr. Ali developing "a sense of learned helplessness" and it contributing to his "compliance" is repeated in multiple interrogation reports. *See e.g.* AE 628FFFFFFFF (AAA), Defense Notice of Exhibits, filed 21 February 2024, Attach. F at p. 112, citing to MEA-10018-00007241.

35

omission.[212] When that happened, he was sternly reprimanded and reminded that his situation and limited privileges could be removed swiftly.[213] The interrogators' warning brought him "back on track" to compliance.[214] The interrogators again reported that if Mr. Ali displayed any defiance, "his clothing, sleeping and solid food privileges will immediately be removed and enhanced measures will be applied in order to instill a compliant posture."[215]

(3) (CUI) Mr. Ali quickly took to his training. During another interrogation in the days following EITs, Mr. Ali continued to "demonstrate an understanding of the way questions should be answered."[216] His previous tactic of lying by omission was referenced and the interrogator reported that, "on a positive note during the session, [Mr. Ali] did not exhibit this deceptive technique.[217]

(4) (CUI) In another interrogation during this period, "Mr. Ali showed progress and demonstrated an understanding of the way questions should be answered."[218] Mr. Ali "also expressed an understanding of his position, and that it is permanent."[219] After again mentioning that Mr. Ali was developing a state of learned helplessness, the interrogator explained that an additional person was present for this interrogation and introduced to Mr. Ali. The person's

---

[212] (U) AE 628FFFFFFFF (AAA), Defense Notice of Exhibits, filed 21 February 2024, Attach. F at p. 114, citing to MEA-10018-00007240.

[213] (U) AE 628FFFFFFFF (AAA), Defense Notice of Exhibits, filed 21 February 2024, Attach. F at p. 114, citing to MEA-10018-00007240.

[214] (U) *Id.* at Attach. F, p. 115, citing to MEA-10018-00007240.

[215] (U) AE 628FFFFFFFF (AAA), Defense Notice of Exhibits, filed 21 February 2024, Attach. F at p. 114, citing to MEA-10018-00007240.

[216] (U) *Id.* at Attach. F, p. 116, citing to MEA-10018-00007236.

[217] (U) *Id.* at Attach. F, p. 117, citing to MEA-10018-00007236.

[218] (U) *Id.* at Attach. F, p. 126, citing to MEA-10018-00007239.

[219] (U) *Id.* at Attach. F, p. 126, citing to MEA-10018-00007239.

CUI

presence effected Mr. Ali as he was the most expansive in his answers that he had been so far.[220] It is not clear who this additional person was, as the only person listed in the Prosecution's RDI Index[221] for this interrogation is Interrogator X3L.

(5) (CUI) On multiple subsequent interrogations, Mr. Ali continued to make progress and the RDI team continued to lessen the intensity of the interrogations relative to his cooperation.[222] They continued to note that he did not display any more deception techniques, that he continued to answer in an expansive manner when additional personnel were present, and that he continued to develop learned helplessness.[223] They also continued to monitor him to ensure he maintained a "compliant posture."[224]

d. (U) Debriefing Phase.

(1) (CUI) On 28 May 2003, after four days in a row of similar "progress," the interrogation personnel reported that Mr. Ali would be transitioning into "full debriefing mode" unless his "compliance posture" regresses.[225] This meant that Mr. Ali was considered to be

---

[220] (U) *Id.* at Attach. F, p. 126, citing to MEA-10018-00007239.

[221] (U) The Prosecution has prepared a document that the Parties, and the Commission, referred to as an "RDI Index," which includes a chronological listing of certain records from the RDI Program. The RDI Index lists records documenting statements made by Mr. Ali during interrogation or debriefing (using Bates Prefix "MEA-STA"), medical records related to Mr. Ali's detention in CIA custody (using Bates Prefix "MEA-10018") and conditions of confinement (also using Bates prefix "MEA-100018"). AE 942YYY (GOV Sup), Government Supplement to AE 942YYY (GOV), Government Response to AE 628 (AAA Sup) and AE 942TTT (AAA), Mr. Ali's Supplements to AE 628 (AAA), Motion to Suppress Alleged Statements as Involuntary and Obtained by Torture, and Government Notice in Response to Questions from the Military Judge, filed 21 February 2025, at 30. The most current version of the RDI Index is located at Attachment E of AE 942YYY (GOV Sup), Government Supplement to AE 942YYY (GOV), Government Response to AE 628 (AAA Sup) and AE 942TTT (AAA), Mr. Ali's Supplements to AE 628 (AAA), Motion to Suppress Alleged Statements as Involuntary and Obtained by Torture, and Government Notice in Response to Questions from the Military Judge, filed 21 February 2025.

[222] (U) AE 628FFFFFFFF (AAA), Defense Notice of Exhibits, filed 21 February 2024, Attach. F pp. 127-129, citing to MEA-10018-00007237-7239.

[223] (U) *Id.* at Attach. F, pp. 127-129, citing to MEA-10018-00007237-7239.

[224] (U) *Id.* at Attach. F, pp. 128-129, citing to MEA-10018-00007237 and 7238.

[225] (U) *Id.* at Attach. F, p. 130, citing to MEA-10018-00007237.

37

compliant enough that actual physical coercive tactics would no longer be needed. The mere threat or inference of physical violence, in addition to the built-in cues or reminders to Mr. Ali, would be enough to maintain his compliance. In debriefing sessions, Mr. Ali would typically be brought to a room shackled.[226] He would then be questioned by RDI personnel consisting of interrogators, debriefers, or both.[227]

(2) (CUI) During one of the first debriefings, Mr. Ali opened the "interview" by "requesting the opportunity to admit to something which he had done wrong."[228] He then admitted to having lied about some of the information he had provided. He understood that "he had done wrong and would be punished, but felt that if interviewers learned on their own that these stories were fabrications, it would be worse for him."[229] The interviewer reprimanded Mr. Ali and "removed some of his very few 'privileges,' to demonstrate the consequences for his actions." For the rest of the interview, Mr. Ali continued to answer expansively and was "continuously apologetic for what he had done."[230]

(3) (CUI) In a June 2003 psychological assessment, Mr. Ali expressed that he was concerned about being "tortured for personal business."[231] He also stated that he was afraid of

---

[226] (U) AE 628FFFFFFFF (AAA), Defense Notice of Exhibits, filed 21 February 2024, Attach. F at pp. 131-132, citing to MEA-10018-00005983.

[227] (U) AE 628FFFFFFFF (AAA), Defense Notice of Exhibits, filed 21 February 2024, Attach. F at pp. 138, citing to MEA-10018-00007243. It is not always clear from the record who questioned Mr. Ali, whether they were in the role of an interrogator or debriefer, and whether such labels have any meaning as some personnel appear to have played multiple roles.

[228] (U) *Id.* at Attach. F, pp. 130-131, citing to MEA-10018-00001806-1807.

[229] (U) *Id.* at Attach. F, p. 131, citing to MEA-10018-00001806-1807.

[230] (U) *Id.* at Attach. F, p. 131, citing to MEA-10018-00001806-1807.

[231] (U) *Id.* at Attach. F, p. 133, citing to MEA-10018-00007234-7235.

CUI

receiving enhanced measures despite his recent cooperation.[232]

(4) (CUI) By 23 June 2003, Mr. Ali's level of responsiveness was "approaching satisfactory."[233] The officers noted that, "[Mr. Ali] answers questions directly asked of him and has been *trained* to not only answer questions asked of him, but once asked, answers expands beyond the parameters of the question and pertinent areas."[234] Mr. Ali would "regularly be provided with topics to be discussed the following day at the end of a session and he would then come to his next session prepared."[235] He was also "reminded regularly that his limited comfort is fully contingent on his total truthfulness. [Mr. Ali was] clear that his situation can regress to the state it was (which he did not enjoy) when he first arrived at [Location 2], and that this experience only represented 'ten percent' of what was possible for him to experience."[236] Mr. Ali believed "that his current imprisoned state represents the rest of his life, and his self-interest appears more important to him [than] the Al Qaida cause."[237] It was also reported that, Mr. Ali "lasted longer than most under the enhanced measures before he began to move toward compliance" and that the experience was profound for Mr. Ali.[238]

(5) (CUI) In a July 2003 debriefing with an interrogator and a psychologist, Mr. Ali was "reminded" that, "as long as he continued to be cooperative, he would have no

---

[232] (U) *Id.* at Attach. F, p. 133, citing to MEA-10018-00007234-7235.

[233] (U) AE 628FFFFFFFF (AAA), Defense Notice of Exhibits, filed 21 February 2024, Attach. F at p. 135, citing to MEA-STA-00001800.

[234] (U) AE 628FFFFFFFF (AAA), Defense Notice of Exhibits, filed 21 February 2024, Attach. F at p. 135, citing to MEA-STA-00001800 (emphasis added.).

[235] (U) *Id.* at Attach. F, p. 135, citing to MEA-STA-00001800.

[236] (U) *Id.* at Attach. F, p. 135, citing to MEA-STA-00001800.

[237] (U) *Id.* at Attach. F, p. 135, citing to MEA-STA-00001800.

[238] (U) AE 628RRRRR (AAA) Corrected Copy, Defense Notice of Exhibits, filed 21 February 2024, Attach. C at p. 60, citing to MEA-2C-00000467.

39

problems, but if he stopped cooperating, his situation would get worse."[239] During the interview, Mr. Ali was "cooperative" and "answered questions spontaneously" and with "full elaboration."[240] During multiple other July 2003 debriefings, Mr. Ali "not only answered all questions asked of him, but volunteered additional information to provide background and context to what he was saying."[241]

(6) (CUI) Mr. Ali was held at Location 2 for approximately five months, from May 2003 to September 2003. Mr. Ali was questioned approximately 135 times at Location 2.[242]

5. (U) **Mr. Ali's Time in the RDI Program at Location 7**.

a. (CUI) In September 2003, Mr. Ali was rendered to DETENTION SITE BLACK

---

[239] (U) AE 628FFFFFFFF (AAA), Defense Notice of Exhibits, filed 21 February 2024, Attach. F at p. 138, citing to MEA-STA-00007243.

[240] (U) AE 628FFFFFFFF (AAA), Defense Notice of Exhibits, filed 21 February 2024, Attach. F at p. 139, citing to MEA-STA-00007243.

[241] (U) AE 628FFFFFFFF (AAA), Defense Notice of Exhibits, filed 21 February 2024, Attach. F at pp. 141-142, citing to MEA-STA-00001354 and MEA-STA-00001350, respectively.

[242] (U) *See* AE 942YYY (GOV Sup), Government Supplement to AE 942YYY (GOV), Government Response to AE 628 (AAA Sup) and AE 942TTT (AAA), Mr. Ali's Supplements to AE 628 (AAA), Motion to Suppress Alleged Statements as Involuntary and Obtained by Torture, *And* Government Notice in Response to Questions from the Military Judge, filed 21 February 2025, Attach. E., RDI Index. The Prosecution's position is that the RDI Index contains a total 1,034 entries for Mr. Ali's entire time in the RDI program. Of the 1,034 RDI Index entries, 474 reflect instances when Mr. Ali was questioned by U.S. officials under circumstances that resulted in an intelligence report being produced by the CIA. Of the 1,034 RDI Index entries, 560 reflect "non-recognition" instances when Mr. Ali was questioned by U.S. officials to determine only whether Mr. Ali was unable to recognize or identify persons, places, or materials of interest of the United States. The Prosecution has asserted that this tally of "non-recognition" instances overstates the number of discrete interactions that U.S. officials had with Mr. Ali for those purposes because the Prosecution has created a separate RDI Index entry for each photograph Mr. Ali was shown, even if those photographs were shown to Mr. Ali together during the same questioning session. The Prosecution has disclosed that the RDI Index does not include entries for 43 instances of Mr. Ali being questioned, those instances having been summarized and cleared for release to the defense under the M.C.R.E. 505 process after 16 May 2018, which is the last date that the RDI Index was updated. *See* AE 942YYY (GOV), Government Response to AE 942YYY (GOV), Government Supplement to AE 628 (AAA Sup) and AE 942TTT (AAA), Mr. Ali's Supplements to AE 628 (AAA), Motion to Suppress Alleged Statements as Involuntary and Obtained by Torture, *And* Government Notice in Response to Questions from the Military Judge, filed 21 February 2025, at 30-31. Mr. Ali disputes the accuracy of the RDI Index but accepts that it may be a baseline for the minimum number of times he was questioned. *See* Tr. dated 22 January 2025, at pp. 51892-51893.

40

CUI

(Location 7).[243] During his rendition, "in accordance with standard rendition procedures," Mr. Ali received a body cavity search,[244] was placed into a jumpsuit, was blindfolded, had noise suppressors placed over his ears to prevent hearing ambient sounds, and had his mouth covered to prevent communication.[245] Mr. Ali's hands and ankles were shackled.[246] He was diapered and then strapped into a seat or strapped to the floor like cargo for however long the flight lasted.[247] Mr. Ali did not know where he was going or how long he would have to remain in a soiled diaper. At the new location, he was confronted with mostly new RDI program personnel.

   b. (CUI) Mr. Ali was held at Location 7 for approximately eight months, from September 2003 to April 2004. The site had constant light 24 hours a day.[248] The interior walls were painted white.[249] Each cell included a toilet, a sink, and a mattress.[250] Mr. Ali was allowed to have a blanket, a sweatshirt, sweatpants, T-shirt, socks, slippers, a towel, and a head cover for prayer.[251] All amenities could be taken away or threatened to be taken away if he did not cooperate fully

---

[243] (U) AE 942YYY (GOV), Government Response to AE 628 (AAA Sup) and AE 942TTT (AAA), Mr. Ali's Supplements to AE 628 (AAA), Motion to Suppress Alleged Statements as Involuntary and Obtained by Torture, filed 2 December 2024, at p. 35.

[244] (U) AE 628RRRRR (AAA) Corrected Copy, Defense Notice of Exhibits, filed 21 February 2024, Attach. C at p. 42, citing to MEA-2C-00000449.

[245] (U) AE 628RRRRR (AAA) Corrected Copy, Defense Notice of Exhibits, filed 21 February 2024, Attach. C at p. 42, citing to MEA-2C-00000449.

[246] (U) *Id.* at Attach. C, p. 42, citing to MEA-2C-00000449.

[247] (U) SSCI Executive Summary at p. 64 n.318.

[248] (U) AE 628FFFFFFFF (AAA), Defense Notice of Exhibits, filed 21 February 2024, Attach. F at p. 153, citing to MEA-10018-00006016.

[249] (U) AE 942YYY (GOV), Government Response to AE 628 (AAA Sup) and AE 942TTT (AAA) Mr. Ali's Supplements to AE 628 (AAA), Motion to Suppress Alleged Statements and Involuntary and Obtained by Torture, filed 2 December 2024, at p. 35.

[250] (U) *Id.* at p. 35.

[251] (U) *Id.* at p. 35. It is not clear whether Mr. Ali had access to a Quran at Location 7.

41

CUI

with questioning.[252] White noise was continuously played in the cells.[253] Mr. Ali was not

allowed outside for exercise.[254] He was only allowed to shower once a week.[255]

c. (CUI) At Location 7, Mr. Ali continued to cooperate with questioning. "At the first

session, [Mr. Ali] smiled broadly when he first saw SM1, whom he recognized from previous

debriefing sessions at his last location[.]"[256] Mr. Ali was questioned approximately 167 times at

Location 7.[257] One officer reported that she questioned Mr. Ali for approximately 45 minutes to

2 hours almost every day.[258] The debriefing rooms at Location 7 were set up for and were

constant reminders of interrogations.[259] Dr. Mitchell observed several debriefings of Mr. Ali at

Location 7.[260] He described Mr. Ali as always cordial and respectful.[261] It was apparent that Mr.

---

[252] (CUI) AE 628FFFFFFFF (AAA), Defense Notice of Exhibits, filed 21 February 2024, Attach. F at p. 249, citing to MEA-13E-00000358. (In December 2003, the following message traffic was sent from Location 7 to CIA headquarters: "In the interrogation process, the detainee is conditioned that additional comforts/privileges result from enhanced cooperation, and diminished comfort/privileges result from lack of cooperation.") *See also* AE 628FFFFFFFF (AAA), Defense Notice of Exhibits, filed 21 February 2024, Attach. F at p. 241, citing to MEA-13E-00000344-345, stating the same.

[253] (U) AE 628FFFFFFFF (AAA), Defense Notice of Exhibits, filed 21 February 2024, Attach. F at p. 153, citing to MEA-10018-00006016.

[254] (U) AE 942YYY (GOV), Government Response to AE 628 (AAA Sup) and AE 942TTT (AAA) Mr. Ali's Supplements to AE 628 (AAA), Motion to Suppress Alleged Statements and Involuntary and Obtained by Torture, filed 2 December 2024, at p. 36.

[255] (U) *Id.* at p. 36.

[256] (U) AE 628FFFFFFFF (AAA), Defense Notice of Exhibits, filed 21 February 2024, Attach. F at p. 151, citing to MEA-STA-00005826.

[257] (U) See AE 942YYY (GOV Sup), Government Supplement to AE 942YYY (GOV), Government Response to AE 628 (AAA Sup) and AE 942TTT (AAA), Mr. Ali's Supplements to AE 628 (AAA), Motion to Suppress Alleged Statements as Involuntary and Obtained by Torture *And* Government Notice In Response to Questions from the Military Judge, filed 21 February 2025, Attach. E., RDI Index.

[258] (U) AE 628RRRRR (AAA) Corrected Copy, Defense Notice of Exhibits, filed 21 February 2024, Attach. C at p. 42, citing to MEA-2C-00000449.

[259] (U) AE 628SSS (AAA), Defense Notice of Exhibits, filed 21 October 2019, Attach. F at p. 399, citing to MEA-PRG-00000211. (cited information is unclassified and is contained in a document classified Secret)

[260] (U) Tr. dated 23 January 2020, at pp. 30782-30798.

[261] (U) Tr. dated 23 January 2020, at pp. 30787-30788.

42

CUI

Ali had been previously questioned on the same topics that came up in the debriefing he sat in on.[262] It was not unusual for a debriefer to ask a detainee to go over the same topics to see if the detainee would disclose any new information.[263] Debriefers were cordial and businesslike with Mr. Ali.[264] Mr. Ali volunteered information to the debriefers and he identified photographs for them.[265] In accordance with his conditioning, Mr. Ali was "fully engaged in the interview process"[266] and he "presented himself as willing to provide information without prompting."[267]

    d. (CUI) At one point during his time at Location 7, Mr. Ali became difficult.[268] Interrogator 6 had another Interrogator join her for a debriefing and Mr. Ali became more compliant.[269] Tactics such as an inferred threat, an interrogator's presence during questioning, and strong language, would all be used sometimes to gain detainee compliance.[270] Interrogator 6 stated that all detainees continued to experience mental torture in detention.[271] During one questioning, Interrogator SM1 confronted Mr. Ali. She told him that she thought he was being untruthful. He became "very, very nervous." She and Interrogator NZ7 left him to think and "sit and stew." Mr. Ali then began "fidgeting and rocking back and forth in his chair," with "his legs

---

[262] (U) Tr. dated 23 January 2020, at p. 30788.

[263] (U) Tr. dated 23 January 2020, at p. 30788.

[264] (U) Tr. dated 23 January 2020, at p. 30791.

[265] (U) Tr. dated 23 January 2020, at pp. 30796-30797.

[266] (U) AE 628FFFFFFFF (AAA), Defense Notice of Exhibits, filed 21 February 2024, Attach. F at p. 156, citing to MEA-10018-00003005.

[267] (U) *Id.* at Attach. F, p. 151, citing to MEA-STA-00005826.

[268] (U) AE 628RRRRR (AAA) Corrected Copy, Defense Notice of Exhibits, filed 21 February 2024, Attach. C at p. 44, citing to MEA-2C-00000451.

[269] (U) *Id.* at Attach. C, p. 44, citing to MEA-2C-00000451.

[270] (U) *Id.* at Attach. C, p. 44, citing to MEA-2C-00000451.

[271] (U) *Id.* at Attach. C, p. 45, citing to MEA-2C-00000452.

43

CUI

shaking."[272] When they returned to the room, Mr. Ali said he would tell them everything they wanted and gave them the whole story.[273] It is unclear whether it was after this exact interrogation, but at one point, Interrogator SM1, "sternly cautioned Ammar that, even though his condition had improved somewhat with the move to his new facility, he was still expected to answer debriefers' questions truthfully and expansively."[274] Interrogator SM1 warned Mr. Ali that, "every day was a test for him and that new people would be talking to him and assessing him."[275]

e. (CUI) One Interrogator's role during the debriefings was to be silent and "intimidate by his presence."[276] The interrogators wore black clothes to symbolize a "menacing black presence."[277] He asserted that he never had to make threats to Mr. Ali because he was always cooperative.[278]

f. (CUI) A CIA contractor reported that Mr. Ali "was having a lot of anxiety and was fearful of what happened or could happen to him." She said, "such fears occur frequently as part of the long-term consequences of detention, particularly when the prisoner is isolated." She further noted that he "was experiencing decreased coping capacity and starting to evidence

---

[272] (U) AE 628RRRRR (AAA) Corrected Copy, Defense Notice of Exhibits, filed 29 January 2020, Attach. C at p. 43, citing to MEA-2C-00000450.

[273] (U) *Id. at* Attach. C, p. 43, citing to MEA-2C-00000450.

[274] (U) AE 628SSS (AAA), Defense Notice of Exhibits, filed 21 October 2019, Attach. F at p. 1004, citing to MEA-PRG-00000896. (cited information is unclassified and is contained in a document classified Secret).

[275] (U) *Id. at* Attach. F, p. 1004 citing to MEA-PRG-00000896. (cited information is unclassified and is contained in a document classified Secret)

[276] (U) AE 628RRRRR (AAA) Corrected Copy, Defense Notice of Exhibits, filed 29 January 2020, Attach. C at p. 44, citing to MEA-2C-00000451.

[277] (U) *Id. at* Attach. C, p. 44, citing to MEA-2C-00000451.

[278] (U) *Id. at* Attach. C, p. 44, citing to MEA-2C-00000451.

44

symptoms related to his loss of control. Typically, she said, "prisoners become increasingly fearful because of their inability to control their environments."[279] She also reported that Mr. Ali "was becoming more fearful and having intrusive thoughts of imagined potential mistreatment while confined."[280]

6. (U) **Mr. Ali's time in the RDI Program at Location 5**.

    a. (CUI) In April 2004,[281] Mr. Ali again went through the stressful rendition process as he was rendered to DETENTION SITE BLUE (Location 5). He remained there for approximately 11 months, until February 2005.[282] Location 5 included lights 24 hours a day and sound masking.[283] RDI personnel noted Mr. Ali "participates well during debriefing sessions" that "based on [Mr. Ali]'s current level of participation, he has been provided with all amenities available."[284] Accordingly, in addition to the previous amenities, he now received an extra T-shirt, an extra pair of socks, a mattress, pillow and a bed covering.[285] He also had access to a Quran, prayer rug, prayer cap, copies of *The Complete Course of Yoga* and *War and Peace*, and

---

[279] (U) AE 628FFFFFFFFFF (AAA), Defense Notice of Exhibits, filed 21 February 2024, Attach. F at p. 147, citing to MEA-STA-00005557-5558.

[280] (U) *Id. at* Attach. F, p. 147, citing to MEA-STA-00005557-5558.

[281] (U) AE 628FFFFFFFFFF (AAA), Defense Notice of Exhibits, filed 21 February 2024, Attach. F at p. 157, citing to MEA-2A-000000007.

[282] (U) AE 942YYY (GOV), Government Response to AE 628 (AAA Sup) and AE 942TTT (AAA), Mr. Ali's Supplements to AE 628 (AAA), Motion to Suppress Alleged Statements and Involuntary and Obtained by Torture, filed 2 December 2024, at p. 36.

[283] (U) AE 628FFFFFFFFFF (AAA), Defense Notice of Exhibits, filed 21 February 2024, Attach. F at pp. 157-158, citing to MEA-2C-00000410-0502 and MEA-10018-00005092.

[284] (U) *Id.* at Attach. F, p. 167, citing to MEA-10018-00005988.

[285] (U) AE 942YYY (GOV), Government Response to AE 628 (AAA Sup) and AE 942TTT (AAA), Mr. Ali's Supplements to AE 628 (AAA), Motion to Suppress Alleged Statements and Involuntary and Obtained by Torture, filed 2 December 2024, at p. 37.

45

CUI

a few other amenities.[286] He was allowed to shower three times a week.[287] He was still not allowed outside to exercise. Now one year into his detention, he was still not allowed any contact with anyone other than the RDI staff; he still was not told where he was, or what would eventually be done with him.

b. (CUI) In numerous reports, RDI personnel at Location 5 reported that Mr. Ali was "forthcoming and readily engaged with the interviewer."[288] Interrogator KG5 described him as, "a young man who likes to please."[289] Around May 2004, there was an incident where detainees heard another detainee being abused during the night.[290] Interrogator KG5 inquired if Mr. Ali had heard anything that bothered him while in his cell. "[Mr. Ali] immediately said yes, and looked relieved to talk about it. [Mr. Ali] remarked that the yelling, sobbing and crying started exactly two weeks ago [. . .] [Mr. Ali] emphatically stated that he was bothered by the interrogation of a woman that had taken place early that morning."[291] Interrogator KG5 assured him that "we" did not abuse women and asked Mr. Ali if he was sure that it was a woman's voice he heard.[292] Mr. Ali said he was 100 percent confident it was a woman's voice. He relayed

---

[286] (U) AE 942YYY (GOV), Government Response to AE 628 (AAA Sup) and AE 942TTT (AAA), Mr. Ali's Supplements to AE 628 (AAA), Motion to Suppress Alleged Statements and Involuntary and Obtained by Torture, filed 2 December 2024, at p. 37.

[287] (U) *Id.* at p. 37.

[288] (U) AE 628FFFFFFFFF (AAA), Defense Notice of Exhibits, filed 21 February 2024, Attach. F at p. 158, citing to MEA-STA-00001493.

[289] (U) AE 628RRRRR (AAA) Corrected Copy, Defense Notice of Exhibits, filed 21 February 2024, Attach. C at p. 47, citing to MEA-2C-00000454.

[290] (U) AE 628FFFFFFFFF (AAA), Defense Notice of Exhibits, filed 21 February 2024, Attach. F at p. 157, citing to MEA-2C-00000410-502.

[291] (U) *Id.* at Attach. F, p. 161, citing to MEA-STA-00006008.

[292] (U) *Id.* at Attach. F, p. 162, citing to MEA-STA-00006008.

46

CUI

that he had not been sleeping or feeling well because of the experience.[293]

    c. (CUI) Mr. Ali was questioned approximately 274 times at Location 5.[294] In addition to the constant debriefings, the RDI personnel conducted recurring assessments on Mr. Ali approximately every 45 days.[295] These assessments were "designed to fully engage the detainee with the interrogators across a diverse range of issues related to resistance posture/participation level, interactions with personnel, requirement for any changes in current approaches, and future exploitation issues."[296] Thus, the CIA was still constantly assessing Mr. Ali to ensure that his conditioning was still effective, i.e., that he was still cooperating or to determine whether they needed to adjust their approach with him.

    d. (CUI) During one such assessment in November 2004, the officer reported that Mr. Ali's "participation with debriefers is consistently good in terms of responding to questions and providing additive details. [. . .] He desires frequent visits from staff. No active resistance is obvious in his interaction with debriefers and interrogators. He communicates the impression of a person who has nothing to hide anymore[.]"[297] It was also noted that "he is not flippant or disrespectful and responds to virtually all dialogue with a smile and other pleasing affectations."[298] RDI Program personnel were still cautious as they noted that, "[Mr. Ali] does a

---

[293] (U) *Id.* at Attach. F, p. 162, citing to MEA-STA-00006008.

[294] (U) *See* AE 942YYY (GOV Sup), Government Supplement to AE 942YYY (GOV), Government Response to AE 628 (AAA Sup) and AE 942TTT (AAA), Mr. Ali's Supplements to AE 628 (AAA), Motion to Suppress Alleged Statements as Involuntary and Obtained by Torture *And* Government Notice In Response to Questions from the Military Judge, filed 21 February 2025, Attach. E., RDI Index.

[295] (U) AE 628FFFFFFFF (AAA), Defense Notice of Exhibits, filed 21 February 2024, Attach. F at p. 170, citing to MEA-10018-00007260.

[296] (U) *Id. at* Attach. F at pp. 169-170, citing to MEA-10018-00007260.

[297] (U) *Id. at* Attach. F at p. 170, citing to MEA-10018-00007260.

[298] (U) AE 628FFFFFFFF (AAA), Defense Notice of Exhibits, dated 21 February 2024, Attach. F at p. 170, citing to MEA-10018-00007260.

47

good job at portraying a cooperative detainee at peace with himself but he is likely both more fragile and fanatical than this in reality."[299] The officer noted that there "is no significant difference in [Mr. Ali]'s interactions with interrogators and debriefers. He is appropriately d[e]ferential and responds with ostensive compliance to all demands."[300] The assessment concludes with the note that, "[Mr. Ali] currently receives all amenities. His level of amenities should be changed only as part of a coordinated plan to influence his behavior to a specific end."[301] The Commission adopts these statements and observations as fact.

    e. (CUI) In January 2005, it was reported that "[Mr. Ali] has discussed experiencing anxiety in the recent past, particularly when people come to his cell. He states that he understands there is nothing for him to be anxious about and currently demonstrates that he can control this anxiety when it occurs."[302] In a psychological assessment at Location 5 in February 2005, it was noted that, "[Mr. Ali] also has strong social reassurance needs that are best met through regular debriefings and regular staff interactions."[303] The Commission adopts these statements and observations as fact.

7. (U) **Mr. Ali's Time in the RDI Program at Location 8**.

    a. (CUI) Mr. Ali was rendered[304] to DETENTION SITE VIOLET (Location 8) in

---

[299] (U) *Id.* at Attach. F, p. 171, citing to MEA-10018-00007260.

[300] (U) *Id*. at Attach. F, p. 171, citing to MEA-10018-00007260.

[301] (U) *Id.* at Attach. F at p. 171, citing to MEA-10018-00007260.

[302] (U) *Id.* at Attach. F at p. 172, citing to MEA-10018-00003087.

[303] (U) *Id.* at Attach. F at p. 173, citing to MEA-10018-00003096.

[304] (CUI) AE 628FFFFFFFFF (AAA), Defense Notice of Exhibits, filed 21 February 2024, Attach. F at p. 173, citing to MEA-2B-00000010 ("Guidance for the transfer of [Mr. Ali] included: [Mr. Ali] will be wearing flex cuffs, have hearing and auditory senses impaired and diapered.")

48

February 2005.[305] He remained there for approximately 14 months, until March 2006.[306] Location 8 again included lights 24 hours a day.[307] However, in late 2005, constant light was downgraded to 18 hours a day, 7 days a week.[308] It is not clear if white noise was used, but public address system speakers outside the cells masked outside noises and conversations.[309] Mr. Ali continued to cooperate, so he continued to receive more amenities than at his previous locations.[310] He was allowed unlimited access to a shower. He was allowed an opportunity each week to access an exercise area and a movie-viewing area. He was allowed to request books from an approved list. He was also permitted to keep his hair and beard as he wished. His cell had no windows.[311] He was still not allowed outside for exercise or recreation.[312] He was still not

---

[305] (U) *Id.* at Attach. F, p. 176, citing to MEA-2C-00001470.

[306] (U) AE 942YYY (GOV), Government Response to AE 628 (AAA Sup) and AE 942TTT (AAA) Mr. Ali's Supplements to AE 628 (AAA), Motion to Suppress Alleged Statements and Involuntary and Obtained by Torture, filed 2 December 2024, at p. 37.

[307] (U) *Id.* at Attach. F, p. 173, citing to MEA-2B-00000010.

[308] (U) AE 942YYY (GOV Sup), Government Supplement to AE 942YYY (GOV), Government Response to AE 628 (AAA Sup) and AE 942TTT (AAA), Mr. Ali's Supplements to AE 628 (AAA), Motion to Suppress Alleged Statements as Involuntary and Obtained by Torture And Government Notice In Response to Questions from the Military Judge, filed 21 February 2025, at p. 29.

[309] (U) AE 628FFFFFFFFF (AAA), Defense Notice of Exhibits, filed 21 February 2024, Attach. F at p. 173, citing to MEA-2C-00000763.

[310] (CUI) *See* AE 942YYY (GOV), Government Response to AE 628 (AAA Sup) and AE 942TTT (AAA) Mr. Ali's Supplements to AE 628 (AAA), Motion to Suppress Alleged Statements and Involuntary and Obtained by Torture, filed 2 December 2024, at pp. 37-38; *see also* AE 628FFFFFFFFF (AAA), Defense Notice of Exhibits, filed 21 February 2024, Attach. F at pp. 296, 306, and 330, citing to MEA-13E-00000492, and 0497-0510. (In July through September 2005, CIA headquarters provided the following guidance to CIA detention sites: "The management of detainees is a dynamic process which becomes more challenging as detainees remain in our custody for an extended period. An equally important consideration is that some detainees are participating at a higher level than others with an expectation that their treatment will improve – an expectation we create and must meet if we are to keep detainees at an acceptable level of participation[.]"

[311] (U) AE 628FFFFFFFFF (AAA), Defense Notice of Exhibits, filed 21 February 2024, Attach. F at pp. 173-174, citing to MEA-2C-00000763.

[312] *Id.* at Attach. F, pp. 173-174, citing to MEA-STA-00000763.

CUI

allowed any contact with anyone other than the RDI staff, nor was he told where he was or what would eventually be done with him.

b. (CUI) Upon his arrival at Location 8, an interrogator spoke with Mr. Ali. He assured Mr. Ali that, "the transfer was routine, his production and deportment were generally within acceptable limits and were expected to continue, and that amenities would be consistent with the previous site."[313] In this way, the interrogator reminded Mr. Ali that his "production" and "deportment" were still linked to his amenities. Mr. Ali expressed relief that the rendition was completed and that the move was not punitive.[314] The interrogators provided additional personal items to the detainees within a few days of their arrival to "[e]nsure positive motivation and establishment of control."[315] The interrogators also started the "initial debriefings" as soon as possible "to reassure detainees the facility is business as usual and to maintain their conditioning to provide information."[316]

c. (CUI) In a March 2005 interrogation, Mr. Ali explained to Interrogator NZ7 that he realized "he would be with the agency for 'a very long time' and he could survive only by telling the truth. He said his motivation for telling the truth was not to gain a shorter sentence or more favorable treatment, but 'because of reality – You are my life now.'"[317] Mr. Ali also expressed a concern, that he said he knew was irrational, that he was and is being used as an experiment.[318]

---

[313] (U) AE 628FFFFFFFF (AAA), Defense Notice of Exhibits, filed 21 February 2024, Attach. F at p. 176, citing to MEA-2C-00001470.

[314] (U) *Id.* at Attach. F, p. 176, citing to MEA-2C-00001470.

[315] (U) *Id.* at Attach. F, p. 177, citing to MEA-2C-00001475-1476.

[316] (U) *Id.* at Attach. F, p. 177, citing to MEA-2C-00001475-1476.

[317] (U) *Id.* at Attach. F, p. 183, citing MEA-10018-00009531-9533.

[318] (U) *Id.* at Attach. F, p. 184, citing MEA-10018-00009531-9533.

50

CUI

As an example, he explained that he had been afraid to complain about a pressure sore on his nose from the rendition process because he was afraid it had been done purposefully to see if it would have an effect on him.[319] Interrogator NZ7, noted that actions can have unintended consequences with Mr. Ali because he is sensitive to small gestures of kindness and equally sensitive to what he perceives as acts of punishment.[320] The officer also reported that, "when asked to describe the interrogation process and his interaction with interrogators, the most frequent word used by Mr. Ali was 'fear.'"[321] Mr. Ali also said, "he felt surrounded by the enemy, that feeling has never left him and, at times, he feels consumed by fear."[322] He also said that the smallest thing can remind him of his early interrogation days, and cause him to tremble.[323] Conversely, he also recognized that the people who could help him are the interrogators.[324] At the end of the report, the interrogator stated that Mr. Ali was currently receiving full amenities and should be considered for any additional amenities. Such amenities would be considered for long-term maintenance of attitude and frame of mind for optimum detainee management.[325] For "future exploitation issues," the interrogator concluded that, "[Mr. Ali] is consumed with the uncertainty of his position. He said he is uncertain about what will happen to him after his intelligence value is exhausted and what his ultimate fate will be. He is sensitive to any hint or reference to his future and may read unintended messages in casual and

---

[319] (U) *Id.* at Attach. F, p. 184, citing to MEA-10018-00009531-9533.

[320] (U) AE 628FFFFFFFF (AAA), Defense Notice of Exhibits, filed 21 February 2024, Attach. F at p. 184, citing to MEA-10018-00009531-9533.

[321] (U) *Id.* at Attach. F, p. 184, citing to MEA-10018-00009531-9533.

[322] (U) *Id.* at Attach. F, p. 184, citing to MEA-10018-00009531-9533.

[323] (U) *Id.* at Attach. F, p. 185, citing to MEA-10018-00009531-9533.

[324] (U) *Id.* at Attach. F, p. 186, citing to MEA-10018-00009531-9533.

[325] (U) *Id.* at Attach. F, p. 186, citing to MEA-10018-00009531-9533.

51

CUI

unguarded comments."[326] Dr. Jessen believed this level of fear by a detainee, after a year and a half in the debriefing phase, was unexpected.[327]

d. (CUI) A May 2005 psychological assessment noted a list of Mr. Ali's physical complaints and concluded that the physical complaints were most likely due to Mr. Ali's anxiety."[328]

e. (CUI) By July 2005, Mr. Ali had been in agency custody for 806 days and had produced 278 intelligence reports.[329] Interrogators noted that Mr. Ali appeared more comfortable at Location 8 than at Location 5. They acknowledged that in the past, "he had described multiple instances of attributing fears to unrelated events. As an example, [Mr. Ali] would indicate that the noise of a cell door might make him begin to think that the security officers were coming for him" and that "strange sounds or other unrelated activities would make him think that he might be harmed."[330] Mr. Ali acknowledged that he knew it was irrational and that he would remind himself that he was safe in U.S. custody and well taken care of in order to make those fears pass.[331] The interrogators reported that, "while [Mr. Ali] retains vivid memories of his earlier interrogations, he knows that interrogators can help him and seeks to establish a connection with them."[332] They noted that, "[Mr. Ali] can, in fact, become somewhat dependent on interrogators

---

[326] (U) *Id.* at Attach. F, p. 186, citing to MEA-10018-00009531-9533.

[327] (U) Tr. dated 16 July 2024, at pp. 48131-48133.

[328] (U) AE 628FFFFFFFF (AAA), Defense Notice of Exhibits, filed 21 February 2024, Attach. F at p. 186, citing to MEA-10018-00005991.

[329] (U) *Id.* at Attach. F, p. 189, citing to MEA-10018-00009534-9536.

[330] (U) *Id.* at Attach. F, pp. 189-190, citing to MEA-10018-00009534-9536.

[331] (U) *Id.* at Attach. F, p. 190, citing to MEA-10018-00009534-9536.

[332] (U) Tr. dated Attach. F, pp. 190 and 195, citing to MEA-10018-00009534-9539.

52

for advice on better ways to cope with detention and managing his daily activities."[333]

f. (CUI) By October 2005, Mr. Ali continued to improve the way he answered RDI officials' questions and rarely required correction of his behavior.[334] The interrogators noted that he "thoroughly enjoys the structured days…as well as the work assignments interrogators give him. This makes him feel like he is involved in a corporation, with a normal work life, which is his desire.[335] He received regular "assignments" from the interrogators to prepare time management and other business-related classes that he then taught to them.[336]

g. (CUI) By late 2005, Mr. Ali had been in CIA custody for 957 days and had produced 294 intelligence reports.[337] Mr. Ali was questioned approximately 424 times at Location 8.[338] His interviewers continued to note his cooperation and compliance. Most debriefers found Mr. Ali to be "respectful, easy to engage and a somewhat pleasant detainee during debriefing sessions."[339]

h. (CUI) A January 2006 psychological assessment found that Mr. Ali's capacity "to effectively cope with sustained confinement" had diminished and that Mr. Ali attributed it to

---

[333] (U) *Id.* at Attach. F, pp. 190 and 195, citing to MEA-10018-00009534-9539.

[334] (U) *Id.* at Attach. F, pp. 194 and 200, citing to MEA-10018-00009537-9542.

[335] (U) AE 628FFFFFFFFF (AAA), Defense Notice of Exhibits, filed 21 February 2024, Attach. F at pp. 195 and 200, citing to MEA-10018-00009537-9542.

[336] (U) *Id.* at Attach. F, pp. 195-196, 200, and 201, citing to MEA-10018-00009537-9542.

[337] (U) *Id.* at Attach. F, p. 199, citing to MEA-10018-00009540-000009542.

[338] (U) *See* AE 942YYY (GOV Sup), Government Supplement to AE 942YYY (GOV), Government Response to AE 628 (AAA Sup) and AE 942TTT (AAA), Mr. Ali's Supplements to AE 628 (AAA), Motion to Suppress Alleged Statements as Involuntary and Obtained by Torture And Government Notice In Response to Questions from the Military Judge, filed 21 February 2025, Attach. E., RDI Index.

[339] (U) AE 942YYY (GOV), Government Response to AE 628 (AAA Sup) and AE 942TTT (AAA) Mr. Ali's Supplements to AE 628 (AAA), Motion to Suppress Alleged Statements and Involuntary and Obtained by Torture, filed 2 December 2024, at p. 39.

53

CUI

"anxiety and uncertainty pertaining to his confinement."[340] The drafter reported that Mr. Ali told

her he had been experiencing sleep problems during the past few months and had "increased

feelings of anxiety accompanied by intrusive thoughts of imagined potential mistreatment while

confined."[341] Mr. Ali feared making a request in the wrong way and that he would then start to

imagine increasingly harsh physical punishments.[342] He stated that he had similar thoughts

throughout his detention, but that they have been increasing in frequency, intensity, and

duration.[343] He did acknowledge that he was crying less frequently than previously.[344]

8. (U) **Mr. Ali's Time in the RDI Program at Location 9.**

a. (CUI) In March 2006, Mr. Ali was rendered to DETENTION SITE ORANGE

(Location 9) in March 2006, where he remained for approximately seven months, until

September 2006.[345] Location 9 facilities were almost the same in configuration as those at

Location 8.[346] Location 9 continued the pattern of slowly improving amenities and conditions for

Mr. Ali. His cell light was dimmed during certain hours of the day.[347] It is not clear if white

noise was used, but using some type of sound masking such as white noise was a standard

---

[340] (U) AE 628FFFFFFFF (AAA), Defense Notice of Exhibits, filed 21 February 2024, Attach. F at p. 205, citing to MEA-10018-00003133-3135.

[341] (U) *Id.* at Attach. F, p. 206, citing to MEA-10018-00003133-3135.

[342] (U) AE 628FFFFFFFF (AAA), Defense Notice of Exhibits, filed 21 February 2024, Attach. F at p. 206, citing to MEA-10018-00003133-3135.

[343] (U) *Id.* at Attach. F, p. 206, citing to MEA-10018-00003133-3135.

[344] (U) *Id.* at Attach. F, p. 206, citing to MEA-10018-00003133-3135.

[345] (U) AE 942YYY (GOV), Government Response to AE 628 (AAA Sup) and AE 942TTT (AAA) Mr. Ali's Supplements to AE 628 (AAA), Motion to Suppress Alleged Statements and Involuntary and Obtained by Torture, filed 2 December 2024, at p. 39.

[346] (U) AE 628FFFFFFFF (AAA), Defense Notice of Exhibits, filed 21 February 2024, Attach. F at p. 207, citing to MEA-2C-00000462.

[347] (U) *Id.* at Attach. F, p. 210, citing to MEA-10018-00003145.

54

practice at CIA sites,[348] so the Commission presumes some such noise-masking was used at this site. Mr. Ali was given unlimited water and "food and drink that [met] or exceed[ed] basic requirements."[349] He could adjust the temperature in his cell. His cell still had no windows. He was given access to an exercise area, but he was still not allowed outside. He was still allowed no contact with anyone outside of the RDI staff. He still was not told what would happen to him.

     b. (CUI) Mr. Ali continued to be compliant and cooperative with questioners at Location 9. Mr. Ali was questioned approximately 92 times while at Location 9.[350] In July 2006, RDI personnel conducted an assessment of Mr. Ali to evaluate his level of participation and interaction with debriefers, interrogators, and other personnel, his intelligence productivity, and any ongoing exploitation issues.[351] Mr. Ali continued to participate at a relatively reliable and predictable level without any overt or obvious resistance techniques and he "readily respond[ed] to questions and provide[d] more detailed or illuminating information when appropriate."[352] Historically, Mr. Ali fought with anxiety problems which took time and "continual reinforcement" by interrogators that he was safe.[353] They observed that while Mr. Ali "retains vivid memories of his earlier interrogations, he knows that interrogators can help him and thus

---

[348] (U) Tr. dated 28 January 2020, at p. 31642.

[349] (U) AE 942YYY (GOV), Government Response to AE 628 (AAA Sup) and AE 942TTT (AAA) Mr. Ali's Supplements to AE 628 (AAA), Motion to Suppress Alleged Statements and Involuntary and Obtained by Torture, filed 2 December 2024, at p. 39.

[350] (U) See AE 942YYY (GOV Sup), Government Supplement to AE 942YYY (GOV), Government Response to AE 628 (AAA Sup) and AE 942TTT (AAA), Mr. Ali's Supplements to AE 628 (AAA), Motion to Suppress Alleged Statements as Involuntary and Obtained by Torture and Government Notice In Response to Questions from the Military Judge, filed 21 February 2025, Attach. E., RDI Index.

[351] (U) AE 628FFFFFFFF (AAA), Defense Notice of Exhibits, filed 21 February 2024, Attach. F at pp. 214-215, citing to MEA-10018-00009543.

[352] (U) Id. at Attach. F, p. 217, citing to MEA-10018-00009543.

[353] (U) Id. at Attach. F, p. 216, citing to MEA-10018-00009543.

seeks to establish and maintain a close connection with interrogators."[354] The RDI personnel

recommended that Mr. Ali should be seen on a regular basis as he had developed a dependency

on interrogators to help him manage his days, his anxieties and basic coping skills for

detention.[355] They cautioned that interrogators should refrain from harsh toned reprimands as

Mr. Ali is easily rattled.[356] Another assessment was conducted in September 2006 and it made

many of the same conclusions as to Mr. Ali's struggle to adjust, difficulty sleeping, and his need

for continual reinforcement that he was safe.[357]

9. (U) **Summary of Mr. Ali's Time in the RDI Program**.

    a. (U) During the entirety of his time in the black sites, totaling more than three years,

Mr. Ali had no contact with anyone who was not either an employee or agent of the United

States. Mr. Ali was held in conditions tantamount to solitary confinement for this entire period.

Mr. Ali did not know where he was being held. He did not know how long he would be held. He

did not know what would happen to him when he no longer had intelligence value to the

Americans.

    b. (U) Over the course of Mr. Ali's time in the RDI program, he was detained at five

different sites and questioned more than 1,000 times[358] by approximately 30 different

---

[354] (U) *Id.* at Attach. F, p. 217, citing to MEA-10018-00009543.

[355] (U) *Id.* at Attach. F, p. 217, citing to MEA-10018-00009543.

[356] (U) AE 628FFFFFFFF (AAA), Defense Notice of Exhibits, filed 21 February 2024, Attach. F at p. 218, citing to MEA-10018-00009543.

[357] (U) *Id.* at Attach. F, pp. 219-220, citing to MEA-10018-00003161.

[358] (U) *See* AE 942YYY (GOV Sup), Government Supplement to AE 942YYY (GOV), Government Response to AE 628 (AAA Sup) and AE 942TTT (AAA), Mr. Ali's Supplements to AE 628 (AAA), Motion to Suppress Alleged Statements as Involuntary and Obtained by Torture And Government Notice In Response to Questions from the Military Judge, filed 21 February 2025, Attach. E., RDI Index. Mr. Ali asserts that he was questioned approximately 1,119 times based on the RDI Index. *See* Tr. dated 22 January 2025, at 51892. This number appears to include the 26 times that he is listed as being questioned at "capture." The Commission interprets these RDI Index entries as

56

CUI

government agents.[359] He provided information on the 11 September 2001 attack and his role in it, other Al Qaeda plots, associates, and Al Qaeda's structure and methods.[360] During RDI questioning, Mr. Ali covered, confirmed, or admitted nearly every fact that is listed as an overt act that he is alleged to have performed as part of the conspiracy in Charge I.[361]

c. (CUI) Psychological assessments were made of Mr. Ali periodically during his three-and-a-half-year RDI detention.[362] During early assessments, the psychologists would not only assess the detainees' psychological states to determine if EITs could be used, but they would also sometimes make suggestions to the interrogators to guide them in their approaches.[363] As far as determining whether the EITs could cause lasting harm to detainees, Y5X acknowledged, and

---

having occurred during Mr. Ali's Pakistani custody which is outside the period of his RDI detention. The Prosecution calculates the RDI Index as having 1034 entries, plus the additional 43 times Mr. Ali was questioned which were not documented in the RDI Index. Although the exact number is unclear, for purposes of this Ruling, the Commission finds that Mr. Ali was questioned at least 1,000 times by U.S. officials prior to the taking of his LHM statements by the FBI.

[359] (U) *See* AE 942YYY (GOV Sup), Government Supplement to AE 942YYY (GOV), Government Response to AE 628 (AAA Sup) and AE 942TTT (AAA), Mr. Ali's Supplements to AE 628 (AAA), Motion to Suppress Alleged Statements as Involuntary and Obtained by Torture And Government Notice In Response to Questions from the Military Judge, filed 21 February 2025, Attach. E., RDI Index.

[360] (U) *See* AE 942YYY (GOV Sup), Government Supplement to AE 942YYY (GOV), Government Response to AE 628 (AAA Sup) and AE 942TTT (AAA), Mr. Ali's Supplements to AE 628 (AAA), Motion to Suppress Alleged Statements as Involuntary and Obtained by Torture And Government Notice In Response to Questions from the Military Judge, filed 21 February 2025, Attach. F at 148-1324.

[361] (U) *See generally* AE 942YYY (GOV Sup), Government Supplement to AE 942YYY (GOV), Government Response to AE 628 (AAA Sup) and AE 942TTT (AAA), Mr. Ali's Supplements to AE 628 (AAA), Motion to Suppress Alleged Statements as Involuntary and Obtained by Torture And Government Notice In Response to Questions from the Military Judge, filed 21 February 2025, Attach. F and G, and *see* Charge Sheet.

[362] (U) *See* AE 942YYY (GOV), Government Response to AE 628 (AAA Sup) and AE 942TTT (AAA) Mr. Ali's Supplements to AE 628 (AAA), Motion to Suppress Alleged Statements and Involuntary and Obtained by Torture, filed 2 December 2024, para. 5.V.C. at pp. 40-44; *see also* CIA OIG report in AE 628RRRRR (AAA) Corrected Copy, Defense Notice of Exhibits, filed 29 January 2020, Attach. C at pp. 20-84, citing to MEA-2C-00000428-0491.

[363] (U) AE 628RRRRR (AAA) Corrected Copy, Defense Notice of Exhibits, filed 29 January 2020, Attach. C at p. 32, citing to MEA-2C-00000439.

57

the Commission finds, that lasting harm is difficult to predict and that such an assessment may not even be possible.[364]

d. (U) None of the personnel who conducted these assessments were called by the Prosecution to testify. The Prosecution has not disclosed their true names and only provided summaries of their backgrounds.[365] As such, it is impossible to determine their qualifications and what, if any, biases these witnesses may have had towards the detainees in general and Mr. Ali in particular.

e. (CUI) The record has numerous examples of medical and mental health professionals showing a callous disregard for the detainees and/or being intimidated by NX2.[366] Additionally, assessments often noted that even though Mr. Ali was cooperative, "information was nevertheless obtained under highly unusual detention circumstances, and must be interpreted with this in mind."[367] Dr. WK5I testified that it is imperative to develop trust with a patient as it enhances any assessment and treatment,[368] but it is hard to determine what, if any, trust was

---

[364] (U) *Id.* at Attach. C, p. 58, citing to MEA-2C-00000465.

[365] (U) Some "technicians" are not identified by any UFI and the record contains no summaries of their background to allow for any analysis of their qualifications.

[366] (U) *See* Tr. dated 24 January 2020, at pp. 30949-30950 ("[Defense Counsel] Q. So you've talked about a situation where you asked a physician's assistant to look at Gul Rahman after you had seen him and thought that he really needed to be looked at, and you were basically told, 'I don't have time for fucking terrorists.' Isn't that right? [Dr. Mitchell] A. That's an exact quote."); *See also Id.* at 24 January 2020, at p. 30950 (Dr. Mitchell testified to observing "another example of medical professional's indifference in a situation where you would [have] expected them to do otherwise," specifically Dr. Mitchell stated he witnessed a medical professional merely shrug their shoulders and not do anything to stop a concerning interrogation situation.); *see also* Tr. dated 22 January 2020, at pp. 30577-30579; *see also* AE 632W (MAH), Defense Notice of Exhibits, filed 23 January 2020, at p. 2041 (In his book, Dr. Mitchell described a CIA contract clinical psychologist evaluating Khalid Shaikh Mohammad. The psychologist started screaming and cursing at Mr. Mohammad and had to be pulled out by the guards. The psychologist apparently continued to perform detainee evaluations.); *see also* SSCI Executive Summary at pp. 111-115.

[367] (U) AE 628FFFFFFFF (AAA), Defense Notice of Exhibits, filed 21 February 2024, Attach. F at p. 165, citing to MEA-10018-00003026.

[368] (U) Tr. dated 16 September 2024, at p. 49852.

58

fostered between Mr. Ali and these personnel in the RDI environment due to the elections the

Prosecution, and perhaps the government more broadly, made with regard to identifying

witnesses and what witnesses they would present to satisfy its burden on this motion. As an

example of the lack of trust, at one point, following a long period of standing sleep deprivation

and an interrogation that involved the use of EITs, Mr. Ali reported to RDI program personnel

that he had experienced symptoms of a possible psychotic episode, specifically, that he

experienced an auditory hallucination of the interview, torture, and subsequent murder of other

detainees. [369] After evaluation, RDI program psychologists concluded that Mr. Ali was probably

fabricating his reported symptoms.[370]

    f. (CUI) The RDI program psychological assessments reflect that Mr. Ali experienced

fear and anxiety throughout his time in the RDI program.[371] He also consistently reported

experiencing trouble sleeping, relaxing, and focusing.[372] When he was first captured, Mr. Ali

weighed 141 lbs,[373] and at one point during the RDI program, his weight had dropped to 117

lbs.[374]

    g. (CUI) During this time, CIA officials assessed Mr. Ali as having subclinical levels of

anxiety and depression. In mid-2006, a psychological evaluation noted that historically, Mr. Ali

---

[369] (U) AE 628FFFFFFFF (AAA), Defense Notice of Exhibits, filed 21 February 2024, Attach. F at pp. 117-121, citing to MEA-STA-00001663-1665.

[370] (U) *Id.* at Attach. F, pp. 121-125, citing to MEA-10018-00005984-5986.

[371] (U) *Id.* at Attach. F, pp. 147-148, citing to MEA-10018-00005557-5558.

[372] (U) *Id.* at Attach. F, pp. 162, 216, 219-220, citing to MEA-STA-00006008, MEA-10018-00003161, and MEA-10018-00009543.

[373] (U) AE 628RRRRR (AAA) Corrected Copy, Defense Notice of Exhibits, filed 29 January 2020, Attach. C at p. 37 n.22, citing to MEA-2C-00000444 (recording Mr. Ali's weight as 53 kilograms, which is 117 pounds).

[374] (U) AE 942OOOO (AAA), In-Court Submission, submitted 23 January 2025, at p. 1, citing to MEA-10018-00003045.

"has fought with anxiety problems which simply took time and continual reinforcement [by High Value Detainee Interrogators] that he was safe."[375] Mr. Ali was not diagnosed with PTSD during his time in the RDI program. None of the medical experts who submitted declarations or testified for either the Prosecution or Mr. Ali interviewed any of the UFI or unidentified "technicians" from the RDI program when rendering their expert opinions.[376]

h. (CUI) The psychological assessments and debriefer interviews in the IG report reflect that Mr. Ali was dependent on his debriefers for communication and contact to combat isolation.[377] DC1, who had debriefed Mr. Ali at locations 7, 5, 8, and 9, said she spent much of her time trying to get Mr. Ali "down from his pole" because he had "major psychological issues."[378] She thought he was a hypochondriac who, without contact with other people, focused on his health and exhibited obsessive compulsive behavior.[379] Mr. Ali had difficulty asking RDI personnel for things and feared they would dislike the requests and hurt him in response.[380]

i. (U) The Commission finds that during the time Mr. Ali was in the RDI program, he was subjected to physical coercion and abuse amounting to torture, and to conditions which constituted cruel, inhuman, and degrading treatment.

---

[375] (U) AE 628FFFFFFFFF (AAA), Defense Notice of Exhibits, submitted 21 February 2024, Attach. F at pp. 216 and 220, citing to MEA-10018-00003161 and MEA-10018-00009543.

[376] (U) The Commission finds the record is not sufficiently developed to make a finding of fact whether Mr. Ali suffered from PTSD or other mental impairment in January 2007 when he gave his LHM statements. To develop a sufficient record, the Commission would need to address Mr. Ali's motion to compel witnesses and potentially receive testimony from classified CIA personnel with and without UFIs. The Commission anticipates such a process would take years to complete and is unnecessary for this Ruling.

[377] (U) *See* AE 628FFFFFFFFF (AAA), Defense Notice of Exhibits, filed 21 February 2024, Attach. F at pp. 172, 190-191, and 217-218, citing to MEA-10018-00003096, MEA-10018-00009534-9536, and MEA-10018-00009543.

[378] (U) AE 628RRRRR (AAA) Corrected Copy, Defense Notice of Exhibits, filed 29 January 2020, Attach. C at p. 63, citing to MEA-2C-00000470.

[379] (U) *Id.* at Attach. C, p. 63, citing to MEA-2C-00000470.

[380] (U) *Id.* at Attach. C, p. 63, citing to MEA-2C-00000470.

60

CUI

10. (U) **Mr. Ali's Detention at NSGB**.

    a. (U) Transfer to NSGB.

      (1) (U) In September 2006, 14 HVDs, including Mr. Ali, were rendered to NSGB. During the rendition flight, Mr. Ali was restrained and sensory deprived, including being made to wear blacked-out goggles.[381] It is unclear whether Mr. Ali was again forced to wear diapers for the length of the flight.[382] The Camp VII Commander met the HVD detainees at the GTMO airfield. While the detainees were still wearing their black-out goggles, the Camp VII Commander told them that they were at NSGB, in the custody of the Department of Defense (DoD) and that the camp operations were consistent with Geneva Convention Common Article 3.[383] The Camp VII Commander later met individually with each HVD to explain the camp rules.

      (2) (U) Confinement conditions at NSGB were markedly similar to those at previous RDI locations. Mr. Ali was kept mostly isolated in his cell. The cells were configured to prevent detainees from communicating with each other. After being allowed to have some hours of darkness each day at Location 9, Mr. Ali was returned to 24-hour light at NSGB.

      (3) (U) The biggest changes at NSGB were in relation to the degree of Mr. Ali's isolation. First, at NSGB, Mr. Ali was allowed to meet with the International Committee of the Red Cross (ICRC). He and the other HVDs all provided the ICRC with similarly detailed

---

[381] (U) Tr. dated 3 May 2024, at pp. 46195-46197, and Tr. dated 16 July 2024, at p. 48144.

[382] (U) The Prosecution provided documentation for what was planned for this rendition flight, but did not call any witnesses to confirm whether the detainees were diapered in accordance with the plan.

[383] (U) Tr. dated 1 November 2019, at p. 28586, and Tr. dated 31 July 2024, at p. 49209 (cited information is unclassified and is contained in a document classified Top Secret).

accounts of the RDI program.[384] This was Mr. Ali's first contact with a person who was not an agent or employee of the United States since he was turned over to CIA custody in 2003. Mr. Ali was also allowed to send a letter to his family, and he received a letter from a family member. Second, the government also began allowing Mr. Ali to communicate with one other detainee for short sessions. The government surreptitiously listened to the sessions and then later started recording these sessions.

      (4) (U) Dr. WK5I was the Camp VII psychiatrist prior to Mr. Ali's arrival at NSGB and remained in that position until sometime after Mr. Ali's LHM questioning.[385] She modeled the Camp VII mental health program off other confinement environments.[386] In January 2007, Dr. WK5I reported to her leadership that she was concerned about the mental degradation of the detainees at Camp VII because of their isolation and lack of stimulation.[387] She recommended that they be allowed more contact with other detainees to combat the adverse mental health effects stemming from their isolation.[388] Camp leadership agreed with her about these concerns and also recommended less isolation for the detainees.[389] However, Mr. Ali was not allowed more contact with other detainees as recommended by Dr. WK5I prior to his LHM questioning and statement. Psychiatrists who took over the program after Dr. WK5I also raised the same concerns.[390]

---

[384] (U) SSCI Executive Summary at p. 160.

[385] (U) Tr. dated 13 May 2024, at pp. 47326 and 49676.

[386] (U) Tr. dated 13 May 2024, at pp. 47327-47328.

[387] (U) Tr. dated 16 September 2024, at pp. 49814-49818.

[388] (U) Tr. dated 16 September 2024, at pp. 49814-49818.

[389] (U) Tr. dated 16 September 2024, at pp. 49814-49819.

[390] (U) Tr. dated 16 September 2024, at p. 49819.

(5) (U) Dr. WK5I saw Mr. Ali multiple times in person, but typically a mental health assessment was performed by an unidentified technician, and she then relied on that technician in making her assessments.[391] The Prosecution did not call any of these technicians to testify about Mr. Ali's mental state during the four-month period at NSGB before the LHM questioning.

(6) (U) When Dr. WK5I did see Mr. Ali in person, it was often by speaking to him through the small slot in his cell door known as a "bean hole."[392] Dr. WK5I saw Mr. Ali in the medical treatment room on 8 September 2006 for an initial intake exam and then again on 12 September 2006 for a follow-up.[393] He told Dr. WK5I that he was having mood swings because he had lost privileges as a result of being rendered to GTMO.[394] A number of the HVD detainees reported that the conditions at Camp VII were harsher than what they had experienced at their previous RDI facility.[395] Mr. Ali told Dr. WK5I that he had been hit in the head during an interrogation.[396] Dr. WK5I took notes and filed a form reporting the allegations up her chain of command, but she did not follow up with Mr. Ali to determine the extent of the abuse and how it may impact his mental health.[397] The form that she sent up her chain of command had portions that were permanently redacted and Dr. WK5I could not remember what was underlying the redactions so it is unclear what all Mr. Ali might have told her.[398]

---

[391] (U) Tr. dated 17 September 2024, at p. 49969.

[392] (U) Tr. dated 8 August 2024, at p. 49676, and Tr. dated 17 September 2024, at pp. 49984-49986.

[393] (U) Tr. dated 8 August, at p. 49700.

[394] (U) Tr. dated 8 August 2024, at pp. 49700-49701.

[395] (U) Tr. dated 16 September 2024, at p. 49915.

[396] (U) Tr. dated 16 September 2024, at p. 49924.

[397] (U) Tr. dated 16 September 2024, at pp. 49928-49931.

[398] (U) Tr. dated 16 September 2024, at p. 49928.

CUI

(7) (U) On 16 October 2006, Mr. Ali reported constantly worrying about his family because they do not know whether he is alive or dead.[399] That same month, Mr. Ali reported to a technician that he had been previously abused during his detention.[400] Dr. WK5I reviewed the technician's notes and again reported the abuse to her chain of command.[401] Just as with the previous report, portions of the details from the report have been permanently redacted.[402] Again, Dr. WK5I did not follow up with Mr. Ali to determine how this past abuse may have been impacting his mental health.[403] On 20 November 2006, Mr. Ali reported to a technician that the guards took his water for 48 hours because he wrote his name in his shower with steam. As a result, he did not sleep well for the past two nights and was worried and restless.[404] On 15 December 2006, Mr. Ali reported good days and bad days and trouble sleeping. On 27 December 2006, Mr. Ali reported feeling less anxious and that he had one panic attack a day during the nighttime.[405] On 7 January 2007, Mr. Ali reported to a technician that his anxiety and panic attacks had increased for the past couple of days due to hearing another detainee yelling. He reported having five to six panic attacks a day.[406] On 15 January 2007, Mr. Ali again reported to a technician that he was having problems with panic attacks for the past couple of days. The

---

[399] (U) AE 942Y (AAA), Defense Notice of Exhibits, filed 13 May 2024, Attach. B at p. 72, citing to MEA-10018-00001096.

[400] (U) Tr. dated 17 September 2024, at p. 49972.

[401] (U) Tr. dated 17 September 2024, at p. 49973.

[402] (U) Tr. dated 17 September 2024, at p. 49974.

[403] (U) Tr. dated 17 September 2024, at p. 49975.

[404] (U) AE 942Y (AAA), Defense Notice of Exhibits, filed 13 May 2024, Attach. B at p. 47, citing to MEA-10018-00001071.

[405] (U) *Id.* at Attach. B, p. 30, citing to MEA-10018-00001053.

[406] (U) *Id.* at Attach. B, p. 23, citing to MEA-10018-00001046.

64

CUI

panic attacks were happening while he was sleeping.[407] On 25 January 2007, Mr. Ali reported to a technician that he was still working on dealing with anxiety and that he was experiencing panic attacks and trouble sleeping.[408]

(8) (U) Dr. WK5I assessed Mr. Ali with, "[m]ixed anxiety, depressive disorder, which in the DSM-IV-TR at that time was described as an anxiety disorder not otherwise specified, meaning he had a combination of anxiety symptoms and depressive symptoms that didn't meet full criteria for a mood disorder or an anxiety disorder."[409] She also assessed a dysthymic disorder which "is a kind of smoldering underlying depression that doesn't meet criteria for a major depressive disorder but has other criteria that it's kind of prevalent and longer lasting."[410] However, Dr. WK5I had almost no understanding of what Mr. Ali had been subjected to during his three and a half years of RDI detention. She had a July 2006 CIA psychological summary to assist her in making an evaluation.[411] As she explained during her testimony, she treated him based primarily on what he was reporting to her at Camp VII and the symptoms that she could observe there.[412]

c. (U) Law Enforcement Questioning at NSGB

(1) (U) Mr. Ali was interviewed by Special Agents Fitzgerald, Perkins, and McClain at NSGB on 17, 18, 19, and 30 January 2007.[413] Special Agents Fitzgerald, Perkins, and

---

[407] (U) *Id.* at Attach. B, p. 22, citing to MEA-10018-00001045.

[408] (U) *Id.* at Attach. B, p. 20, citing to MEA-10018-00001043.

[409] (U) Tr. dated 8 August 2024, at p. 49704.

[410] (U) Tr. dated 8 August 2024, at p. 49705.

[411] (U) Tr. dated 8 August 2024, at p. 49686.

[412] (U) Tr. dated 16 September 2024, at p. 49912.

[413] (U) *See* LHM *at* AE 628C (GOV), Government Response to Mr. Ali's Motion to Suppress Alleged Statements as Involuntary and Obtained by Torture, filed 29 May 2019, Attach. F, at p. 89.

65

CUI

McClain were on a temporary duty assignment as members of an interagency organization called

the High Value Detainee Prosecution Task Force (HVD PTF) which was an entity that included

participants from the CIA, FBI, and Department of Defense, among other agencies.[414]

Prosecutors from the Office of Military Commissions were present at NSGB and available to the

HVD PTF agents for consultation during breaks in the questioning of Mr. Ali.[415]

(2) (U) A couple of months[416] prior to questioning Mr. Ali, the HVD PTF agents

were given access to "buckets" of CIA reporting that had been disseminated out about each RDI

program detainee, or from each RDI program detainee, including a "bucket" of CIA reporting

concerning Mr. Ali.[417] SA Perkins reviewed the CIA reporting contained in Mr. Ali's "bucket"

prior to questioning him.[418] SA Fitzgerald did not review the CIA reporting prior to questioning

Mr. Ali, but he may have seen the reporting previously.[419] SA Fitzgerald had also previously sent

questions to the CIA to be asked of detainees, including Mr. Ali, in the RDI program.[420]

Additionally, SA Fitzgerald had the CIA review documents prior to showing them to Mr. Ali

during the questioning.[421]

(3) (U) On 17 January 2007, Mr. Ali was told that he had a meeting to attend, and that

the meeting would be held in the same location where he previously met with the ICRC, but he

---

[414] (U) Tr. dated 18 September 2019, at pp. 25890-25906.

[415] (U) Tr. dated 16 September 2019, at pp. 25472-25473.

[416] (U) Tr. dated 20 September 2019, at pp. 26646-26648.

[417] (U) Tr. dated 16 September 2019, at pp. 25447-25449; Tr. dated 20 September 2019, at pp. 26641-26645; Tr. dated 16 April 2024, at pp. 44154-44155.

[418] (U) Tr. dated 20 September 2019, at pp. 26649-26650.

[419] (U) Tr. Dated 16 September 2019, at p. 25462-25463.

[420] (U) Tr. dated 19 September 2019, at pp. 26190-26212.

[421] (U) Tr. dated 16 September 2019, at p. 25450.

66

CUI

was not told who or the organizational affiliation of the persons with whom he would be meeting.[422] Mr. Ali agreed to go to the meeting. He was then taken to a small camp onboard NSGB called "Echo II"[423] where he was placed in a single-person cell or "hut" approximately 15 feet wide by 20 or 25 feet long.[424] Escort to Echo II was via guards in military uniforms.[425] Mr. Ali's legs were shackled to the floor inside the Echo II cell.[426]

(4) (U) A third of the Echo II cell was comprised of an area caged with metal mesh and containing a bed, toilet, and sink; the other two-thirds of the cell was an open space with a table and four plastic chairs.[427] Echo II had previously been used by the CIA to detain high value detainees.[428] The debriefings (as opposed to interrogations) conducted by the CIA in the RDI program were similar in nature to the law enforcement interviews conducted by the FBI.[429]

(5) (U) During the questioning on 17 January 2007, Mr. Ali appeared healthy and alert.[430]

(6) (U) At the start of the LHM questioning, the agents proceeded to go through an admonishment form drafted specifically by the Department of Justice (DOJ) for the HVDs.[431]

---

[422] (U) Tr. dated 1 November 2019, at pp. 28597-28598.

[423] (U) Tr. dated 19 September 2019, at p. 26333, Tr. dated 1 November 2019, at p. 28712.

[424] (U) Tr. dated 16 September 2019, at p. 25476.

[425] (U) Tr. dated 1 November 2019, at p. 28595.

[426] (U) Tr. dated 16 September 2019, at p. 25480.

[427] (U) Tr. dated 16 September 2019, at pp. 25477.

[428] (U) Tr. dated 7 December 2017, at p. 17869; Tr. dated 19 September 2019, at pp. 26320, 26325.

[429] (U) Tr. dated 30 October 2019, at pp. 28177-28181.

[430] (U) *See* LHM *at* AE 628C (GOV), Government Response to Mr. Ali's Motion to Suppress Alleged Statements as Involuntary and Obtained by Torture, filed 29 May 2019, Attach. F, at pp. 89-90.

[431] (U) Tr. dated 16 September 2019, at p. 25485-25493; *see also* AE 628C (GOV), Government Response to Mr. Ali's Motion to Suppress Alleged Statements as Involuntary and Obtained by Torture, filed 29 May 2019.

CUI

(7) (U) The agents were instructed not to read *Miranda*[432] rights to the detainees they questioned at NSGB. SA Fitzgerald and SA Perkins described the lack of *Miranda* warnings as different from their normal practice.[433]

(8) (U) First, the agents stated they did not work for, and were independent from, any organization that previously held Mr. Ali.[434] SA Fitzgerald asked Mr. Ali what he knew of the CIA and Mr. Ali described the CIA as an external agency and that he knew the FBI was an internal agency.[435] SA Fitzgerald told Mr. Ali that the FBI does investigations, travels outside the United States, and is a law enforcement organization.[436] SA Fitzgerald told Mr. Ali that they had collected documents regarding him and wanted to speak to him about those documents.

(9) (U) Second, the agents identified themselves to Mr. Ali as agents of the FBI, showed Mr. Ali their FBI credentials, and identified the FBI as a law enforcement agency distinct from the CIA.[437] The agents then assured Mr. Ali that he was no longer in CIA custody, that he would not be returned to CIA custody, and that he was instead being held at NSGB, which was under the control of the United States Army and the United States Navy, with the United States military being responsible for his care, his food, and his control.[438]

---

[432] (U) *Miranda v. Arizona*, 384 U.S. 436 (1966).

[433] (U) Tr. dated 19 September 2019, at pp. 26351-26352; Tr. dated 8 November 2023, at pp. 39267-39269; *See* LHM *at* AE 628C (GOV), Government Response to Mr. Ali's Motion to Suppress Alleged Statements as Involuntary and Obtained by Torture, filed 29 May 2019, Attach. E, p. 82, "If the detainee asks whether any prior statements can be used against the detainee at a criminal proceeding, the agent should tell the detainee that decision will be made by the court if he is charged with a crime . . . Allegations of misconduct will not be included in this LHM." *See also* Tr. dated 19 September 2019, at p. 26349.

[434] (U) Tr. dated 16 September 2019, at pp. 25486-25487.

[435] (U) Tr. dated 20 September 2019, at p. 26675.

[436] (U) Tr. dated 20 September 2019, at pp. 26675-26676.

[437] (U) Tr. dated 20 September 2019, at pp. 26676.

[438] (U) Tr. dated 20 September 2019, at pp. 26676-26677.

68

(10) (CUI) Third, SA Fitzgerald told Mr. Ali that he did not have the benefit of any of the previous conversations, as he had not been part of them, that he did not care what his answers were for any previous questioning, and that they were "only concerned with Mr. Ali's current recollection."[439] The form that SA Perkins checked off stated that this admonition was supposed to convey that they were aware Mr. Ali may have made prior statements but that they were "not interested" in the previous questioning or his previous answers. At this point, Mr. Ali said something to the effect of, "It looks like you're looking at me officially."[440]

(11) (U) Fourth, the agents asked Mr. Ali if he was willing to answer questions. Mr. Ali agreed to do so. Mr. Ali said, "Yes, let's get down to business."[441]

(12) (U) Last, the agents instructed Mr. Ali, regarding any documents or photographs shown to him, that he may have seen them before, but that the agents were interested in his independent reflection with regard to those documents.[442]

(13) (U) Mr. Ali acknowledged each point on the form as it was read, and SA Perkins placed a checkmark next to each item on the form.

(14) (U) The agents were instructed, in the event that Mr. Ali were to ask for an attorney, to tell him he was not entitled to one.

(15) (U) The agents did not advise Mr. Ali that he had the right to remain silent.

---

[439] (U) AE 942YYY (GOV), Government Response to AE 628 (AAA Sup) and AE 942TTT (AAA), Mr. Ali's Supplements to AE 628 (AAA), Motion to Suppress Alleged Statements as Involuntary and Obtained by Torture, filed 2 December 2024, at p. 70.

[440] (U) Tr. dated 20 September 2019, at p. 26677.

[441] (U) Tr. dated 20 September 2019, at p. 26678.

[442] (U) Tr. dated 20 September 2019, at p. 26677.

69

(16) (U) The agents did not advise Mr. Ali that anything he said could be used against him in a court of law. The agents had been instructed that if a detainee asked whether his statements could be used against him at a future proceeding, the agent was to inform the detainee that such use was a possibility.[443]

(17) (U) The agents did not tell Mr. Ali that the prior statements he made while in the RDI program could not be used against him in court.[444]

(18) (U) The agents were instructed to include any allegations of mistreatment by detainees in a separate document recorded on a separate computer.

(19) (U) The agents and Mr. Ali shared food during the LHM questioning, and Mr. Ali was permitted to and did take breaks at his discretion. The questioning occurred on 17, 18, 19, and 30 January 2007.[445] Each day lasted approximately seven to eight hours, including breaks.[446] The atmosphere during the questioning was courteous, professional, and respectful.

(20) (U) The agents showed Mr. Ali numerous documents and photos during the questioning. SA Perkins showed him documents to let him know that they had done their homework, and had gathered lots of information, so they knew a lot of things about him.[447]

(21) (U) Throughout the questioning, the agents continued to remind Mr. Ali after breaks that he did not have to speak with them. On the third day, he again raised the issue of

---

[443] (U) Tr. dated 19 September 2019, at p. 26354.

[444] (U) Tr. dated 19 September 2019, at p. 26368.

[445] (U) Although the agents had no plans to meet with Mr. Ali again after 19 January 2007, they did ask Mr. Ali if he would be willing to meet with them again in the future if they had any further questions of him. Mr. Ali responded that he was willing to do so. Tr. dated 16 September 2019, at p. 25498. Although, the record is unclear, it appears that the agents decided to meet with Mr. Ali one last time on 30 January 2007 after receiving a "sticky note" from Mr. Ali that contained some additional information. Tr. dated 16 September 2019, at pp. 25499-25500.

[446] (U) Tr. dated 20 September 2019, at pp. 26678-26679.

[447] (U) Tr. dated 20 September 2019, at p. 26671.

70

whether this was his legal case.[448] He asked if the Department of Justice was going to come talk to him. The agents explained, "We are the -- you know, the Department of Justice."[449] Mr. Ali said, "Yeah, it seems like you're asking me about the documents, and the investigation that you conducted is different from the CIA."[450]

(22) (U) None of the LHM questioning of Mr. Ali was recorded via audio or visual means. Additionally, no transcript was made of the LHM questioning. The only recording of what happened during the questioning is the LHM, a single narrative document summarizing what Mr. Ali allegedly said during the four days of FBI questioning prepared by the agents using their notes taken during the questioning. Mr. Ali did not review, adopt, or sign the LHM statements prepared by the agents.

(23) (U) During the four days of questioning, Mr. Ali incriminated himself, providing extensive details regarding his role in the conspiracy that culminated in the attacks on 11 September 2001, as well as numerous other Al Qaeda plots. After the last of the questioning, Mr. Ali sent the agents a note letting them know the downtown area he had mentioned at one point was Rowlah.[451]

d. (U) Camp Recordings.

(1) (U) On 26 January 2007, Mr. Ali was allowed outdoor recreation at the same time

---

[448] (U) Tr. dated 20 September 2019, at p. 26678.

[449] (U) Tr. dated 20 September 2019, at p. 26679.

[450] (U) Tr. dated 20 September 2019, at p. 26679.

[451] (U) AE 628C (GOV), Government Response to Mr. Ali's Motion to Suppress Alleged Statements, filed 29 May 2019, Attach. H, at p.368, citing to MEA-LHM-00001495.

71

as Mr. Ahmed Ghailani, a fellow detainee.[452] The purpose of the joint recreation time was to allow the U.S. government operatives to listen in on the conversation. On the recordings, Mr. Ali and Mr. Ghailani spoke about the FBI questioning.[453] Mr. Ali stated that they showed him "disasters" and that they dug up things from all over.[454] He also said, "They obtained the bank accounts, the banks…that I had opened, things that I bought-I mean disasters."[455]

(2) (U) At one point, Mr. Ghailani tells Mr. Ali that he has stomach discomfort. Mr. Ali then tells Mr. Ghailani that he can ask them to postpone his questioning if he is not feeling well.[456]

(3) (U) As they discuss the LHM questioning, Mr. Ali tells Mr. Ghailani that the investigators just want to make sure the information they were told was correct.[457]

(4) (CUI) During one discussion around the time of the LHM questioning, Mr. Ali warned Mr. Ghailani that detainees without useful intelligence information would be killed.[458]

e. (U) Combatant Status Review Tribunal.

---

[452] (U) AE 942YYY (GOV), Government Response to AE 628 (AAA Sup) and AE 942TTT (AAA), Mr. Ali's Supplements to AE 628 (AAA), Motion to Suppress Alleged Statements as Involuntary and Obtained by Torture, filed 2 December 2024, at p. 109.

[453] (U) AE 942YYY (GOV), Government Response to AE 628 (AAA Sup) and AE 942TTT (AAA), Mr. Ali's Supplements to AE 628 (AAA), Motion to Suppress Alleged Statements as Involuntary and Obtained by Torture, filed 2 December 2024, at p. 109-110.

[454] (U) *Id*. at p. 109.

[455] (U) *Id*. at p. 110.

[456] (U) AE 791B (GOV), Government Second Notice of Proposed Interim Findings of Fact, filed 18 January 2024, Attach. C at p. 116, citing to MEA-XYMA-00000046.

[457] (U) AE 791B (GOV), Government Second Notice of Proposed Interim Findings of Fact, filed 18 January 2024, Attach. C at p. 117, citing to MEA-XYMA-00000047.

[458] (U) AE 628 (AAA), Mr. al Baluchi's Motion to Suppress Alleged Statements as Involuntary and Obtained by Torture, filed 15 May 2019 (cited information is unclassified and is contained in a document classified Top Secret), Attach. M (pp. 1123-1136), citing to MEA-XYM-00000164.

72

CUI

(1) (U) Mr. Ali's Combatant Status Review Tribunal (CSRT) took place on 30 March 2007 at NSGB.[459] The CSRT was a quasi-judicial proceeding held to determine whether Mr. Ali should be classified as an enemy combatant.

(2) (U) Mr. Ali was assigned a personal representative to assist him during the proceeding. The personal representative was not an attorney.[460]

(3) (U) The hearing took place in a prefabricated building set up similar to a courtroom.[461] Present in the room were the President of the Board, two other voting members of the tribunal, a recorder, and a court reporter. Mr. Ali was then brought into the room with his personal representative and a translator.

(4) (U) Mr. Ali was advised of the following rights: the right to be present; the right to not be compelled to testify; the right to testify voluntarily either under oath or in an unsworn statement; the right to have a personal representative; the right to present evidence, including witnesses; the right to question witnesses; and the right to examine unclassified evidence.

(5) (U) The hearing was recorded, and a verbatim transcript of the proceeding was created.

(6) (U) Mr. Ali appeared alert and engaged with the process at the CSRT.[462] He requested several witnesses who were also detainees at NSGB. The President of the Board found that they were not available, but Mr. Ali agreed to withdraw the requests and accept statements from the witnesses in lieu of their testimony at the hearing.

---

[459] (U) AE 628C (GOV), Government Response to Mr. Ali's Motion to Suppress Alleged Statements, filed 29 May 2019, Attach. O at p. 407, citing to MEA-CSRT-00000044-10018.

[460] (U) Tr. dated 24 September 2019, at p. 26864.

[461] (U) Tr. dated 24 September 2019, at p. 26860.

[462] (U) Tr. dated 24 September 2019, at p. 26892.

73

(7) (U) The President of the Board was a judge in both his civilian and military capacities. The recorder read a summary of allegations of fact related to Mr. Ali's suspected involvement in the attack on 11 September 2001. Mr. Ali was then offered an opportunity to make a statement. Mr. Ali opted to have his personal representative read a prepared statement on his behalf. Mr. Ali was offered the opportunity to take an oath to tell the truth, but he was advised that he was not required to do so.

(8) (U) Mr. Ali's personal representative then read Mr. Ali's prepared statement. In the statement, Mr. Ali asserted that he had nothing to do with some of the allegations against him. He explained that he was a businessman and an entrepreneur.[463] He admitted that Marwan Al Shehhi approached him, but claimed Al Shehhi was just a man wanting to do business.[464] He admitted that Khalid Sheikh Mohammed was his uncle, but claimed the people he met through his uncle were just businessmen interested in trade, education, and travel.[465] He also claimed that he did not belong to Al Qaida, the Taliban, or associated organizations.[466]

(9) (U) Following his statement, the President asked Mr. Ali if he was under any force or pressure at the CSRT proceeding. Mr. Ali answered, "No."[467] The President then asked if the personal statement was given of his own free will. Mr. Ali answered, "Exactly."[468]

---

[463] (U) AE 628C (GOV), Government Response to Mr. Ali's Motion to Suppress Alleged Statements, filed 29 May 2019, Attach. O at p. 421, citing to MEA-CSRT-00000044-10018.

[464] (U) *Id.* at Attach. O, p. 421, citing to MEA-CSRT-00000044-10018.

[465] (U) *Id.* at Attach. O, p. 421, citing to MEA-CSRT-00000044-10018.

[466] (U) *Id.* at Attach. O, p. 423, citing to MEA-CSRT-00000044-10018.

[467] (U) AE 628C (GOV), Government Response to Mr. Ali's Motion to Suppress Alleged Statements, filed 29 May 2019 at Attach. O, p. 423, citing to MEA-CSRT-00000047-10018.

[468] (U) *Id.* at Attach. O, p. 423, citing to MEA-CSRT-00000047-10018.

(10) (U) The President and other panel members proceeded to ask Mr. Ali questions about his statement, including about the allegations that he participated in the attack on 11 September 2001. During the questioning, Mr. Ali admitted sending money to Marwan al-Shehhi, but he generally denied involvement in the conspiracy that led to the attack on 11 September 2001.[469]

## IV. (U) Law.

1. (U) **The law on admissibility of an accused's statements – the Military Commission Rules of Evidence (M.C.R.E.).**

a. (U) M.C.R.E. 304 governs the admissibility of an accused's statements.

b. (U) M.C.R.E. 304(a)(1) prohibits the admission of an accused's statements if they are "obtained by the use of torture, or by cruel, inhuman, or degrading treatment."[470]

c. (U) M.C.R.E. 304(a)(2) permits the admission of an accused's statements if they are voluntary:

> (2) *Other Statements of the Accused*.  A statement of the accused may be admitted in evidence in a military commission only if the military judge finds—
>
> > (A)  that the totality of the circumstances renders the statement reliable and possessing sufficient probative value; and
> > (B) that—
> >
> > > (i)    the statement was made incident to lawful conduct during military operations at the point of capture or during closely related active combat engagement, and the interests of justice would best be served by admission of the statement into evidence; or

---

[469] (U) AE 628C (GOV), Government Response to Mr. Ali's Motion to Suppress Alleged Statements, filed 29 May 2019, Attach. O at pp. 424-433, citing to MEA-CSRT-00000044-10018.

[470] (U) *See also* 10 U.S.C. § 948r(a) (stating same).

(ii) the statement was voluntarily given.[471]

d. (U) M.C.R.E. 304(a)(5) generally precludes the admission of both (i) [e]vidence derived from a statement obtained by torture or cruel, inhuman, or degrading treatment[472] and evidence derived from other excludable statements of the accused.[473]

e. (U) M.C.R.E. 304(b)(3) largely mirrors 18 U.S.C. 2340 and defines torture as:

> (3) *Torture*. For the purpose of determining whether a statement must be excluded under section (a) of this rule, "torture is defined as an act specifically intended to inflict severe physical or mental pan or suffering (other than pain or suffering incident to lawful sanctions) upon another person within the actor's custody or physical control. "Severe mental pain or suffering" is defined as the prolonged mental harm caused by or resulting from:
>
>> (A) the intentional infliction or threatened infliction of severe physical pain or suffering;
>>
>> (B) The administration or application, or threatened administration or application of mind-altering substances or other procedures calculated to disrupt profoundly the senses or the personality;
>>
>> (C) the threat of imminent death; or
>>
>> (D) the threat that another person will imminently be subjected to death, severe physical pain or suffering, or the administration or application of mind-altering substances or other procedures calculated to disrupt profoundly the senses or personality.

f. (U) M.C.R.E. 304(b)(4) defines cruel, inhuman, or degrading treatment as:

---

[471] (U) *See also* 10 U.S.C. § 948r(c)(2)(B) (stating same).

[472] (U) M.C.R.E. 304(a)(5)(A); *see also* M.C.R.E. 304(b)(3) for the definition of torture, and M.C.R.E. 304(b)(4) for the definition of "cruel, inhuman, or degrading treatment."

M.C.R.E. 304 was added following the promulgation of the Military Commissions Act of 2009 ("M.C.A."), P.L. 111-84, Div. A, Title XVIII, § 1802, Oct. 28, 2009, 123 Stat. 2580, and published in the M.M.C. (2010 ed), mirroring 10 U.S.C. § 948(a). However, its prohibitions have been long held in our jurisprudence. *See also*, the Detainee Treatment Act of 2005, Sec. 1003; 42 U.S.C. § 2000dd; The 1984 Convention against Torture and Other Cruel, Inhuman, or Degrading Treatment or Punishment, Art. 15 (Dec. 10, 1984) 1465 U.N.T.S. 85, 113; S. Treaty Doc. No. 100-20 (1988); 23 I.L.M. 1027 (1984).

[473] (U) M.C.R.E. 304(a)(5)(B).

CUI

(4) *Cruel, inhuman or degrading treatment*.  The term "cruel, inhuman, or degrading treatment or punishment" means the cruel, unusual, and inhumane treatment or punishment prohibited by the Fifth, Eighth, and Fourteenth Amendments to the Constitution of the United States, as defined in the United States Reservations, Declarations and understandings to the United Nations Convention Against Torture and Other Forms of Cruel, Inhuman or Degrading Treatment or Punishment done at New York, December 10, 1984, without geographical limitation.

g. (U) M.C.R.E. 304(d)(1) prescribes the burden of proof for determining the

admissibility of an accused's statements:

(d) *Burden of proof*. [. . .] [T]he prosecution has the burden of establishing the admissibility of the evidence. [. . .]

(1) *In general*. The military judge must find by a preponderance of the evidence that a statement by the accused comports with the requirements of this rule before it may be received into evidence."[474]

## 2. (U) **The law on admissibility of an accused's statements—voluntariness, generally**.

a. (U) "[A]n extra-judicial confession, if it [is] to be offered in evidence against a man,

must be the product of his own free choice. So fundamental, historically, is this concept, that [. .

.] neither the body nor mind of an accused may be twisted until he breaks."[475]

---

[474] (U) No corresponding burden of proof provision appears in 10 U.S.C. § 948r.

[475] (U) *Culombe v. Connecticut*, 367 U.S. 568, 584 (1961); *see also Brown v. Mississippi*, 297 U.S. 278, 282-286 (1936) ("[D]etails of the brutal treatment to which these helpless prisoners were subjected need not be pursued. It is sufficient to say that in pertinent respects the transcript reads more like pages torn from some medieval account than a record made within the confines of a modern civilization which aspires to an enlightened constitutional government. [. . .] [A trial is] a mere pretense where the state authorities have contrived a conviction resting solely upon confessions obtained by violence. [. . .] It would be difficult to conceive of methods more revolting to the sense of justice than those taken to procure the confessions of these petitioners, and the use of the confessions thus obtained as the basis for conviction and sentence was a clear denial of due process."); *Lyons v Oklahoma,* 322 U.S. 596, 605 (1944) ("A coerced confession is offensive to basic standards of justice, not because the victim has a legal grievance against the police, but because declarations procured by torture are not premises from which a civilized forum will infer guilt."); *Leyra v. Denno*, 347 U.S. 556, 558 (1954) ("The use in a state criminal trial of a defendant's confession obtained by coercion—whether physical or mental—is forbidden"); *and United States v. Karake*, 443 F.Supp.2d 8, 89 (D.D.C. 2006) (citing *Schneckloth v. Bustamonte*, 412 U.S. 218, 225 (1973) ("The Court's role when faced with an allegedly coerced confession is to enforce the strongly felt attitude of our society that important human values are sacrificed where an agency of the government, in the course of securing a conviction, wrings a confession out of an accused against his will.")

77

b. (U) Whether an extra-judicial statement was voluntarily given "turns on whether the defendant's will was overborne when he gave his statement, and the test for this is whether the statement was a product of an essentially free and unconstrained choice by its maker."[476]

### 3. (U) **The law on admissibility of an accused's statements—M.C.R.E. factors to be considered when determining voluntariness**.

a. (U) "The ultimate issue of voluntariness is a legal question that requires a careful evaluation of all the circumstances of the interrogation."[477]

b. (U) When evaluating whether a statement was voluntarily given, M.C.R.E. 304(a)(4) requires military judges to consider the totality of the circumstances and further prescribes, in its subparagraphs, a non-exhaustive list of factors to be considered including, as appropriate, the following:

(A) the details of the taking of the statement, accounting for the circumstances of the conduct of military and intelligence operations during hostilities.

(B) the characteristics of the accused, such as military training, age, and education level; and

(C) the lapse of time, change of place, or change in identity of the questioners between the statement sought to be admitted and any prior questioning of the accused.[478]

c. (U) When considering the factors prescribed in M.C.R.E. 304(a)(4) subparagraphs (A), (B), and (C), military judges are not required to evaluate the factors in each of those

---

[476] (U) Published En Banc Opinion of the Court, *United States v. Al-Nashiri*, No. 23-005, __F.Supp.3d __, 2025 WL 727466 at *9 (C.M.C.R., January 30, 2025) (internal quotations omitted), *quoting United States v. Murdock*, 667 F.3d 1302, 1305 (D.C. Cir. 2012), *Schneckloth v. Bustamonte*, 412 U.S. 218, 226 (1973), and *Culombe v. Connecticut*, 367 U.S. 568, 602 (1961).

[477] (U) *United States v. Al-Nashiri*, No. 23-005, __F.Supp.3d __, 2025 WL 727466 at *9 (C.M.C.R., January 30, 2025) (C.M.C.R. January 30, 2025) (internal quotations and brackets omitted), (*quoting Culombe v. Connecticut*, 367 U.S. 568, 601 (1961), *Miller v. Fenton*, 474 U.S. 104, 110 (1985) and *Mincey v. Arizona*, 437 U.S. 385, 401 (1978)).

[478] (U) *See also* 10 U.S.C. § 948r(d) (stating same).

78

subparagraphs separately. Rather, military judges evaluate all the factors collectively.[479]

4. (U) **The law on admissibility of an accused's statements—considering the totality of the circumstances**.

    a. (U) A determination of voluntariness does not turn "on the presence or absence of a single controlling criterion" and, instead, the determination turns on "a careful scrutiny of all the surrounding circumstances."[480]

    b. (U) "[C]ourts consider the totality of all the surrounding circumstances, regarding both the characteristics of the accused and the details of the interrogation."[481]

    c. (U) "[L]ess traditional forms of coercion, including psychological torture, as well as the conditions of confinement have been considered by courts in their assessment of the voluntariness of the statements."[482]

5. (U) **The law on admissibility of an accused's statements—considering the details of the interrogation**.

    a. (U) Prior coercion of the accused.

        (1) (U) "*Schneckloth* and its progeny do not prohibit the military judge from

---

[479] (U) *United States v. Al-Nashiri*, No. 23-005, __F.Supp.3d __, 2025 WL 727466 at *10 (C.M.C.R., January 30, 2025). "[W]e find no clear support in the law—and government counsel provide us none—for their suggestion that the military judge was required to conduct separate voluntariness and attenuation analyses. We find nothing in the text of Mil. Comm. R. Evid. 304(a)(4) leading to the conclusion that the voluntariness factors in subparagraphs (A) and (B) of the Rule must be divorced from the attenuation factors in (C) when application of (C) is 'appropriate' and therefore must be considered. Likewise, we find no support for the government's 'separation' argument in 10 U.S.C. § 948r(d)." (citing *Schneckloth*, 412 U.S. at 50).

10 U.S.C. § 948r(d)(1)-(3) codifies application of the "attenuation factors" (described in *Oregon v. Elstad*) and the "voluntariness" factors (described in *Schneckloth v. Bustamonte*). *See, id.,* at *9.

[480] (U) *United States v. Al-Nashiri*, No. 23-005, __F.Supp.3d __, 2025 WL 727466 at *10 (C.M.C.R., January 30, 2025) (*quoting Mohammed v. Obama*, 704 F. Supp. 2d 1, 26 (D.D.C. 2009) and *Schneckloth v. Bustamonte*, 412 U.S. 218, 226 (1973).

[481] (U) *United States v. Al-Nashiri*, No. 23-005, __F.Supp.3d __, 2025 WL 727466 at *12 (C.M.C.R., January 30, 2025) (*quoting Schneckloth v. Bustamonte*, 412 U.S. 218, 226-27 (1973).

[482] (U) *United States v. Karake*, F.Supp.2d, 8, 51 (referencing *Brooks v. Florida,* 389 U.S. 413, 413-15 (1967)).

giving weight to [an accused's] history of coercive interrogations as part of the totality of the circumstances under Mil. Comm. R. Evid. 304(a)(4) (or 10 U.S.C. § 948r(d))."[483]

(2) (U) However, "'making a confession under circumstances which preclude its use' does not 'perpetually disable the confessor from making a usable one after those conditions have been removed.'"[484]

(3) (U) "The question of whether those confessions subsequently given are themselves voluntary depends on the inferences as to the continuing effect of the coercive practices which may fairly be drawn from the surrounding circumstances. The voluntary or involuntary character of a confession is determined by a conclusion as to whether the accused, at the time he confesses, is in possession of 'mental freedom' to confess or to deny a suspected participation in a crime."[485]

(4) (U) In determining whether a statement is voluntary, it is relevant for a military judge to consider whether an accused has been conditioned to answer questions.[486] Ultimately, to admit a confession, the military judge must be persuaded that, under the totality of the circumstances, "police interrogators had [not] overborne the accused."[487]

---

[483] (U) *United States v. Al-Nashiri*, No. 23-005, __F.Supp.3d __, 2025 WL 727466 at *10 (C.M.C.R., January 30, 2025). *See also, id.*at fn. 13 ("In *Culombe v. Connecticut*, the Supreme Court stated that the inquiry into a confession's voluntariness involves 'finding the crude historical facts, the external, 'phenomenological' occurrences and events *surrounding the confession*." 367 U.S. 568, 603 (1961)." (emphasis in original footnote)).

[484] (U) *United States v. Al-Nashiri*, No. 23-005, __F.Supp.3d __, 2025 WL 727466 at *8 (C.M.C.R., January 30, 2025) (*quoting United States v. Bayer*, 331 U.S. 532, 541 (1947).

[485] (U) *Lyons v. Oklahoma*, 322 U.S. 596, 602 (1944) (*citing Lisenba v. California*, 314 U.S. 219, 240 (1941); *Ashcraft v. Tennessee*, 322 U.S. 143 (1944); and *Hysler v. Florida*, 315 U.S. 411, 413 (1942)).

[486] (U) *See United States v. Al-Nashiri*, No. 23-005, __F.Supp.3d __, 2025 WL 727466 at *25 (C.M.C.R., January 30, 2025). "The military judge concluded that appellee was conditioned to answer questions from United States government officials—be they debriefers, interrogators, or interviewers—not that he was conditioned to answer questions only about future events. The military judge did not err in making this conclusion.".

[487] (U) *Culombe*, 367 U.S. at 626.

80

CUI

(5) (U) While not binding precedent, the holding of the Court of Appeals for the Armed Forces in *United States v. Cuento* is persuasive.[488] In *Cuento*, the Court of Appeals for the Armed Forces held that, "[w]here a confession is obtained at a lawful interrogation that comes after an earlier interrogation in which a confession was obtained due to *actual* coercion, duress, or inducement, the subsequent confession is presumptively tainted as a product of the earlier one."[489]

b. (U) Lapses in time between interrogations.

(1) (U) The Commission considers whether there has been a sufficient break in the stream of events separating the coercion from the statement.[490]

(2) (U) Lapses of time between questioning may, or may not, cure the coercive effect of a prior interrogation accompanied by force or threats.[491]

(3) (U) As the Supreme Court admonished in *Elstad*, "[f]ar from establishing a rigid rule, we direct courts to avoid one[.] [. . .] The relevant inquiry is whether, in fact, the second statement was [. . .] voluntarily made. As in any such inquiry, the finder of fact must examine the surrounding circumstances and the entire course of police conduct with respect to the suspect in evaluating the voluntariness of his statements."[492]

---

[488] (U) *United States v. Cuento*, 60 M.J. 106 (C.A.A.F. 2004).

[489] (U) *United States v. Cuento,* 60 M.J. at 108 – 109 (emphasis in the original) (citing its prior decision in *United States v. Phillips*, 32 M.J. 76, 79 (C.M.A. 1991).

[490] (U) *Clewis v. State of Texas*, 386 U.S. 707 (1967). The test has already been applied in the context of Guantanamo Bay litigation. *See Al Rabiah v. United States*, 658 F.Supp.2d 11, 36–37 (D.C. Cir. 2009) (approximately two years was not long enough to dissipate coercion); *see also Anam v. Obama*, 696 F.Supp.2d 1, 7 (D.C. Cir. 2010) ("The Court is particularly concerned that the interrogators at Guantanamo relied on, or had access to, Petitioner's coerced confessions from Afghanistan.").

[491] (U) *Oregon v. Elstad*, 470 U.S. 298, 317-18 (1985).

[492] (U) *Oregon v. Elstad*, 470 U.S. 298, 318 (1985); *see also United States v. Al-Nashiri*, No. 23-005, __F.Supp.3d __, 2025 WL 727466 at *17 (C.M.C.R., January 30, 2025) (quoting favorably the military judge's determination that

81

CUI

c. (U) Length of detention and repeated or prolonged interrogation.

(1) (U) Military judges may, if voluntariness is supported by a totality of the circumstances, admit "confessions made after prolonged detention," particularly if "questioning of the defendant was sporadic, not systematic, or had been discontinued during a considerable period prior to confession[.]"[493]

(2) (U) However, even interrogation sessions "of relatively short duration" might not, depending on the totality of the circumstances, serve to "mitigate the substantial coercive effect created by repeated interrogation[.]"[494] Ultimately, to admit a confession, the military judge must be persuaded that, under the totality of the circumstances, "police interrogators had [not] overborne the accused."[495]

d. (U) Changed conditions of detention.

(1) (U) It is relevant for a military judge to consider whether, at the time of the contested confession, the accused was faced with the threat of incommunicado detention.[496]

---

the lapse of time in that case had been insufficient to remedy the coercive effect of prior interrogations: "[f]our months is a considerable amount of time; however, it is a small fraction of time compared to the years the Accused spent held incommunicado in inhumane and degrading living conditions.")

[493] (U) *Culombe*, 367 U.S. at 626-627.

[494] (U) *Davis v. North Carolina*, 384 U.S. 737, 752 (1966).

[495] (U) *Culombe*, 367 U.S. at 626.

[496] (U) *Haynes v. Washington*, 373 U.S. 503, 514 (1963)

"Here [ . . . ] the petitioner was alone in the hands of the police, with no one to advise or aid him, and he had 'no reason not to believe that the police had ample power to carry out their threats' to continue, for a much longer period if need be, the incommunicado detention—as in fact was actually done. Neither the petitioner's prior contacts with the authorities nor the fact that he previously had made incriminating oral admissions negatives the existence and effectiveness of the coercive tactics used in securing the written confession introduced at trial. The petitioner at first resisted making a written statement and gave in only after consistent denials of his requests to call his wife, and the conditioning of such outside contact upon his accession to police demands. Confronted with the express threat of continued incommunicado detention and induced by the promise

82

(2) (U) It is relevant for a military judge to consider whether a delay in providing access to the Courts served to intimidate the accused.[497]

(3) (U) It is relevant for a military judge to consider whether, considering a totality of the circumstances, improvements in an accused's conditions of confinement are meaningful enough to dispel the effects of prior coercion.[498]

---

of communication with and access to family Haynes understandably chose to make and sign the damning written statement; given the unfair and inherently coercive context in which made, that choice cannot be said to be the voluntary product of a free and unconstrained will[.]"

[497] (U) *See Culombe*, 367 U.S. at 632-33,

"[E]very circumstance of the Police Court's procedure was, in itself, potentially intimidating. Culombe had been told that morning that he would be presented in a court of law and would be able to consult counsel. Instead, he was led into a crowded room, penned in a corner, and, without ever being brought before the bench or given a chance to participate in any way, his case was disposed of. Culombe had been convicted of crimes before and presumably was not ignorant of the way in which justice is regularly done. It would deny the impact of experience to believe that the impression which even his limited mind drew from this appearance before a court which did not even hear him, a court which may well have appeared a mere tool in the hands of the police, was not intimidating."

[498] (U) *United States v. Al-Nashiri*, No. 23-005, __F.Supp.3d __, 2025 WL 727466 at *19-20 (C.M.C.R., January 30, 2025), quoting favorably the following determination by the military judge:

[A]lthough the EITs [Enhanced Interrogation Techniques] may have ceased in 2003, the Accused was subjected to constant reminders [. . .] that a failure to cooperate with debriefers upon demand could lead to a return to the 'hard times.' *Unsurprisingly, the Accused continued to make statements while in CIA custody from late 2002 until September 2006.* These statements, made during the course of scores of interrogations and debriefings over four years, were not merely unwarned, but instead were actually coerced, with the constant looming threat of 'hard times' to come if the Accused failed to live up to his end of the 'contract.' [. . .]

Any resistance the Accused might have been inclined to put up when asked to incriminate himself was intentionally and literally beaten out of him years before. For years, the Accused was coerced and psychologically conditioned to cooperate with questioners—dozens, if not hundreds of times. To refuse to cooperate was to face the prospect once again of experiencing [ . . . ] physical and mental abuse. Through all of that, the Accused implicated himself again and again. *The Commission finds that the limited changes in the Accused's circumstances from September 2006 until February 2007 were not meaningful enough to erase the effects of what came before.*

and concluding:

e. (U) Change of questioners.

(1) (U) It is relevant for a military judge to consider, under the totality of the circumstances, whether a change in questioners is probative.[499]

(2) (U) To the extent that there are disputed questions of fact related to the federal agency affiliation of the questioners, a military judge may find that such disputed facts are irrelevant for purposes of determining voluntariness.[500]

---

Even if confinement officials had offered appellee more amenities, overall, after his transfer to Guantanamo Bay than what was previously available to him, or if he had experienced no consequences for disciplinary infractions at Guantanamo Bay, this fact would not contradict the military judge's conclusion—that there was no 'meaningful relief' from the coercive contract and 'the general conditions of confinement' it imposed on appellee before and throughout his LHM interviews.

We thus find that the military judge did not err when he determined [that] the government failed to demonstrate that improved confinement conditions at Guantanamo Bay resulted in a material change in the coercive conditions that existed with appellee gave his LHM statements.

(Emphasis in original opinion).

[499] (U) *United States v. Al-Nashiri*, No. 23-005, __F.Supp.3d __, 2025 WL 727466 at *18 (C.M.C.R., January 30, 2025),

The military judge clearly did not give significant weight to the CIA's role at the time of appellee's LHM interviews. Instead, he gave weight to the fact that appellee 'was still under the complete domination and control of *the U.S. government*. He highlighted that appellee 'could not be expected' to appreciate the differences between interrogation under CIA authority and the interviews by law enforcement under DoD authority. He found that, given the prior conditions of coercion and abuse, 'the change in interlocutors meant little.'

(Emphasis in original opinion; internal citations and brackets omitted).

[500] (U) *Ashcraft v. Tennessee*, 322 U.S. 143, 152-53 (1944):

In reaching our conclusion as to the validity of Ashcraft's confession we do not resolve any of the disputed questions of fact relating to the details of what transpired within the confession chamber of the jail or whether Ashcraft actually did confess. Such disputes, we may say, are an inescapable consequence of secret inquisitorial practices.

(Internal citations omitted); *See also, e.g.*, *Missouri v. Seibert*, 542 U.S. 600, 612 (2004):

Could the warnings effectively advise the suspect that he had a real choice about giving an admissible statement at that juncture? Could they reasonably convey that he could choose to stop talking even if he had talked earlier? For unless the warnings could place a suspect who has just been interrogated in a position to make such an informed choice, there is no practical justification for accepting the formal warnings as compliance with *Miranda*, or

84

f. (U) Rights advisements and cleansing statements.

(1) (U) "The Military Commissions Act does not require [a *Miranda*] warning" and *Miranda* does not apply to unprivileged "enemy belligerents held at NSGB while awaiting trial for alleged law of war violations."[501] However, there is a "*benefit—not requirement—of* reading *Miranda* warnings to remove taint from a previous unwarned but voluntary admission."[502]

(2) (U) It is relevant for a military judge to consider the extent to which the government may have affirmatively chosen not to provide optional *Miranda* warnings despite "how giving such warnings might have helped shape the conditions for a voluntary admission."[503]

(3) (U) It is relevant for a military judge to consider whether the accused was provided a "cleansing statement" advisement; specifically, that prior involuntary statements would not be used against the accused in court.[504]

## 6. (U) **The law on admissibility of an accused's statements—considering the characteristics of the accused**.

a. (U) M.C.R.E. 304(a)(4)(B) states that "the military judge shall consider the totality of

---

for treating the second stage of interrogation as distinct from the first, unwarned and inadmissible segment.

[501] (U) *United States v. Al-Nashiri*, No. 23-005, __F.Supp.3d __, 2025 WL 727466 at *33 (C.M.C.R., January 30, 2025).

[502] (U) *United States v. Al-Nashiri*, No. 23-005, __F.Supp.3d __, 2025 WL 727466 at *33 (C.M.C.R., January 30, 2025) (quoting the findings of the military judge).

[503] (U) *Id*. at *33.

[504] (U) *Id*. at *22 ("Additionally, the advice agents provided to appellee before his LHM interviews claiming *no interest in prior statements* is not the equivalent of the more specific advisement that his *prior statements could not be used against him in a criminal trial*.) (emphasis in original)

85

the circumstances, including, as appropriate, [. . .] the characteristics of the accused[.]"[505]

b. (U) The specific characteristics to be considered, and the weight those characteristics are to be afforded within the totality of the circumstances' determination of voluntariness, are all matters within the discretion of the military judge.[506]

c. (U) Additionally, military judges may consider both whether characteristics of the accused either hinder or support a finding that a statement was voluntary.[507]

d. (U) Though not *required* to be considered, M.C.R.E. 304(a)(4)(B), provides a non-exhaustive list of exemplar characteristics that judges may weigh into their analyses: factors "such as military training, age, and education level."

e. (U) *Schneckloth* clarifies that when determining voluntariness, the Court assesses "the totality of all the surrounding circumstances— both the characteristics of the accused and the details of the interrogation." The breadth of cases addressing this very issue make clear the Commission is not bound by the characteristics of the accused as listed in M.C.R.E.

---

[505] (U) *See also Schneckloth*, 412 U.S. at 226 (requiring the same).

[506] (U) *See, e.g.*, *United States v. Al-Nashiri*, No. 23-005, __F.Supp.3d __, 2025 WL 727466 at *12 (C.M.C.R., January 30, 2025). "Mil. Comm. R. Evid. 304(a)(4) does not *require* consideration of military training. It requires a consideration of 'the totality of the circumstances, including, as appropriate . . . the characteristics of the accused.' Mil. Comm. R. Evid. 304(a)(4)(B)."

[507] (U) *See e.g. United States v. Perez*, 127 F.4th 146, 167-169 (10th Cir. 2025) (Finding no error in a district court judge's determination that the defendant's "age, education level, [and] mental ability" all supported a finding that his statements were voluntary); *but see United States v. Al-Nashiri*, No. 23-005, __F.Supp.3d __, 2025 WL 727466 at *11 (C.M.C.R., January 30, 2025),:

> "We decline to accept the government's suggestion that 'age,' as used in Mil. Comm. R. Evid. 304(a)(4)(b), requires consideration of 'significant life experience.' Government counsel have provided no legal authority to support their position. Our review of case law reveals that youth is the component of age that relates significantly to a voluntariness analysis. Here, whether at the time of his coerced interrogations or when he gave his LGM statements, appellee was well into adulthood. [. . .]
>
> As such, we find the military judge did not err by finding appellee was not a youth and conversely by not giving special consideration to appellee's adult status in his analysis on voluntariness."

86

304(a)(4)(B)."[508]

f. (U) When evaluating characteristics of the accused and the details of the interrogations, the military judge may "assess[] the psychological impact on the accused, and evaluate[] the legal significance of how the accused reacted."[509]

## V. (U) Analysis.

### 1. (U) Coercion and Attenuation.

a. The Prosecution concedes that during his time in the RDI program, Mr. Ali was "questioned in a coercive environment until his transfer to DoD custody" and that any statements he made during that time are inadmissible.[510] However, the Prosecution argues that Mr. Ali's LHM statements made in January 2007 are admissible because they were reliable[511] and voluntarily made, were not obtained by coercive means, and were sufficiently attenuated from the taint of the coercive atmosphere experienced by Mr. Ali while in the RDI program. Having already found that Mr. Ali suffered torture and cruel, inhuman, and degrading treatment while in the RDI program, the Commission further finds that the statements made by Mr. Ali while in the RDI program reflect more than just that he was "questioned in a coercive environment" as the Prosecution conceded – the statements made by Mr. Ali in the RDI program were statements:

(1) (U) obtained by torture and, therefore, would be excluded pursuant to

---

[508] (U) *Schneckloth*, 412 U.S. at 226 (string cites omitted; highlighting the vast discretion of the Court to determine what may be relevant in assessing the totality of the circumstances).

[509] (U) *Id.*

[510] (U) AE 942YYY (GOV), Government Response to AE 628 (AAA Sup) and AE 942TTT (AAA), Mr. Ali's Supplements to AE 628 (AAA), Motion to Suppress Alleged Statements as Involuntary and Obtained by Torture, filed 2 December 2024, at n.126.

[511] (U) In AE 628 (AAA), one of the bases Mr. Ali asserted for suppressing the LHM statements was that they are not reliable. The Prosecution presented argument and evidence to demonstrate the reliability of the LHM statements. However, the Commission does not need to address the reliability argument as the ruling is based on other grounds.

87

M.C.R.E. 304(a)(1); and

(2) (U) were involuntary and would, therefore, be excluded pursuant to M.C.R.E. 304(a)(2).

b. (U) The crux of the issue before the Commission is whether the Prosecution has proven that there has been sufficient attenuation between the involuntary statements made by Mr. Ali from May 2003 to September 2006 and Mr. Ali's January 2007 LHM statements to render the LHM statements voluntary. To make such a determination, this Commission must address how long the taint of Mr. Ali's torture and abuse lasted and under which circumstances it may be considered attenuated.

c. (U) Mr. Ali was tortured during his time in the RDI program. The goal of the program was to condition him through torture and other inhumane and coercive methods to become compliant during any government questioning. The program worked. The hostile, resistant man described in early reporting quickly became compliant and cooperative. Just as the CIA psychologists had planned, Mr. Ali learned that he was helpless to resist the torture, and that cooperation meant a lessening of abuse and an increase in rewards. First, the rewards would be that he was allowed to sleep and eat; later they would be amenities such as clothes, better food, or books. Although Mr. Ali's direct physical torture in the form of EITs may have ceased in 2003, Mr. Ali's conditioning continued for the entire time he was in the RDI program. At each questioning session, he was taught how to behave and how to answer questions. He was also subjected to constant reminders, whether directly communicated or contextually inferred, that a failure to cooperate with debriefers and to answer questions the way he had been trained could lead to a return to EITs or a loss of his limited amenities.

88

d. (U) Mr. Ali also quickly learned that he was completely dependent on his captors. In a typical law enforcement case, the accused may be held in detention, but someone knows that the accused is there. He has some support network whether family, a lawyer, or even other detainees. Mr. Ali had only his RDI captors. Mr. Ali acknowledged this complete dependence when he told his interrogators that they "were his life now." Unsurprisingly, as a result of this initial physical and then continual mental abuse, Mr. Ali proceeded to make coerced statements throughout his three and a half years in CIA custody. As in *Karake*, "here, the coercion was a product of both discrete beatings, as well as the general conditions of confinement."[512] This result is exactly what the CIA designed the program to produce—a compliant and cooperative detainee.

e. (U) Mr. Ali was subjected to torture and other physical and mental abuse. That treatment created the coercive conditions wherein he gave hundreds of incriminating statements while in the RDI program. Therefore, any subsequent statements made by Mr. Ali to government officials are presumptively tainted by the prior statements obtained by torture or cruel, inhuman, or degrading treatment. It is for the Prosecution to prove that the LHM statements are sufficiently attenuated from that taint.

f. (U) It is easy to focus on the EITs because the torture of Mr. Ali is so absurdly far outside the norms of what is expected of U.S. custody preceding law enforcement questioning. However, the three and a half years of uncharged, incommunicado detention, and essentially solitary confinement[513]—all while being continually questioned and conditioned— is just as

---

[512] (U) 443 F.Supp.2d at 89.

[513] (U) *See, e.g.*, *In re Medley*, 134 U.S. 160, 167–69 (1890) ("solitary confinement bears 'a further terror and peculiar mark of infamy'"); *Davis v. Ayala*, 576 U.S. 257, 287 (2015) (Kennedy, J., concurring); *Glossip v. Gross*, 135 S. Ct. 2726, 2765 (2015) (Breyer, J., dissenting); *Gallina v. Wilkinson*, 988 F.3d 137 (2d Cir. 2021); *Porter v. Pennsylvania Dep't of Corr.*, 974 F.3d 431 (3d Cir. 2020); *Porter v. Clarke*, 923 F.3d 348 (4th Cir. 2019), as

89

CUI

egregious as the EITs. Mr. Ali was transferred to NSGB in September 2006 and the LHM was taken a mere four months later. In a typical case, four months could be a considerable amount of time; however, this is not a typical case. The Supreme Court found two weeks in a windowless sweatbox to be a "shocking display of barbarism," however, that pales in comparison to what the U.S. government did to Mr. Ali.[514] The same Court also noted that for "*two full weeks* he saw not one friendly face from outside the prison, but was completely under the control and domination of his jailers."[515] Mr. Ali lived under such daily conditions for over three and a half years. Mr. Ali's four months at NSGB in which he began receiving modest—and only modest—improvements in his detention conditions, is a small fraction of time compared to the years that he spent held incommunicado, often in inhumane and degrading living conditions, all the while being subjected to continual conditioning meant to instill compliance and cooperation.

g. (U) Mr. Ali's conditions of confinement improved only incrementally from the time he was in CIA custody to the time he was at NSGB. The Prosecution heralds each new amenity, however, the growing list of such minimally humane amenities only highlights the austere and harsh baseline Mr. Ali started with at Location 2. More importantly, Mr. Ali knew that each amenity was something that could then be taken away from him at any time and was used to continue to train his compliance.[516]

h. (U) Significantly, the harshest part of the long RDI detention was also left in place as

---

amended May 6, 2019; *Grissom v. Roberts*, 902 F.3d 1162 (10th Cir. 2018); *Williams v. Sec'y Pennsylvania Dep't of Corr.*, 848 F.3d 549 (3d Cir. 2017); *United States v. King*, 61 M.J. 225 (C.A.A.F. 2005).

[514] (U) *Brooks*, 389 U.S. at 415.

[515] (U) *Brooks*, 389 U.S. at 414 (emph. added).

[516] (U) Dr. Mitchell explained that, "we know that people will work harder to keep what they've got than they will to gain new stuff, right? That's a relatively robust finding in psychology." Tr. dated 20 February 2024, at p. 41681.

90

CUI

he was still kept isolated from most non-U.S. government personnel. It is true that after his arrival at NSGB, Mr. Ali was allowed a few visits with the ICRC, a letter from a relative, and periodic communication with one other detainee. However, to a person such as Mr. Ali who had been conditioned by the RDI program, these limited interactions were still rewards that could be taken away by his captors. Regardless, Mr. Ali was still held in near total incommunicado status in a former CIA black site which would have reasonably reminded him of the other RDI sites he had been held in for three and a half years. Under all of these circumstances, it would not be reasonable to expect, nor does the evidence persuade the Commission, that Mr. Ali would have believed that his circumstances had significantly changed or that his RDI trained compliance was not still required. The Prosecution argues that Mr. Ali should have known of his changed circumstances because the Camp VII Commander told him his conditions had changed. As explained above, his actual detention conditions had not substantially improved and in some ways had changed for the worse. He still was kept extremely isolated. Given these circumstances, it is in no way clear that he would, or did, think that he was actually free from the RDI program, its requirements, or its potential consequences.

i. (U) The Prosecution also asserts that Mr. Ali should have been aware that his conditions had changed based on what the agents told him during the LHM questioning. The agents who questioned Mr. Ali for the LHM statements treated him with fairness and respect and did not intentionally subject him to any form of coercion. However, this fact alone does not erase everything that happened to Mr. Ali during the RDI program. After being questioned by dozens of interrogators and debriefers over three and a half years, Mr. Ali would have seen Agents Fitzgerald, Perkins, and McClain for what they were, just the latest iteration of American

91

CUI

officials who wanted answers. The setting was just like the RDI program. The way the agents conducted the questioning by showing him documents and photos was just like the RDI program. The subject matter was the same areas he had already been questioned about many times during the RDI program.[517] He was accustomed to RDI questioners going over previously asked material.[518] He knew from the agents' limited advice that they were aware of his past statements, even if they said they were not interested in them at that time. All of this would have indicated to Mr. Ali that he was still in the RDI program, and he needed to answer the way he had been trained. As he had been warned, he knew that "every day was a test for him" and that "new people would be talking to him and assessing him."[519]

j. (U) Drs. Mitchell and Jessen wrote that, "the key to influencing someone else is to control which mental events are dominant in emerging consciousness."[520] They explained that "through the systematic creation and manipulation of competing mental events, perceptions, feelings, motives, thoughts, and emotional reactions, interrogators can attack a subject's will power, resolve, confidence, and decision-making—with the potential to ultimately influence

[517] (U) See AE 942YYY (GOV Sup), Government Supplement to AE 942YYY (GOV), Government Response to AE 628 (AAA Sup) and AE 942TTT (AAA), Mr. Ali's Supplements to AE 628 (AAA), Motion to Suppress Alleged Statements as Involuntary and Obtained by Torture *And* Government Notice In Response to Questions from the Military Judge, filed 21 February 2025, at Attachs. F and G. The agents questioned Mr. Ali about not only the 9/11 attacks, but also various other Al Qaeda plots and actors. Mr. Ali was questioned about all of these topics during his time in the RDI program.

[518] (U) Dr. Mitchell testified that this was a standard technique in the RDI program. *See* Tr. dated 23 January 2020, at p. 30788-89. *See also* Mr. Ali's RDI statements which demonstrate him being questioned repeatedly on the same topics. AE 942YYY (GOV Sup), Government Supplement to AE 942YYY (GOV), Government Response to AE 628 (AAA Sup) and AE 942TTT (AAA), Mr. Ali's Supplements to AE 628 (AAA), Motion to Suppress Alleged Statements as Involuntary and Obtained by Torture *And* Government Notice In Response to Questions from the Military Judge, filed 21 February 2025, at Attachs. F and G.

[519] (U) AE 628SSS (AAA), Unclassified Notice, Defense Notice of Exhibits, filed 21 October 2019, at Attach. F., p. 1004, citing to MEA-PRG-00000896 (cited information is unclassified and is contained in a document classified Top Secret).

[520] (U) AE 628FFFFFFFF (AAA), Defense Notice of Exhibits, filed 21 February 2024, at Attach. D., p. 27, citing to MEA-2C-00001188.

92

subjects to think, act, and feel in ways harmful to their own interests."[521] Just as the doctors

planned, when faced with questions from a U.S. official, Mr. Ali would have relied on his RDI

training and complied. It is not clear whether his compliance would be because of any autonomic

responses or simply that the questioning reminded him that he did not want to be tortured or lose

privileges.[522] Either way, that is coercion. When the agents provided Mr. Ali with the limited

form of a rights advisement, he had to determine whether he was willing to risk that he could

stop cooperating and not be punished, or whether he would just continue to cooperate, as he was

conditioned to do, and repeat the same incriminating statements he had already made numerous

times. Considering his RDI experience and knowing that he was still under the complete control

of the Americans, it is not surprising that Mr. Ali continued to comply and cooperate.

     k. (U) One of the strongest pieces of evidence that the Prosecution[523] could have used to

show that Mr. Ali knew he was no longer subject to the RDI program would have been a full

rights advisement pursuant to *Miranda*. Agents have provided a full rights advisement to other

alleged Al Qaeda operatives[524] and the agents testified that they would normally have done so.

---

[521] (U) *Id* at Attach. D., p. 27, citing to MEA-2C-00001188.

[522] (U) As Dr. Mitchell explained, "what you want to do is create the mental environment where the urge to do something will be there and then provide logical reasons for acting on that urge." Tr. dated 20 February 2021, at p. 41493.

[523] (U) As previously noted, OMC prosecutors were present at NSGB and available to advise the FBI and DoD agents who were conducting the LHM questioning.

[524] (U) When Abdul Hakim Ali Murad was interviewed by U.S. law enforcement agents, including FBI SA Francis Pellegrino, he was admonished pursuant to *Miranda*. Tr. dated 27 September 2023, at p. 37103. SA Pellegrino was also involved in the arrest of Wahid Khan. Wahid Khan was given his full *Miranda* rights when he was arrested; Tr. dated 27 September 2023, at p. 37183. Khalfan Khamis Mohamed (KKM) received three separate rights advisements from SA Perkins, one on a plane bound to the U.S. was "regular *Miranda* advice" ("Oh, it was -- I believe the difference was in that because he was not in the United States and an attorney was available, it was the modified advice, initially. On the plane, would have been the regular *Miranda* advice, he had the right to an attorney. Right to an attorney, the full rights? Yes"); Tr. dated 7 December 2017, at pp. 17894-17895. SA Perkins was also aware that when Mohammed Al-Owhali was interviewed by FBI SAs, he received full *Miranda* warnings and full *Miranda* rights. Tr. dated 7 December 2017, at p. 17917.

93

Instead, the agents used a carefully constructed advisement that avoided informing Mr. Ali that he had a right to counsel and that he had a right to remain silent.[525] The agents also did not notify Mr. Ali that his prior statements, which were obtained through torture or cruel, inhuman, or degrading treatment and covered many of the same issues as the LHM, could not be used against him at any future trial.[526] A deficient cleansing statement alone does not require suppression, however, it is appropriate for the Commission to consider under the totality of the circumstances of the LHM questioning. The Commission finds that the deficient cleansing statement provided Mr. Ali no reason to believe that his many prior incriminating RDI statements would not eventually be used against him and that he likely assumed they could, and would, be so used.

2. (U) **Voluntariness and Apparent Lack of Fear**.

a. (U) The Prosecution relies on the witness testimony of the Camp VII Commander, Dr. WK5I, SA Fitzgerald, SA Perkins, SA McClain, and Dr. Michael Welner in noting that Mr. Ali did not demonstrate any fear during the LHM questioning and that he appeared to be acting voluntarily in making the statements. The problem with all of these witnesses is their limited information about what was done to Mr. Ali to put him in that compliant state.

b. (U) The Camp VII Commander and Dr. WK5I did not know the extent of what was

---

[525] (U) The Commission does not imply that Mr. Ali is entitled to a *Miranda* warning or that he is entitled to suppression of his statements due to the lack of such a warning. The Military Commissions Act does not require such a warning, and the Commission does not find that *Miranda* applies to unprivileged alien enemy belligerents held at NSGB while awaiting trial for alleged law of war violations. However, the nature of the rights advisement provided to Mr. Ali by the agents can be considered among the totality of the circumstances surrounding the January 2007 LHM questioning.

[526] (U) *See, e.g.*, *Missouri v. Seibert*, 542 U.S. 600, 612 (2004) ("Could the warnings effectively advise the suspect that he had a real choice about giving an admissible statement at that juncture? Could they reasonably convey that he could choose to stop talking even if he had talked earlier? For unless the warnings could place a suspect who has just been interrogated in a position to make such an informed choice, there is no practical justification for accepting the formal warnings as compliance with *Miranda*, or for treating the second stage of interrogation as distinct from the first, unwarned and inadmissible statement.").

94

CUI

done to Mr. Ali. Neither did SAs Fitzgerald, Perkins and McClain. In fact, SA Perkins testified

that she was instructed not to review the tactics and techniques used on Mr. Ali when she

reviewed his RDI statements. It is no surprise that the Camp VII Commander, SA Fitzgerald, and

SA Perkins testified about a polite, professional detainee who readily answered questions and

even volunteered information. They were not aware that these behaviors were just what Mr. Ali

had been *trained* to do over the course of three and a half years of continual questioning and

conditioning. The agents testified how Mr. Ali readily made notations on documents they

showed him—just as he had been taught to do countless times in the RDI program. The agents

even marveled that Mr. Ali reached out to them to send them a note with more information. This

is exactly how Mr. Ali had been conditioned to behave—consider the interviewers' questions

back in his cell and think about what further information he might be able to provide. The agents

also testified about how Mr. Ali said, "let's get down to business." This is exactly how he acted

during his RDI time—get assignments and provide information or lessons like he was a

businessman doing a job.

   c. (U) The Prosecution's expert, Dr. Michael Welner reviewed the same documents and

other evidence provided in discovery to the defense concerning the RDI program. From his

review of that evidence, Dr. Welner opined that Mr. Ali's LHM statements were voluntary

because they were not a "coerced compliant confession."[527] In Dr. Welner's view, Mr. Ali was

not coerced because the RDI program merely rendered him "cooperative" rather than

"compliant."[528]

---

[527] (U) Tr. dated 7 November 2024, at pp. 51048-51049.

[528] (U) Tr. dated 8 November 2024, at pp. 51143-51145.

CUI

d. (U) The Commission has considered Dr. Welner's testimony and does not find it persuasive. Dr. Welner testified that a "coerced-compliant confession is zeroed in on extracting a confession which then gets flipped into a prosecution…and the relationship with the suspect terminates."[529] In Dr. Welner's opinion, Mr. Ali's situation "is an ongoing relationship that's much more resembling what you see for, say, a police informant…they have an understanding. Each side wants something."[530] Dr. Welner acknowledges that what Mr. Ali received is "reassurance" and "some kind of social interaction with [the RDI personnel]..that gave him greater psychological comfort."[531] Of course, what this ignores is that the RDI personnel are the ones who created the state where Mr. Ali needed "reassurance" and they placed him in the long-term isolation where he needed the "comfort" of the "social interaction." Dr. Welner relies on examples of how coercive police interrogations compare to interviews with a cooperative police informant, perhaps because those are the type of interactions where he has experience. That experience is of limited utility in Mr. Ali's case. Mr. Ali's "cooperation" in the RDI program is not at all similar to a police informant's cooperation. Mr. Ali was not free to cooperate or not cooperate. Throughout his time in the RDI program, Mr. Ali was completely under the control and domination of his captors.[532] Dr. Welner describes Mr. Ali as having an attention-seeking personality style and needing reassurance from the RDI personnel.[533] Again, this seems to be the type of exploitable detainee that the RDI program was designed to create. The initial physical

---

[529] (U) Tr. dated 8 November 2024, at p. 51161.

[530] (U) Tr. dated 8 November 2024, at p. 51161.

[531] (U) Tr. dated 8 November 2024, at p. 51160.

[532] (U) In contrast to Mr. Ali's circumstances, any other informant, even one in prison, would have had access to a lawyer, family, or even other inmates.

[533] (U) Tr. dated 8 November 2024, at pp. 51170-51171.

96

CUI

abuse and adverse environment would create a sense of fear, anxiety, uncertainty, and/or helplessness. The detainee would then be taught that he was dependent[534] on his captors and would feel relief at talking to them. Most of Dr. Welner's testimony about Mr. Ali's neediness actually demonstrates the conditioning that Mr. Ali was undergoing.

e. (U) Dr. Welner focused much of his testimony on examples of a lack of demonstrated fear by Mr. Ali both during his time in the RDI program and during the LHM questioning. However, Mr. Ali reported his continuing fear and anxiety throughout his time in the RDI program[535] and continued to do so during his time at NSGB.[536] Additionally, Dr. Welner's testimony does not account for the likelihood that, due to his conditioning, Mr. Ali would only show fear if he was trying to lie or omit facts to the questioners.[537] Mr. Ali was cooperating during the RDI and LHM questioning, so, just as he was conditioned, he likely would have experienced feelings of relief from any anxiety or fear.[538]

f. (U) Much of Dr. Welner's testimony, and in fact much of the litigation, involved the

---

[534] (U) In response to a question about psychological dependence, Dr. Mitchell explained, "that means that what you would like is the person to think that you are the one responsible for helping them get their food, the one responsible for helping them get their water and, you know, improving conditions. And so they become dependent on you…What you would like them to think is that his interaction with the interrogator is what's going to be linked to the rewards that he has in his life, the operant conditioning piece of the thing." Tr. dated 20 February 2024, at pp. 41556-41557.

[535] (CUI) Mr. Ali reported being "consumed by fear" and that, "the smallest thing can remind him of his early interrogation days, and cause him to tremble." *supra* notes 322 and 323. When Dr. Jessen read that passage, he testified that, "[i]t sounds to me like when he saw things, cues, that reminded him of when he was interrogated that he still felt the fear to some degree of what he felt when he was interrogated. So that's not a—necessarily a judgment heuristic. That's more like a conditioned response." Tr. dated 16 July 2024, at p. 48127.

[536] (U) *See* discussion of Mr. Ali's anxiety and fear at NSGB *supra* Section III, para. 10(a)(7).

[537] (U) Dr. Mitchell testified that, "after the conditioning process was over, it—much like a person who's afraid to go to the dentist, it didn't stop them voluntarily lying to us or being deceptive or something, but it made them appear nervous when they attempted to do that…" Tr. dated 22 January 2020, at pp. 30410-30411. He acknowledged that would be a reflection of the internal anxiety they would feel. Tr. dated 22 January 2020, at p. 30411.

[538] (U) Dr. Mitchell testified that, "what we wanted them to do was to be sure that they experienced a sense of relief and a sense of safety in answering questions…" Tr. dated 23 January 2020, at p. 30749.

question of what, if any, mental disorders Mr. Ali may have had at the time of the LHM

questioning. The Defense provided testimony and/or declarations from Dr. Morgan, Dr. David

Hanrahan, Dr. Ruben Gur, Dr. Leo Shea and Dr. Stephen Xenakis. The Prosecution provided

testimony from Dr. Thomas Guilmette, Dr. WK5I, and Dr. Welner. However, all of these experts

had limitations on what data they had on which to base their opinions. Even Dr. WK5I and

Dr. Hanrahan, who were able to interact with Mr. Ali, were both limited in what information

they had about what was done to him in the RDI program. Drs. Morgan and Welner have both

reviewed much of the RDI evidence, but that record is still incomplete. The Prosecution did not

call any of the medical professionals who dealt with Mr. Ali in the RDI program. The

Prosecution did not call any of the RDI personnel who questioned Mr. Ali save for Drs. Jessen

and Mitchell.[539] The documentary evidence consists primarily of cables that were sent from the

RDI sites to CIA headquarters. It is often unclear who drafted these cables, whether they were

the actual people who witnessed what was documented in the cables, and what information they

may have omitted from the cables. There are witness statements from some of the investigations

into the RDI program, however, again most of those witnesses did not testify in this case so it is

difficult to determine what biases those witnesses might have and what was omitted from their

statements. Given the state of the evidence, the Commission has not made any findings regarding

Mr. Ali's possible mental disorders.

---

[539] (U) See AE 942YYY (GOV Sup), Government Supplement to AE 942YYY (GOV), Government Response to AE 628 (AAA Sup) and AE 942TTT (AAA), Mr. Ali's Supplements to AE 628 (AAA), Motion to Suppress Alleged Statements as Involuntary and Obtained by Torture *And* Government Notice In Response to Questions from the Military Judge, filed 21 February 2025, Attach. E., RDI Index. Dr. Mitchell is listed on Mr. Ali's RDI index 6 times and Dr. Jessen is listed twice. Based on their testimony, they had very limited interactions with Mr. Ali.

98

CUI

3. (U) **Statements to Mr. Ghailani.**[540]

    a. (U) The Prosecution points to statements made by Mr. Ali to Mr. Ghailani in arguing

that he knew that his situation had changed, that he had rights, and that he did not have to speak

to the agents. Mr. Ali's statements to Mr. Ghailani only show that Mr. Ali believed the

documents that the agents showed him were damaging to him. Was his fear that the documents

showed more culpability than he had already admitted to his RDI handlers? If so, he had reason

to fear punishment if he had lied by omission to them. Was his fear that the U.S. officials now

had all of the information they needed about his activities? If so, he had already expressed

multiple times that he feared what would happen to him when he ran out of information for the

Americans. Even if he did believe that the information was damaging to some future criminal

case against him, that does not prove the voluntariness of Mr. Ali's LHM statements. It just

demonstrates that conditioning in the RDI program effectively yielded an accused willing to

make statements against his interest even when he knows such statements are "disasters."

    b. (U) There are two important statements from Mr. Ali to Mr. Ghailani that indicate his

mindset. First, he told Mr. Ghailani that Mr. Ghailani could postpone his LHM questioning if he

was not feeling well. This is consistent with the debriefing phases of the RDI program where

detainees were allowed to postpone debriefings with the understanding that eventually they

would have to answer the questions. If Mr. Ali believed the detainees could absolutely decline

the LHM questioning, it seems more likely that Mr. Ali would have told Mr. Ghailani to simply

refuse to go to the LHM questioning rather than just postpone it. These facts demonstrate that

Mr. Ali was under the impression that RDI program rules were still in effect. Second, Mr. Ali

---

[540] (U) The Commission notes that Mr. Ali moved to suppress these statements in AE 628 (AAA). The analysis contained in this paragraph is for purposes of analyzing the voluntariness of Mr. Ali's LHM statement.

CUI

warned Mr. Ghailani that if a detainee could no longer provide useful information to the Americans, he would be killed. This shows that, after his arrival at NSGB, Mr. Ali had retained the mindset that had been conditioned into him during the RDI program—answer the questions from American officials, or else.

4. (U) **Comparison of Mr. Ali's LHM Statements with his CSRT Statements**.[541]

    a. (U) The Prosecution argues that Mr. Ali's statements at his CSRT demonstrate that he was not suffering from "learned helplessness" during the LHM questioning. Instead, what the CSRT statements actually demonstrate is that at some point after the LHM questioning, Mr. Ali began to act more voluntarily. During the LHM questioning, the Commission finds that Mr. Ali was likely still following his RDI training and complying. Mr. Ali had been trained to comply or face punishment, so he initially followed his training. After all, he had little to risk by repeating what he had already said many times and he had much to risk in the form of punishment if he refused to talk. By the time of the CSRT hearing, Mr. Ali likely knew that he no longer needed to cooperate. This may be based on the passage of time, or more likely, the substantial differences between the LHM questioning and the CSRT proceedings. At the CSRT proceeding, Mr. Ali was assigned a personal representative to assist him and explain his rights. This was substantially different from the debriefings and interrogations he experienced during the RDI program and the LHM questioning. The CSRT was also conducted as an official proceeding in a hearing room presided over by a board president, who was an experienced judge, and with two other military officers sitting as panel members. The CSRT hearing was markedly different, in both environment and procedures, from the RDI interrogations/debriefings and the LHM questioning.

---

[541] (U) The Commission notes that Mr. Ali moved to suppress these statements in AE 628 (AAA). The analysis contained in this paragraph is for purposes of analyzing the voluntariness of Mr. Ali's LHM statement.

100

b. (U) The CSRT president clearly explained the purpose of the hearing and advised Mr. Ali of his rights. In his unsworn statement, Mr. Ali denied much of what he previously told RDI interrogators/debriefers and the LHM questioners. At the CSRT, he denied his knowing involvement in the 11 September 2001 attacks. He also denied being a member of Al Qaeda. The president asked Mr. Ali if he was "under any force or pressure today." Mr. Ali responded, "No."[542] Mr. Ali also answered questions from the president and the other panel members. Although some of his statements tend to incriminate him in certain respects, he continued to insist that he was not knowingly involved in the plan to attack the United States on 11 September 2001 and that he was simply a businessman.

c. (U) Mr. Ali's statements at the CSRT actually show how an Accused exhibiting free will would be expected to behave. He denies or explains away criminal allegations and otherwise minimizes his role. These statements are diametrically opposed to what he said and how he acted during the LHM questioning.

5. (U) **Admissibility of LHM Statements**.

a. (U) In determining whether an accused's will was overborne in a particular case, courts consider the totality of all the surrounding circumstances, regarding both the characteristics of the accused and the details of the interrogation.[543] The Commission has considered, among others, the following factors in the analysis of the voluntariness of Mr. Ali's statements to investigators in January 2007:

(1) (U) Age. Mr. Ali was taken into U.S. custody at age 25. When the 2007

---

[542] (U) AE 628C (GOV), Government Response to Mr. Ali's Motion to Suppress Alleged Statements as Involuntary and Obtained by Torture, filed 29 May 2019, at Attach. O, p. 423 (MEA-CSRT-00000047-10018).

[543] (U) *Schneckloth*, 412 U.S. at 226–27 (listing cases).

101

statements were made, he was 29 years old. Therefore, this factor does not weigh heavily in the evaluation.

(2) (U) Education and intelligence. Mr. Ali appears to be intelligent and well-educated. He attended college in Pakistan and earned Microsoft Certified Systems Engineer and Microsoft Certified Internet Engineer certificates. He speaks four languages. This factor weighs against suppression.

(3) (U) Military Training. Mr. Ali never received any military training.[544] This factor does not weigh heavily in the evaluation.

(4) (U) Lack of a full rights advisement or a cleansing statement. As discussed previously, the U.S. agents who questioned Mr. Ali for the LHM statements were specifically directed not to advise him that he could consult an attorney. Agents also did not advise Mr. Ali that his coerced RDI statements would not be used against him in a criminal prosecution. Although Mr. Ali was told that he did not have to speak to the agents, it was reasonable for him to fear that a failure to cooperate could lead to punishment and that his many prior coerced confessions had already sealed his fate in any future judicial proceedings. Given this combination of considerations, Mr. Ali was likely more willing to cooperate with agents based on his prior treatment. This factor weighs toward suppression.

(5) (U) Length of detention. At the time of the 2007 LHM questioning, Mr. Ali had been in U.S. government custody for approximately three and a half years. For the vast majority of that time, he was held incommunicado and in solitary confinement. This factor

---

[544] (U) AE 628C (GOV), Government Response to Mr. Ali's Motion to Suppress Alleged Statements as Involuntary and Obtained by Torture, filed 29 May 2019, at Attach. O, p. 425 (MEA-CSRT-00000047-10018) (statement of Mr. Ali at his 30 March 2007 CSRT: "I have never received any military training in Afghanistan.").

102

CUI

weighs heavily toward suppression.

(6) (U) Repeated and prolonged nature of the questioning. Prior to the 2007 LHM questioning, Mr. Ali had been interrogated or debriefed more than 1,000 times. These interrogations were repeated over the three and a half years of Mr. Ali's detention. The 2007 LHM questioning themselves took place over several days, seven to eight hours each day. This factor weighs heavily toward suppression.

(7) (U) Use of physical punishment such as the deprivation of food or sleep. As previously addressed, Mr. Ali endured physical and mental abuse during his years in the RDI program. Although the physical abuse stopped after three and a half days, the RDI program was crafted to constantly remind him of that period. As such, while Mr. Ali was no longer experiencing the physical abuse in 2007, he was still under the complete domination and control of the U.S. government under circumstances similar to those he had experienced the previous three and a half years. This factor weighs heavily toward suppression.

(8) (U) Circumstances of the statement. The agents involved in the LHM questioning acted professionally and did not intentionally coerce Mr. Ali. However, the circumstances of the LHM questioning were not coercive only if one ignores the years of conditioning leading up to that questioning. The agents, whether they realized it or not, benefited greatly from the RDI program conditioning of Mr. Ali to ultimately comply in the exact circumstances of the government agent LHM questioning. This factor weighs toward suppression.

(9) (U) Psychological impact on the accused. The entire goal of the RDI program, both the EITs and the extended debriefings/detention period, was to condition Mr. Ali to act

103

against his interests and comply with questioning. The compounding effects of years in the program on Mr. Ali are significant and weigh extremely heavily towards suppression.

(10) (U) Lapse of Time. Mr. Ali was at NSGB for approximately four months before the LHM questioning. As discussed previously, four months is a short lapse of time in comparison to the three and a half years of continuous RDI confinement and conditioning. This factor weighs towards suppression.

(11) (U) Change of Place. The physical characteristics of NSGB and Echo 2 would have reminded Mr. Ali of his years in the RDI program and his numerous coercive questioning sessions during that time. This factor weighs towards suppression.

(12) (U) Change of Identities of the Questioners. The agents conducting the LHM questioning identified themselves and told Mr. Ali how they were different from the RDI questioners. However, as discussed previously, a change in the identities of the questioners was unlikely to have any affect on Mr. Ali as he had been conditioned to expect regular changes in the identities of questioners and he had been trained to answer their questions with elaboration and spontaneity, which is exactly what he did. This factor weighs neither for nor against suppression.

b. (U) The Commission has carefully considered the aforementioned factors among the totality of the circumstances surrounding the 2007 LHM statements, to include the treatment of Mr. Ali from the time his detention began in April 2003 until the 2007 questioning. The Commission concludes that the 2007 LHM statements were not sufficiently attenuated from the RDI conditioning and mistreatment to meaningfully erase the effects of the RDI program.

c. (U) Considering the totality of all relevant circumstances, the Commission finds the

104

Government created a program to train Mr. Ali to be compliant and cooperative. That program was successful. The clearest example of that is the startling contrast between the "defiant" and "hostile" Mr. Ali at the beginning of his time in the RDI program and the Mr. Ali later during his RDI experience who "like[d] to please" and RDI staff were warned not to use harsh tone reprimands with as he was easily rattled. Mr. Ali understood that if he was questioned by U.S. officials, he needed to cooperate, or his conditions would worsen. That expected behavior includes speaking to the agents in January 2007. The Commission is not persuaded that Mr. Ali actually believed he was free to remain silent during the LHM questioning.

d. (U) The Commission is not convinced that the LHM statement would have been obtained but for Mr. Ali's prior experience with being tortured, abused, and conditioned in the RDI program. On the facts presented, the Commission does not find that Mr. Ali should have, or could have, reasonably believed that his circumstances had substantially changed when he was questioned by the newest round of U.S. personnel in late January 2007. The modestly changed confinement circumstances and the limited rights advisement given were insufficient to attenuate the lingering taint of the torture, the psychological abuse (cruel, inhuman, and degrading treatment) from the years of incommunicado detention and solitary confinement, and the continual threat of a worsening of his conditions if he stopped cooperating.

e. (U) In *Lyons*, the Supreme Court explained that, "the effect of the earlier abuse may be so clear as to forbid any other inference than that it dominated the mind of the accused to such an extent that the later confession is involuntary."[545] Here, over the course of three and a half years and more than a thousand interrogations/debriefings, Mr. Ali was coerced and psychologically

---

[545] (U) 322 U.S. at 603.

conditioned to cooperate with questioners. If he did not comply with his training and answer in the way that he had been taught, he knew he might be tortured again and lose any limited amenities that he had. In these circumstances, it is not surprising that Mr. Ali continued to implicate himself. The Commission finds that the changes in Mr. Ali's circumstances from his arrival at NSGB to the time of the LHM questioning were not sufficiently meaningful to erase the effects of the RDI program on Mr. Ali to a degree where the Prosecution has satisfied its burden to prove that the LHM statement was given voluntarily.

f. (U) Most of the cases dealing with the admissibility of a subsequent statement made following an inadmissible statement concern circumstances where the initial statement was unwarned and therefore not in compliance with *Miranda*, but where no actual coercion was involved. In contrast, Mr. Ali was subjected to physical and mental abuse while in U.S. custody for three and a half years, and where he was intentionally and repeatedly conditioned to answer questions. The circumstances of this case are wholly different, and far more severe, than the circumstances which informed decisions by most other courts who have had to determine the admissibility of a subsequent statement following a prior inadmissible statement.[546]

g. (U) The only other comparable case is that of *United States v. Al Nashiri, No. 23-005 (C.M.C.R. January 30, 2025).* Mr. Ali and Mr. Nashiri were subjected to the same RDI program conditioning, but Mr. Al Nashiri was detained longer than Mr. Ali and he was physically tortured more extensively. However, it appears that Mr. Ali simply responded to the conditioning more

---

[546] (U) *See, e.g.*, *United States v. Bayer*, 331 U.S. 532, 540 (1947) ("Of course, after an accused has once let the cat out of the bag by confessing, no matter what the inducement, he is never thereafter free of the psychological and practical disadvantages of having confessed. He can never get the cat back in the bag. The secret is out for good. In such a sense, a later confession always may be looked upon as fruit of the first."). Though *Elstad* found this theory inapplicable as to that case, it is helpful here in evaluating the totality of the circumstances.

106

CUI

readily and became compliant more quickly than Mr. Al Nashiri. As such, it appears that Mr. Ali was more susceptible to the RDI program's conditioning techniques, perhaps because of individual character traits such as his documented anxiety, which may have led him to dwell more on the uncertainty and fear that the RDI program was designed to instill and exploit. Additionally, because Mr. Ali was more compliant than Mr. Al Nashiri, he would have received more operant conditioning in the form of additional amenities, making him more incentivized to please his captors. The same factors that the military judge found persuasive in *Al Nashiri*, apply in this case. The Prosecution asserts that this Commission has testimony about the conditions of confinement at NSGB that differs from what was present in *Al Nashiri*. The Commission has considered this evidence and does not find it persuasive. For example, although a great deal of time was spent by the Parties litigating which U.S. agency had "operational control" of high value detainee operations at NSGB, the Commission does not believe it actually matters. Mr. Ali was conditioned to answer questioning by American officials. There is no evidence that conditioning was premised on what U.S. agency was doing the questioning or which U.S. organization had custody of him. His acknowledgement of the difference between the CIA and the FBI does not mean that he thought there would be any difference in the outcome if he stopped cooperating.

### VI. (U) Conclusion.

1. (U) **LHM Statements**.

    a. (U) M.C.R.E. 304 (a)(1). The Prosecution has not met its burden under M.C.R.E. 304 (a)(1) of proving by a preponderance of the evidence that the Mr. Ali's LHM statements were not obtained by the lingering effects of the torture, cruel, inhuman, or degrading treatment

CUI

CUI

suffered while in the CIA RDI program.

b. (U) M.C.R.E. 304 (a)(2). Even if the Prosecution had proven that the LHM statements were not obtained in violation of M.C.R.E. 304 (a)(1), the Prosecution has not proven by a preponderance of the evidence that Mr. Ali's LHM statements are admissible when applying the constraints of M.C.R.E. 304 (a)(2)(B).

(1) (U) Applying M.C.R.E. 304(a)(2)(B)(i), the Prosecution does not argue, and the Commission does not find, that the LHM statements of Mr. Ali were made incident to lawful conduct during military operations at the point of capture or during closely related active combat engagement and that the interests of justice would best be served by the admission of the LHM statements into evidence.

(2) (U) Applying M.C.R.E. 304(a)(2)(B)(ii), although the Prosecution argues that the LHM statements were voluntarily given, the Prosecution has not proven by a preponderance of the evidence that that those statements were, in fact, voluntary. The Prosecution has not proven that the presumed taint from the prior years of physical and psychological abuse had sufficiently dissipated when Mr. Ali was again confronted with U.S. government officials in January 2007 to find that Mr. Ali's LHM statements were voluntarily made. The evidence, instead, supports the conclusion that Mr. Ali did what he was trained to do: cooperate and comply. Under these circumstances, cooperation and compliance do not equate to the "mental freedom" addressed by the Supreme Court in *Ashcraft*, nor do they adequately establish the voluntariness of the LHM statements.

c. (U) Applying M.C.R.E. 304(a)(5), the Commission further concludes that the Prosecution has not satisfied its burden of proving by a preponderance of the evidence that

CUI

CUI

Mr. Ali's LHM statements were not derived from prior RDI program statements that were obtained by torture or cruel, inhuman, or degrading treatment. At the time Mr. Ali made his statements to the FBI in January 2007, he had already made numerous statements of remarkably similar substance while being subjected to conditions constituting cruel, inhuman, or degrading treatment in the RDI program. The Prosecution argues that the FBI only used evidence during the LHM interview that it had obtained from independent investigative sources, and therefore did not need the evidence obtained during questioning of Mr. Ali while he was in the RDI program. That may be true from the questioner's perspective. However, regardless of the source of the information feeding the interviewer's questioning, the Prosecution has not satisfied its burden of proving that Mr. Ali's responses to those questions in January 2007 were not substantially affected by, and therefore derived from, the fact that he had already made numerous similar incriminating statements in CIA custody. Accordingly, the Commission cannot find that Mr. Ali would have made incriminating statements had he not already repeatedly incriminated himself while in the RDI program. Likewise, the Commission does not find that the use of the LHM statements to be in the interest of justice.

d. (U) Accordingly, Mr. Ali's LHM statements must be suppressed under 10 U.S.C. § 948r, M.C.R.E. 304(a)(1), M.C.R.E. 304(a)(2)(B)(ii), and M.C.R.E. 304(a)(5).

2. (U) **Other Statements**. Although Mr. Ali's suppression motion sought to exclude, not only the LHM statements, but later statements such as the statements made during the CSRT and recorded statements known as the XYM statements, the Commission will defer ruling on these other statements.

3. (U) **AE 524 Series**. Although the AE 524 Series also involved the potential suppression of Mr.

109

Ali's LHM statements (and that of his Co-Accused), the litigation in that series hinged not on the issue of voluntariness of the LHM statements, but on the issue of whether the discovery provided by the Prosecution and access to witnesses would provide the Defense with substantially the same ability to investigate, prepare, and litigate motions to suppress the LHM statements and/or to investigate, prepare, and present evidence regarding the conditions of confinement of the Accused while in CIA custody for mitigation. The Commission will defer ruling on the AE 524 series and defer any potential reconsideration of its Rulings in AE 548H and AE 549H, which both relied on the Commission's Ruling in AE 524LL.

**VII**. **(U) Ruling**.

1. (U) The motion is **GRANTED, IN PART**.

    a. (U) The statements made by Mr. Ali to Special Agents Fitzgerald, Perkins, and McClain on 17, 18, 19, and 30 January 2007 at Naval Station Guantanamo Bay, Cuba, such statements having been documented by the Government on 30 January 2007 in a Letterhead Memorandum ("the LHM statements"), are hereby suppressed.[547]

    b. (U) Any decisions as to the remaining statements referenced in Mr. Ali's suppression motion are **DEFERRED**.

---

[547] (U) During oral argument on this motion, Counsel for Mr. Ali effectively withdrew the additional requests for relief raised in AE 628 (AAA Sup) related to the dismissal of charges and removal of the death penalty as authorized punishment. Therefore, such earlier requested relief is moot as to the Ruling on this motion. *See supra*, note 15. To the extent the Commission misunderstood Counsel's seemingly clear oral argument on this point, such requested relief as to this motion would be DENIED.

110

CUI

2. (U) This Ruling does not disturb either those findings that were deferred or the relief that was suspended in AE 524LLL. Such findings and relief remain deferred and suspended until further action by the Commission.

So **ORDERED** this 11th day of April, 2025.

//s//
MATTHEW N. MCCALL, Colonel, USAF
Military Judge
Military Commissions Trial Judiciary

CUI